No. 23-7116

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

WILLIAM WHITE,

*Petitioner-Appellant*,

*v.*

WARDEN OF FEDERAL CORRECTIONAL INSTITUTION - CUMBERLAND,

*Respondent-Appellee*.

On Appeal from the United States District Court
for the District of Maryland, No. 22-cv-02371-DKC (Chasanow, J.)

## OPENING BRIEF FOR WILLIAM WHITE

JAMES WYDA
CLAIRE MADILL
PATRICIA L. RICHMAN
OFFICE OF THE FEDERAL
    PUBLIC DEFENDER
6411 Ivy Lane, Suite 710
Greenbelt, Maryland 20770
(301) 344-0600
Claire_Madill@fd.org

May 21, 2025

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................. iii

INTRODUCTION .........................................................................................1

JURISDICTION.............................................................................................5

ISSUES PRESENTED....................................................................................6

STATEMENT ................................................................................................6

     A.    First Step Act Time Credits........................................................6

     B.    Factual Background....................................................................12

     C.    Procedural History.....................................................................13

SUMMARY OF ARGUMENT ....................................................................15

STANDARD OF REVIEW ..........................................................................18

ARGUMENT ...............................................................................................18

I.    THE DISTRICT COURT ERRED IN CONCLUDING THAT BOP REGULATION 28
C.F.R. § 523.41 AND THE CORRESPONDING PROGRAM STATEMENT
PREVENTED PETITIONER FROM EARNING FIRST STEP ACT TIME CREDITS
WHILE AT A FEDERAL TRANSFER CENTER. .......................................18

     A.    The Government waived any objection. ...................................19

     B.    The district court erred in applying Chevron. ...................................20

     C.    Precluding prisoners from earning First Step Act credits
while in transit violates the FSA. ...................................22

     D.    The regulation did not apply. ...................................25

II.    FEDERAL PRISONERS POSSESS A DUE PROCESS INTEREST IN EARNING
FIRST STEP ACT TIME CREDITS. ...................................27

     A.    The Government waived any due process argument. .........................28

- i -

B.     Federal inmates have a protected liberty interest in earning FSA time credits.................................................................29

    1.    The Due Process Clause can protect rights created by statute. ....................................................................29

    2.    A two-step inquiry applies to analyzing whether a prisoner has a protected liberty interest. ...................................31

    3.    Applying the two-step inquiry, federal prisoners have a liberty interest in earning FSA time credits...................33

    4.    The district court's opinion is riddled with errors. ...................46

        a.    The district court did not apply the proper legal test. .................................................................46

        b.    The district court failed to recognize that FSA time credits shorten sentences. ..............................46

        c.    The district court erred in concluding that the so-called "conditional" nature of FSA time credits defeats a due process claim.........................49

CONCLUSION ...............................................................................................54

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD..........................56

CERTIFICATE OF COMPLIANCE....................................................................57

CERTIFICATE OF SERVICE ...........................................................................58

# TABLE OF AUTHORITIES

## Cases

*Adepoju v. Scales*, No. 3:25cv245, 2025 WL 1392287 (E.D. Va. May 14, 2025) ................................................................................................ passim

*Alicea v. Saad*, 761 F. App'x 168 (4th Cir. 2019) ....................................................5

*Anderson v. Recore*, 317 F.3d 194 (2d Cir. 2003) ............................................ passim

*Asquith v. Dep't of Corr.*, 186 F.3d 407 (3d Cir. 1999) .........................................42

*Bd. of Pardons v. Allen*, 482 U.S. 369 (1987) ........................................................38

*Black & Decker Corp. v. C.I.R.*, 986 F.2d 60 (4th Cir. 1993) ................................27

*Borker v. Bowers*, No. 24-10045-LTS, 2024 WL 2186742 (D. Mass. May 15, 2024) ................................................................................... 11, 12, 22

*Campbell v. Holt*, 432 F. App'x 49 (3rd Cir. 2011) ..................................................5

*Cardoza v. Pullen*, No. 3:22-CV-00591 (SVN), 2022 WL 3212408 (D. Conn. Aug. 9, 2022) ........................................................................................ passim

*Chambers v. Colorado*, 205 F.3d 1237 (10th Cir. 2000).........................................52

*Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837 (1984) ................................................................................................ passim

*Churuk v. Warden*, No. 3:24-CV-1306 (VDO), 2024 WL 4695839 (D. Conn. Oct. 21, 2024) .....................................................................................................24

*Clinkenbeard v. King*, No. 23-cv-3151, 2024 WL 4355157 (D. Minn. June 20, 2024) .....................................................................................................50

*Corrales v. Ricolcol*, No. 5:23-cv-01959-JGB-BFM, 2024 WL 5275574 (C.D. Cal. Jan. 10, 2024)............................................................................. 16, 23, 24, 26

*Dayton Power & Light Co v. Fed. Energy Regul. Comm'n*, 126 F.4th 1107 (6th Cir. 2025) .......................................................................................... 20, 21

*Deas v. Kohl*, No. 8:15CV35, 2015 WL 4601523 (D. Neb. July 29, 2015)............32

*Fiorito v. Fikes*, No. 22-CV-0749 (PJS/TNL), 2022 WL 16699472 (D. Minn. Nov. 3, 2022) ........................................................................................... passim

*Foucha v. Louisiana*, 504 U.S. 71 (1992)..................................................40

*Franklin v. Warden, F.C.I. Bennettsville*, No. 4:23-6591, 2024 WL 4046245 (D.S.C. Aug. 14, 2024) .......................................................................11

*Gale v. Warden FCI Milan*, No. 24-13127, 2025 WL 223870 (E.D. Mich. Jan. 16, 2025) ............................................................................................ 21, 23

*Gonzalez-Fuentes v. Molina*, 607 F.3d 864 (1st Cir. 2010) ................ 41, 42, 44, 48

*Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1 (1979) ... passim

*Guerriero v. Miami RRM*, 2024 WL 2017730 (11th Cir. May 7, 2024) ................43

*Henderson v. Harmon*, 102 F.4th 242 (4th Cir. 2024) ..................................... 18, 30

*Jackson v. Carlson*, 707 F.2d 943 (7th Cir. 1983)................................. 31, 35, 39, 51

*Jones v. Zych*, 812 F. App'x 115 (4th Cir. 2020) ......................................................18

*Kentucky Dep't of Corrs. v. Thompson*, 490 U.S. 454 (1989).......................... 31, 34

*Kim v. Hurston*, 182 F.3d 113 (2d Cir. 1999)..........................................................42

*Komando v. Luna*, 22-cv-425-SE, 2023 WL 310580 (D.N.H. Jan. 13, 2023) ..........7

*Kuzmenko v. Phillips*, No. 2:25-cv-00663-DJC-AC, 2025 WL 779743 (E.D. Cal. Mar. 10, 2025) ...................................................................................................36

*LaMar v. Ebert*, 756 F. App'x 245 (4th Cir. 2018) .................................................46

*Lexington Cnty. Hosp. v. Schweiker*, 740 F.2d 287 (4th Cir. 1984).......................27

*Lopatina v. United States*, 528 F. App'x 352 (4th Cir. 2013) .................................19

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ........................................20

*McQuillion v. Duncan*, 306 F.3d 895 (9th Cir. 2002) .............................................44

*Meachum v. Fano*, 427 U.S. 215 (1976)........................................................... 32, 42

*Mills v. Holmes*, 95 F. Supp. 3d 924 (E.D. Va. 2015).................................... passim

*Montgomery v. Anderson*, 262 F.3d 641 (7th Cir. 2001).................................. passim

*Morrissey v. Brewer*, 408 U.S. 471 (1972)...................................................... passim

*Neal v. Shimoda*, 131 F.3d 818 (9th Cir. 1997).....................................................52

*Nicoletti v. Bayless*, No. 24-6012, 2025 WL 80294 (4th Cir. Jan. 13, 2025)
 ...................................................................................... 5, 18, 21, 22

*Olim v. Wakinekona*, 461 U.S. 238 (1983) ............................................................42

*Paige v. Hudson*, 341 F.3d 642 (7th Cir. 2003).....................................................42

*Portley-El v. Brill*, 288 F.3d 1063 (8th Cir. 2002) ...................................................45

*Prieto v. Clarke*, 780 F.3d 245 (4th Cir. 2015)............................................ 30, 31, 37

*Ramirez v. Phillips*, No. 2:23-cv-02911-KJM-JDP, 2023 WL 8878993 (E.D. Cal.
 Dec. 22, 2023) ...........................................................................................10

*Rivera-Perez v. Stover*, 757 F. Supp. 3d 204 (D. Conn. 2024) ...............................36

*Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385 (4th Cir. 2014) ..............19

*Sandin v. Conner*, 515 U.S. 472 (1995)........................................................... passim

*Sharma v. Peters*, 756 F. Supp. 3d 1271 (M.D. Ala. 2024)....................................24

*Slezak v. Evatt*, 21 F.3d 590 (4th Cir. 1994)........................................................30

*Smith v. Collins*, 964 F.3d 266 (4th Cir. 2020).....................................................45

*Umejesi v. Warden*, No. 22-cv-251-SE, 2023 WL 4101471 (D.N.H. Mar. 16, 2023)
 ....................................................................................................................24

*United States v. Burke*, 694 F.3d 1062 (9th Cir. 2012) ..........................................44

*United States v. Bursey*, 416 F.3d 301 (4th Cir. 2005)..........................................27

*United States v. Davis*, 99 F.4th 647 (4th Cir. 2024)............................................28

*United States v. Diaz*, 865 F.3d 168 (4th Cir. 2017) .............................................28

*United States v. Fernandez*, 46 F.4th 211 (4th Cir. 2022).....................................19

- v -

*United States v. Griffiths*, 47 F.3d 74 (2d Cir. 1995)..................................................28

*United States v. Lee*, 827 F. App'x 274 (4th Cir. 2020) ...........................................28

*United States v. Linder*, 561 F.3d 339 (4th Cir. 2009) ............................................19

*United States v. Metzger*, 3 F.3d 756 (4th Cir. 1993)..............................................28

*United States v. Oprea*, No. 11-cr-64, 2023 WL 6958690 (D.N.H. Oct. 20, 2023) ..................................................................................................................................11

*United States v. Vandivere*, 88 F.4th 481 (4th Cir. 2023) .......................................40

*United States v. Venable*, 943 F.3d 187 (4th Cir. 2019)...........................................6

*Utah v. Su*, 109 F.4th 313 (5th Cir. 2024) ...............................................................22

*Valladares v. Ray*, 130 F.4th 74 (4th Cir. 2025)............................................. passim

*Van Loon v. Dep't of Treasury*, 122 F.4th 549 (5th Cir. 2024).............................20

*Vitek v. Jones*, 445 U.S. 480 (1980)................................................................ passim

*White v. United States*, 8 F.4th 547 (7th Cir. 2021)................................................19

*White v. Warden*, No. DKC-22-2371, 2023 WL 4867562 (D. Md. July 31, 2023) .....................................................................................................................................2

*Wilkinson v. Austin*, 545 U.S. 209 (2005)............................................. 30, 31, 34, 37

*Wilson v. Jones*, 430 F.3d 1113 (10th Cir. 2005) ................................. 30, 35, 38, 52

*Wolff v. McDonnell*, 418 U.S. 539 (1974) ...................................................... passim

*Young v. Harper*, 520 U.S. 143 (1997)................................................. 42, 45, 48, 51

## Statutes

18 U.S.C. § 3585.............................................................................................. 3, 22, 23

18 U.S.C. § 3621.................................................................................................. 25, 26

18 U.S.C. § 3624................................................................................................ passim

18 U.S.C. § 3632................................................................................................ passim

28 U.S.C. § 1291 .................................................................................5

28 U.S.C. § 2241 ........................................................................ passim

28 U.S.C. § 2253 .................................................................................5

## Other Authorities

164 Cong. Rec. S7838, 2018 WL 6693848 (daily ed. Dec. 19, 2018) (statement of Sen. Grassley) .........................................................................6

Ames C. Grawert & Patricia L. Richman, *The First Step Act's Prison Reforms*, Brennan Center for Justice (Sept. 23, 2022) ...........................................7

BLACK'S LAW DICTIONARY (12th ed. 2024) ...........................................26

Fed. Bureau of Prisons, *About Our Facilities*, https://www.bop.gov/about/facilities/residential_reentry_management_centers.jsp ....................................................................................45

Fed. Bureau of Prisons, *First Step Act of 2018 – Time Credits: Procedures for Implementation of 18 U.S.C. § 3632(d)(4)*, Program Statement 5410.01 (Nov. 18, 2022), *available at* https://www.bop.gov/policy/progstat/5410.01_cn2.pdf .........1

Fed. Bureau of Prisons, *FTC Oklahoma City*, https://www.bop.gov/locations/institutions/okl/ ...................................26

Fed. Bureau of Prisons, *Home Confinement*, Program Statement 7320.01, at 6 (Sept. 6, 1995), *available at* https://www.bop.gov/policy/progstat/7320_001_CN-1.pdf..............................43

Fed. Bureau of Prisons, *PATTERN Risk Assessment*, https://www.bop.gov/inmates/fsa/pattern.jsp ...................................52

Merriam-Webster.com Dictionary, Merriam-Webster, *available at* https://www.merriam-webster.com/dictionary/prison ........................26

Webster's II New College Dictionary 779 (2001)....................................25

## Regulations

28 C.F.R. § 523.41 ...................................................................... passim

28 C.F.R. § 550.55 .............................................................................50

**INTRODUCTION**

This case presents what should be a straightforward question: do federal inmates have a due-process-protected liberty interest in getting out of prison? The answer is obviously yes. Yet, the district court concluded otherwise.

The questions in this case stem from the First Step Act of 2018 ("FSA"). In the FSA, Congress created a new mandatory time-credit program for federal inmates. When doing so, Congress declined to give the Bureau of Prisons ("BOP") much discretion over administering those credits. Instead, Congress mandated that eligible prisoners *shall* earn FSA credits and, eventually, *shall* have those credits applied to early release. 18 U.S.C. § 3632(d)(4)(A), (C). The first 365 days of credits are applied to get an individual out of prison altogether. J.A.212, 230.[1] Any additional credits should be applied to release to a halfway house or home confinement. In short, a federal prisoner eligible to earn and have applied FSA credits is released from behind the prison walls into the community, and the BOP has no discretion to stop that from happening.

Petitioner William White, a federal prisoner, challenges the BOP's refusal to allow him to earn FSA credits for time he spent in a Federal Transfer Center. In

---

[1] The Joint Appendix contains the pertinent BOP Program Statement. J.A.210-33. At the time of this brief's filing, the Program Statement was also available online. Fed. Bureau of Prisons, *First Step Act of 2018 – Time Credits: Procedures for Implementation of 18 U.S.C. § 3632(d)(4)*, Program Statement 5410.01 (Nov. 18, 2022), *available at* https://www.bop.gov/policy/progstat/5410.01_cn2.pdf.

- 1 -

depriving White of those credits, the BOP invoked 28 C.F.R. § 523.41. That regulation states that an inmate cannot earn FSA time credits when they are in a "[d]esignation status outside the institution (e.g., for extended medical placement in a hospital or outside institution, an escorted trip, a furlough, etc.)." 28 C.F.R. § 523.41(c)(4)(ii); J.A.217.

White filed a 28 U.S.C. § 2241 petition challenging the denial of FSA credits. He argued that the regulation was contrary to the statute and that the BOP could not deny him this credit without affording him the minimum procedures mandated under the Due Process Clause. The Government did not respond to his transfer status or due process arguments.

The district court denied White's petition. Applying the since-overruled *Chevron* decision, the district court concluded that it had to defer to the BOP's regulation because it was "reasonable and reflects a 'permissible construction of the statute.'" J.A.192 (quoting *Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984)).[2] As to the constitutional issue, the district court concluded that White did not have a liberty interest protected by the Due Process Clause in FSA credits. On this point, the district court did not conduct its own legal analysis, but rather block quoted an out-of-district court decision that was issued

---

[2] The district court's opinion can also be found on Westlaw at *White v. Warden*, No. DKC-22-2371, 2023 WL 4867562 (D. Md. July 31, 2023).

- 2 -

before the publication of Program Statement 5410.01. J.A.194-95 (quoting *Fiorito v. Fikes*, No. 22-CV-0749 (PJS/TNL), 2022 WL 16699472 (D. Minn. Nov. 3, 2022)).

This Court should reverse.

The district court's statutory decision was wrong. The Government waived any response to White's transfer center argument. Further, the district court applied a legal framework—*Chevron*—that has since been overruled. Additionally, to the extent the regulation even applied to White's situation,[3] it contravenes the plain text of the FSA, which mandates that all eligible people earn FSA time credits any time after the date their sentence commences. 18 U.S.C. § 3632(d)(4)(B) (citing 18 U.S.C. § 3585(a)).

This Court should also reverse the district court's constitutional decision. The Government waived the right to contest the due process argument. On the merits, federal inmates do have a due-process-protected liberty interest in earning FSA credits. A protected liberty interest exists when (1) the government creates a reasonable expectation in some outcome (like early release due to time credits) and (2) the state or federal law affects when an individual will get out of prison, even if

---

[3] As discussed *infra*, the BOP's regulation applies to prisoners that are "outside [a BOP] institution," like in a hospital or on furlough, 28 C.F.R. § 523.41(c)(4)(ii). White was not "outside the institution" during the time in question, but rather in a BOP institution.

- 3 -

the transfer is to a less-restrictive form of custody like parole, electronic monitoring, or home confinement. FSA time credits satisfy both prongs. By dictating that eligible inmates "shall" earn FSA time credits that "shall" be applied to early release, 18 U.S.C. § 3632(d)(4)(A), (C), Congress created a "justifiable expectation" that eligible federal prisoners will earn FSA time credits, *Vitek v. Jones*, 445 U.S. 480, 489 (1980). And decisions about an individual's rate of earned FSA time credits affect when they will be released from prison, as the FSA mandates that all time credits for qualifying individuals be applied to early release, whether to supervision, a halfway house, or home confinement. 18 U.S.C. § 3624(g). Courts for decades have recognized the Due Process Clause attaches to prison decisions that affect whether an individual is going to get out of prison, including classification decisions regarding whether a person is eligible to earn time credits in the first place. *E.g.*, *Montgomery v. Anderson*, 262 F.3d 641 (7th Cir. 2001). Indeed, a district court in this Circuit recently agreed that the Due Process Clause applies to FSA time credits. *Adepoju v. Scales*, No. 3:25cv245, 2025 WL 1392287, at *11 (E.D. Va. May 14, 2025).

In reaching the opposite conclusion, the district court made numerous factual and legal errors. For example, the district court failed to apply the appropriate legal test—or really any test—for ascertaining the existence of a protected liberty interest. The district court also failed to recognize that the first 365 days of FSA time credits

- 4 -

automatically apply to an individual's early release, thus effectively shaving up to a year off a person's sentence. Further, the district court seemed to think that release to prerelease custody like a halfway house or home confinement did not implicate the Due Process Clause, but courts have regularly recognized that any prison decision affecting whether a prisoner can live "outside the walls of a prison facility" implicates due process. *Cardoza v. Pullen*, No. 3:22-CV-00591 (SVN), 2022 WL 3212408, at \*10 (D. Conn. Aug. 9, 2022); *see also Anderson v. Recore*, 317 F.3d 194, 200 (2d Cir. 2003).

This Court should reverse and remand with directions to grant White's habeas petition or, at the very least, to reconsider his petition under the correct legal standards.

## JURISDICTION

The district court had jurisdiction pursuant to 28 U.S.C. § 2241. "A federal prisoner may challenge the execution of his sentence, including the computation of his remaining prison term, by petitioning for habeas corpus under § 2241." *Alicea v. Saad*, 761 F. App'x 168, 170 (4th Cir. 2019); *e.g.*, *Valladares v. Ray*, 130 F.4th 74, 80 (4th Cir. 2025); *Nicoletti v. Bayless*, No. 24-6012, 2025 WL 80294 (4th Cir. Jan. 13, 2025).

This Court has jurisdiction under 28 U.S.C. § 1291 and 28 U.S.C. § 2253(a). *Valladares*, 130 F.4th 74; *Campbell v. Holt*, 432 F. App'x 49, 50 (3rd Cir. 2011).

## ISSUES PRESENTED

1. Whether the district court's decision upholding the Bureau of Prison's denial of First Step Act time credits to White for the time he spent in a federal transfer center:

   a. Wrongly applied the now-defunct *Chevron* standard;

   b. Violated with the plain language of the First Step Act, which dictates when prisoners start earning time credits and does not exclude time spent in a transfer center; and

   c. Ignored that the plain language of the regulation—preventing the earning of credits for time spent in "designation status outside the institution"—does not apply to White, who was always in a BOP institution while being transferred?

2. Whether federal inmates have a protected liberty interest in earning time credits under 18 U.S.C. § 3632(d)(4)(A).

## STATEMENT

This statement proceeds in three parts. First, it briefly outlines the FSA. Second, it describes the BOP's denial of FSA time credits to White. Finally, it discusses the procedural history of this case.

### A.    First Step Act Time Credits

Background: Described by a co-sponsor as "once-in-a-generation criminal justice reform," the FSA combined front-end sentencing reforms with back-end prison reforms to combat overincarceration, reduce recidivism, and enhance public safety.[4]

---

[4] 164 Cong. Rec. S7838, 2018 WL 6693848 (daily ed. Dec. 19, 2018) (statement of Sen. Grassley); *see also United States v. Venable*, 943 F.3d 187, 188 (4th Cir. 2019);

- 6 -

Relevant to this appeal, "[t]he First Step Act established a system of mandatory time credits for incarcerated individuals who participate in recidivism reduction programming[.]" *Valladares*, 130 F.4th at 77; *see also Komando v. Luna*, 22-cv-425-SE, 2023 WL 310580, at *1 (D.N.H. Jan. 13, 2023) ("The FSA . . . establishes . . . a new type of sentencing time credit."). This credit provides an "incentive to encourage prisoners to participate in programs to reduce the risk that they will recidivate, with one goal being the cost savings associated with reduced recidivism and the transfer of eligible prisoners from BOP facilities into prerelease custody or supervised release." *Komando*, 2023 WL 310580, at *3. FSA time credits are different from, and added on top of, the "good time" credits to which prisoners are already entitled. 18 U.S.C. § 3632(d)(6).[5]

Congress did not give the BOP much discretion over how FSA credits are earned. As detailed below, the FSA ***requires*** BOP to provide time-credit incentives, award those credits, and, ultimately, release prisoners when the statutory criteria are met.

---

Ames C. Grawert & Patricia L. Richman, *The First Step Act's Prison Reforms*, Brennan Center for Justice (Sept. 23, 2022).

[5] Good time credits are the 54-days-per-year reduction in sentence that federal prisoners can earn for good behavior. 18 U.S.C. § 3624(b).

Earning FSA Time Credits: With two exceptions not applicable here,[6] all federal prisoners are entitled to earn FSA credits. 18 U.S.C. § 3632(d)(4)(A). Qualifying individuals earn 10 or 15 days of credit for every 30 days of "successful participation in evidence-based recidivism reduction [EBRR] programming or productive activities [PAs]." *Id.*

The FSA "established a system of *mandatory* time credits." *Valladares*, 130 F.4th at 77 (emphasis added). "The award and computation of time credits is mandatory." *Id.* at 79. The FSA plainly states that eligible prisoners "*shall* earn time credits" and specifies the precise number of time credits a prisoner "*shall* earn" per month. 18 U.S.C. § 3632(d)(4)(A) (emphases added).

In recognition of its mandatory duty to award FSA time credits, BOP has "fully automated" the calculation of FSA time credits. J.A.223. FSA time credits "are auto-calculated based on 30-day increments in earning status" and "automatically uploaded to the Inmate Central File[.]" J.A.224-25.

Applying FSA Time Credits: Although every prisoner with a non-disqualifying offense and no final order of removal can *earn* FSA time credits, additional procedures govern the application of those credits to early release. *See*

---

[6] All federal prisoners earn FSA time credits except where the prisoner has (1) a disqualifying conviction or (2) a final order of removal. 18 U.S.C. § 3632(d)(4)(D)-(E). White does not fall into either of these exceptions. *See* J.A.23.

- 8 -

18 U.S.C. § 3624(g)(1). The FSA states that a prisoner is eligible for release where he has earned FSA time credits "in an amount that is equal to the remainder of the prisoner's imposed term of imprisonment." 18 U.S.C. § 3624(g)(1)(A); *see also* J.A.227. Additionally, only prisoners determined to be a "minimum or low recidivism risk" are automatically released early. 18 U.S.C. § 3624(g)(1)(D). In accordance with the FSA's directive that the Attorney General create a "risk and needs assessment system," *see* 18 U.S.C. § 3632(a), the Government has created an assessment called "PATTERN" categorizing a person's recidivism risk as minimum, low, medium, or high. J.A.221. The BOP *must* apply FSA credits for people categorized as minimum or low risk and who have maintained that risk level for at least two consecutive assessments and who have sufficient credits. 18 U.S.C. § 3624(g); 18 U.S.C. § 3632(d)(4)(C).[7]

The statute gives three options for early release. FSA time credits "shall be applied toward time in prerelease custody or supervised release." 18 U.S.C. § 3632(d)(4)(C). *Id.* "Prerelease custody" refers to two scenarios: (1) home confinement or (2) a "Residential Reentry Center" (RRC), *a.k.a.* a "halfway house."[8]

---

[7] Individuals with medium and high PATTERN scores can be released but, unlike those with lower PATTERN scores, they require warden approval. 18 U.S.C. § 3624(g)(1)(D)(i)(II).

[8] *See Rodriguez v. Smith*, 541 F.3d 1180, 1181 n.1 (9th Cir. 2008) ("[T]he parties both agree that RRCs were formally referred to as Community Correction Centers (CCCs) and are commonly known as 'halfway houses[.]'").

18 U.S.C. § 3624(g)(2)(A)-(B). In other words, the FSA requires the BOP to apply FSA credits toward a prisoner's early release to (1) supervision; (2) home confinement; or (3) an RRC. Although the statute authorizes three alternative options for early release, it still mandates that the credits *must* ("shall") be applied to one of these options. 18 U.S.C. § 3632(d)(4)(C); *see also* J.A.228 ("The First Step Act *requires* that, if an individual meets the criteria outlined in (c)(1), the credits *must* be applied[.]" (emphases added)). So, no matter what, a person with applied FSA credits gets out of prison early. *Ramirez v. Phillips*, No. 2:23-cv-02911-KJM-JDP, 2023 WL 8878993, at *4 (E.D. Cal. Dec. 22, 2023) ("In other words, while the BOP has discretion to determine the form of release, transfer to a non-prison setting is mandatory for eligible prisoners.").

The BOP's policies have cemented the FSA's early release requirement into specific expectations regarding the type of release. The FSA permits up to 365 days of credit to be applied to early release to supervision. 18 U.S.C. § 3624(g)(3). The BOP has promulgated policies that strengthens this option into an automatic benefit, directing that "up to 365 days of earned FTCs *will be automatically applied* to early release." J.A.212, 230 (emphasis added).[9] Additional FSA time credits above and

_____

[9] This assumes that the prisoner has supervised release following their prison sentence. White has a term of supervision. J.A.30, 37-41. Judges can amend a sentence to add supervised release to render a prisoner eligible for early FSA release.

- 10 -

beyond one year must be credited to prerelease custody (*i.e.*, home confinement or an RRC). *See* 18 U.S.C. § 3632(d)(4). For example, a prisoner who has earned 600 FSA time credits will have 365 days shaved off his sentence all together and should also enter home confinement or an RRC an additional 235 days before that. *E.g.*, *Franklin v. Warden, F.C.I. Bennettsville*, No. 4:23-6591, 2024 WL 4046245, at *2 (D.S.C. Aug. 14, 2024).

BOP Exclusions: The BOP's interpretation of "successful participation" in the FSA time credit program is at issue here. The FSA states that all eligible prisoners earn credits for every "day[]" of "successful participation" after a sentence commences. 18 U.S.C. § 3632(d)(4). Congress did not define "day" or "successful participation," but the BOP has promulgated regulations interpreting those terms. To be "successfully participating," an inmate need not *actually* engage in EBBRs or PAs, but rather only need to be *willing* to do so. "Under BOP's time credit regulations, inmates automatically earn one day of programming credits for each day that passes, without regard to program completion or the number of hours actually spent in any particular program or activity[.]" *Borker v. Bowers*, No. 24-10045-LTS, 2024 WL 2186742, at *2 (D. Mass. May 15, 2024) (citation omitted). In other words, "a 'willing and able' prisoner . . . accrue[s] FSA time credits automatically

---

*United States v. Oprea*, No. 11-cr-64, 2023 WL 6958690, at *3-4 (D.N.H. Oct. 20, 2023).

after the BOP's assessment process, even if he were not actually participating in, scheduled to begin, or waitlisted for any programming." *Id.* at *3 (emphasis omitted). The process is fully automatic: if an eligible prisoner is willing and able to participate in EBRRs or PAs, they accrue FSA time credits, regardless of whether they actually participate. *Id.* at *2-*3; *see also* J.A.223-24.

The BOP took the position, in both a regulation and a Program Statement, that an otherwise eligible inmate is not "successfully participating"—and thus does not get FSA time credits—if, *inter alia*, that inmate was in the Special Housing Unit ("SHU") or in "[d]esignation status outside the institution." 28 C.F.R. § 523.41(c)(4); J.A.217-18. The pertinent regulation states:

> (4) An eligible inmate . . . will generally not be considered to be "successfully participating" in EBRR Programs or PAs in situations including, but not limited to: . . .
>
> > (ii)    Designation status outside the institution (e.g., for extended medical placement in a hospital or outside institution, an escorted trip, a furlough, etc.).

*Id.*

## B.    Factual Background

Petitioner White is serving a 349-month federal prison sentence. J.A.30. If he receives all projected good time credits, and putting aside his FSA credits, his projected release date is in 2037. J.A.36. White is eligible to earn FSA time credits. J.A.23.

- 12 -

In 2022, White was moved from the Federal Correctional Institution in Terre Haute, Indiana to another institution in Cumberland. J.A.76, 78-79, 101. As a result, he was in the Federal Transfer Center – Oklahoma City from July 21, 2022 to July 25, 2022. *Id.* When calculating White's FSA time credits, the BOP refused to give him credit for the time he spent there. J.A.78-79, 176-77.

### C.     Procedural History

White's Habeas Petition:  White filed a *pro se* habeas petition under 28 U.S.C. § 2241 challenging the BOP's decision to deny him FSA time credits for the time he spent in the transfer center. J.A.4-10.  He argued that the BOP's interpretation of "successfully participating" to exclude this situation was wrong.  J.A.5-6, 8-9.  He also asserted that the BOP had deprived him of credit without procedural due process. J.A.7-9.  White sought a declaration that the BOP had deprived him of FSA time credits without due process and an order directing the BOP to restore those credits. J.A.9.

Government Response: Following an order to respond (J.A.13), the Government filed a motion to dismiss and, in the alternative, a motion for summary judgment. J.A.14-15.  The Government did not dispute White's recitation of the facts. J.A.176.  Nor did the Government respond to White's argument that he had a due process interest in FSA time credits or really defend the BOP's decision to deprive inmates from earning those credits while in transfer status. *See* J.A.15-27.

Instead, the Government raised three arguments for why the Court should deny White's habeas petition. First, the Government spilled the most ink on exhaustion. J.A.21-23. Second, the Government argued that while White was "*eligible* to receive Time Credits," he was not "*entitled* to the application of Time Credits" because, at the time of the habeas petition, White's PATTERN score was not minimum or low. J.A.23. Finally, the Government argued: "An Inmate housed in the SHU is not eligible to receive any Time Credit." J.A.25.[10]

The Ruling: The district court granted the Government's motion to dismiss and alternative motion for summary judgment. J.A.175-96.

First, the Court rejected the Government's exhaustion defense. It found material disputes of fact that precluded summary judgment on this ground. J.A.180-84.

However, the Court otherwise ruled against White. It rejected White's statutory argument that "successful participation" should include his time in the

---

[10] White also challenged the denial of credits for the time he spent in the SHU. Upon arriving in Cumberland, White spent nearly a month in the SHU for reasons outside of his control: there was inadequate bed space in the general population. J.A.76, 176. Originally, the BOP took the position that a person could not earn FSA credits while in the SHU but, while White's petition was pending, changed their position and awarded White credit for this time. J.A.147, 165-66. This did not moot White's case because the BOP continued to deny him credit for his time in transfer status. J.A. 175, 189-90.

- 14 -

Federal Transfer Center on deference grounds, so did not analyze the statutory text itself.  J.A.191-93.

The district court also cursorily addressed White's due process argument. J.A.193-95.  The court did not cite or apply the seminal cases regarding whether prisoners have a protected liberty interest, like *Wolff v. McDonnell*, 418 U.S. 539 (1974) or *Morrissey v. Brewer*, 408 U.S. 471 (1972).  J.A.193-95.  Instead, it block-quoted paragraphs from an unpublished, out-of-district opinion and curtly concluded that "[t]his analysis is sound" without elaboration.  J.A.195 (citing *Fiorito*, 2022 WL 16699472).

White timely appealed.  ECF 1; J.A.197-208.  This Court appointed undersigned counsel to represent White on appeal.  ECF 9-10.

## SUMMARY OF ARGUMENT

I.      The Court should reverse the district court's determination that White was not entitled to earn FSA time credits during the time he was incarcerated in the Federal Transfer Center for at least four reasons.

First, the Government waived any objection to White's challenge to the denial of FSA time credits while in transfer status.  While the Government responded to his argument related to his time in the SHU, the Government devoted only a single sentence to the transfer argument.  Such cursory and perfunctory briefing is insufficient to preserve an argument.

- 15 -

Second, the district court applied *Chevron* deference. *Chevron* was overruled. Courts now have an obligation to ascertain in the first instance the best meaning of a statute, not defer to the BOP's interpretation. Because the district court applied the wrong legal standard, reversal is warranted.

Third, to the extent BOP's regulation (and virtually identical Program Statement) excludes prisoners from earning time while in a Federal Transfer Center, it conflicts with the plain language of the First Step Act. Congress carefully laid out two limited circumstances in which prisoners cannot earn FSA time credits. 18 U.S.C. § 3632(d)(4)(B). Time spent in transfer custody is not one of the statutory exceptions. *Id.* "Congress left no room for the BOP to create additional exceptions from its mandate that earned time credit accrues except in [these] two limited circumstances." *Corrales v. Ricolcol*, No. 5:23-cv-01959-JGB-BFM, 2024 WL 5275574, at *5 (C.D. Cal. Jan. 10, 2024).

Fourth, assuming arguendo its validity, the regulation invoked to justify denying White his FSA time credits does not apply. The BOP relied on a regulation excluding prisoners from earning FSA time credits when in a "[d]esignation status outside the institution," like "extended medical placement in a hospital" or a "furlough." 28 C.F.R. § 523.41(c)(4)(ii). But White was in a BOP institution (a Federal Transfer Center), not "outside the institution."

- 16 -

II.    The Court should also reverse the district court's decision that prisoners do not have a protected liberty interest in earning FSA time credits.

First, the Government waived any argument about the Due Process Clause by failing to respond to it below.

Second, the Due Process Clause applies to the earning of FSA time credits. A protected liberty interest exists when (1) the Government has created a reasonable expectation among prisoners in some particular outcome or right, and (2) the Government's actions affect the duration of a sentence and, in particular, affect whether they will be able to live outside of the prison walls. FSA time credits satisfy both prongs. By using mandatory language, the FSA has created a legitimate expectation that qualifying individuals will earn FSA time credits. And FSA time credits affect whether a person is getting out of prison. Per the BOP Program Statement, those credits shave up to a year off of a prisoner's sentence—full stop. On top of that, FSA time credits also result in early release to a halfway house or home confinement. Even though a prisoner in such prerelease custody is still technically in the BOP's care, the movement from behind the prison walls to these alternative forms of "custody" still implicates the Due Process Clause.

The district court's decision concluding otherwise is riddled with legal and factual errors. Among other things, the district court did not recognize that FSA time credits result in early release (as the first 365 days of credit are applied to release

- 17 -

to supervision, not to other forms of BOP custody) and the district court failed to apply the proper legal test for analyzing the due process issue.

<div align="center">

**STANDARD OF REVIEW**

</div>

This Court reviews the denial of a § 2241 petition de novo. *Valladares*, 130 F.4th at 80; *Nicoletti*, 2025 WL 80294, at *1. Questions related to statutory interpretation, the existence of a protected liberty interest, and whether the district court applied the correct legal framework all are reviewed de novo. *Valladares*, 130 F.4th at 80; *Henderson v. Harmon*, 102 F.4th 242, 247 (4th Cir. 2024); *Jones v. Zych*, 812 F. App'x 115, 119 (4th Cir. 2020).

<div align="center">

**ARGUMENT**

</div>

**I.     The District Court Erred in Concluding that BOP Regulation 28 C.F.R. § 523.41 and the Corresponding Program Statement Prevented Petitioner from Earning First Step Act Time Credits While at a Federal Transfer Center.**

Below, Mr. White argued that he was entitled to earn FSA time credits during the time he was at the Federal Transfer Center. The district court rejected this argument, citing a BOP regulation preventing federal inmates from earning FSA time credits when in a "[d]esignation status outside the institution." J.A.191-93 (quoting 28 C.F.R. § 523.41(c)). Assuming that the Government even sufficiently preserved an objection to White's petition for FSA time credits for his stint in the

<div align="center">

- 18 -

</div>

transfer center, the district court erred in concluding this regulation precluded White from earning FSA time credits.

## A.    The Government waived any objection.

"[P]erfunctory and undeveloped arguments . . . are waived." *White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021); *see also Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396 n.* (4th Cir. 2014). In its response to White's petition, the Government argued against White's claim he was entitled to credits for his time in the SHU, but neglected White's transfer center argument. J.A.25-26. The heading of the pertinent section of the Government's response does not mention transfer status at all. J.A.25 ("An Inmate housed in the SHU is not eligible to receive any Time Credit"). Only a single sentence mentions the transfer argument: "Because Petitioner was in transfer status and in SHU status, he is precluded from receiving 33 days of credits. *See* 28 C.F.R. § 523.41(c)." J.A.26. A single sentence is insufficient to preserve an issue, even by the Government. *United States v. Fernandez*, 46 F.4th 211, 219 (4th Cir. 2022); *United States v. Ulysse*, 2024 WL 3874677, at *1 n.1 (4th Cir. Aug. 20, 2024); *see also Lopatina v. United States*, 528 F. App'x 352, 357 (4th Cir. 2013); *United States v. Linder*, 561 F.3d 339, 342 (4th Cir. 2009).

## B.    The district court erred in applying *Chevron*.

Assuming arguendo that the Government has not waived the statutory issue, at minimum, this Court should reverse and remand for further proceedings because, given that *Chevron* has been overruled, the district court did not apply the proper legal framework.

Below, the court did not engage with the merits of White's argument that BOP could not deprive him of FSA time credits during his time in transfer status. J.A.191-93. Rather, the district court concluded that the pertinent BOP regulation was "a permissible construction of the statute, and thus the BOP is entitled to *Chevron* deference." J.A.192.

*Chevron* is no longer the law. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024). Under *Chevron*, a court had to adhere to any permissible agency interpretation of an ambiguous statute, even if that reading of the statute was "suboptimal." *Dayton Power & Light Co v. Fed. Energy Regul. Comm'n*, 126 F.4th 1107, 1136 (6th Cir. 2025) (Nalbandian, J., concurring). Now, courts have an independent obligation to "determine the 'best' reading of a statute; a merely 'permissible' reading is not enough." *Van Loon v. Dep't of Treasury*, 122 F.4th 549, 563 (5th Cir. 2024) (citations omitted). Following *Loper Bright*, "the BOP's interpretation of ambiguous statutory language is no longer entitled to deference." *Gale v. Warden FCI Milan*, No. 24-13127, 2025 WL 223870, at *4 (E.D. Mich. Jan.

- 20 -

16, 2025); *see also Nicoletti*, 2025 WL 80294.  Thus, the district court applied an incorrect legal standard when it deferred to the BOP regulation without applying tools of statutory construction to assess whether BOP's interpretation was the "best" reading of the law.

The district court also purported to apply "*Skidmore*" deference, but it applied that doctrine incorrectly as well.  J.A.192-93.  "[T]he term '*Skidmore* deference' is, strictly speaking, a misnomer."  *Dayton*, 126 F.4th at 1135 (Nalbandian, J., concurring).  It's not actually "deference," but rather stands for the straightforward proposition that, if an agency has the best interpretation of a statute, a court can adopt that interpretation.  *Id.*  Here, however, the district court did not actually do any independent legal analysis, but rather brusquely concluded that the BOP's regulation "makes sense," so *Skidmore* deference applied.  J.A.193.  That was error; the district court was obliged to conduct its own legal analysis about the proper interpretation of the statute and decide independently if the BOP's interpretation warranted deference.  *See Nicoletti*, 2025 WL 80294, at *2 (reversing because "the district court did not examine the persuasiveness of the BOP's interpretation of its rule under *Skidmore*").  And, as explained below, far from having a persuasive interpretation, the BOP regulation violates the plain language of the FSA.

- 21 -

These applications of the wrong legal standards merit, at the very least, reversal and remand for reconsideration. *Nicoletti*, 2025 WL 80294, at *2; *Utah v. Su*, 109 F.4th 313, 318 (5th Cir. 2024).

### C. Precluding prisoners from earning First Step Act credits while in transit violates the FSA.

Putting aside the erroneous application of *Chevron*, the district court also erred because, to the extent the BOP regulation and corresponding Program Statement do exclude individuals in transfer status, that violates the First Step Act. A BOP regulation cannot "contravene[] the command of Congress." *Borker*, 2024 WL 2186742, at *2 (emphasis and citation omitted); *see also Valladares*, 130 F.4th at 83-85. Here, however, the BOP's regulation conflicts with Congress's command that individuals shall earn FSA time credits at all times of successful participation after their sentence commences.

The FSA specifies in clear terms when a prisoner starts earning FSA credits. It states that an individual "*shall*" earn FSA time credits for every day they successfully participate in EBBRs or PAs. 18 U.S.C. § 3632(d)(4)(A) (emphasis added). The statute then lists two—and only two—time-based exceptions. Individuals do not earn FSA credits for participation that occurred "(i) prior to the date of enactment of this subchapter; or (ii) during official detention prior to the date that the prisoner's sentence commences under section 3585(a)." 18 U.S.C. § 3632(d)(4)(B). The cross-referenced statute, in turn, defines "commences" as "the

- 22 -

date the defendant is received in custody awaiting transportation to . . . the official detention facility at which the sentence is to be served." 18 U.S.C. § 3585(a). In other words, Congress mandated that all individuals start earning FSA time credits either on the date the statute was enacted (*i.e.*, December 21, 2018) if they were already incarcerated; otherwise, they start earning on the date they are taken into custody.

Courts have repeatedly rejected the BOP's attempt to add additional exceptions to this plain language. For example, the BOP has taken the position that a newly sentenced individual "is eligible to start accruing earned time credit when she *arrives* at the facility to which she has been designated," which can be months or years after the individual enters custody. *Corrales*, 2024 WL 5275574, at *1; *see also Gale*, 2025 WL 223870, at *1. District courts have resoundingly rejected this position as "contradict[ing] the plain language of the statute," which directs that an inmate shall start earning credits when his sentence "commences" under 18 U.S.C. § 3585(a). *Corrales*, 2024 WL 5275574, at *1; *see also Gale*, 2025 WL 223870, at *4 (collecting cases). As one district court explained: "Congress has made mandatory that individuals receive earned time credits for their qualifying programming, and has delineated the limited time frames during which such credits will not accrue," *i.e.*, before the enactment of the FSA and before the date of sentencing. *Corrales*, 2024 WL 5275574, at *4. "Congress left no room for the

- 23 -

BOP to create additional exceptions from its mandate that earned time credit accrues except in [these] two limited circumstances." *Id.* at *5.

That same reasoning applies here. In denying White credit, the BOP created a third exclusionary time frame that is simply not in the statute: when a prisoner is in transfer status. But the BOP may not rewrite the statute.

Indeed, some district courts have already recognized as much. For example, in *Sharma*, the BOP had invoked 28 C.F.R. § 523.41 to claim a prisoner was ineligible to earn FSA time credits "during the time the BOP considered him in transfer or administrative detention status." *Sharma v. Peters*, 756 F. Supp. 3d 1271, 1280 (M.D. Ala. 2024). The district court, relying on the same reasoning invoked by courts that rejected the BOP's claim that prisoners cannot earn FSA credits until they reach their designated facilities, rejected this interpretation. As the court explained, the FSA "unambiguously addresses the question of when an inmate is eligible for FSA credits," and that is "the date the inmate is sentenced and committed to custody of the BOP." *Id.* at 1281 (citations omitted). The BOP's regulation excluding time in transfer status "adds a layer of eligibility not found in the statute" and thus "conflicts with its express language." *Id.* at 1282; *see also Umejesi v. Warden*, No. 22-cv-251-SE, 2023 WL 4101471, at *2, *4 (D.N.H. Mar. 16, 2023); *see also Churuk v. Warden*, No. 3:24-CV-1306 (VDO), 2024 WL 4695839, at *2 (D. Conn. Oct. 21, 2024) (agreeing with inmate that the FSA "does not bar him from

- 24 -

earning credits while on writs or in transit," but concluding inmate was otherwise ineligible to earn credits because he was subject to a final order of removal).

Confirmation that Congress intended for all successfully participating federal prisoners to earn FSA time credits at all times after the enactment of the statute or their sentencing comes from 18 U.S.C. § 3621(h)(6). That statute dictates that "[t]he Director of the Bureau of Prisons *shall* provide *all* prisoners with the opportunity to actively participate in evidence-based recidivism reduction programs or productive activities, according to their specific criminogenic needs, ***throughout their entire term of incarceration***." 18 U.S.C. § 3621(h)(6) (emphases added). Again, this makes clear that Congress wants all federal inmates, at all times after their sentence commences, to be eligible to earn FSA time credits.

## D.    The regulation did not apply.

Finally, the BOP's view suffers from an even more fundamental problem: the text of the BOP regulation does not apply to White.

The BOP invoked a regulation precluding credits for time spent in "[d]esignation status outside the institution" to deny White credits for the time he spent in transfer status. 28 C.F.R. § 523.41(c)(4)(ii). But White was not "outside the institution" when he was in the transfer center. "Outside" means "[t]he space beyond a boundary or confining structure." Webster's II New College Dictionary 779 (2001). A "prison" is "an institution . . . for confinement of persons convicted

- 25 -

of serious crimes." Merriam-Webster.com Dictionary, Merriam-Webster, *available at* https://www.merriam-webster.com/dictionary/prison. And Black's defines a "federal prison" as "[a] prison that is operated and managed by a national or federal government; esp., in the United States, one run by the Federal Bureau of Prisons for incarcerating those convicted of federal crimes." *Prison*, BLACK'S LAW DICTIONARY (12th ed. 2024). Thus, a "designation status outside the institution" suggests someone who is physically exterior to a building or property owned and operated by the BOP. The Federal Transfer Center in Oklahoma City is owned and operated by the BOP,[11] and seemingly offers the productive activities needed to earn FSA credits.[12] And White was inside it. Thus, White was not "outside the institution" during the pertinent period, and the regulation does not apply.

The examples of "outside the institution" provided in the BOP regulation confirm this reading. "[W]here general words follow specific words . . . , the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *United States v. Bursey*, 416 F.3d

---

[11] Fed. Bureau of Prisons, *FTC Oklahoma City*, https://www.bop.gov/locations/institutions/okl/.

[12] *Corrales*, 2024 WL 5275574 ("Productive activities' includes a broad range of activities, many of which the BOP says are available at all BOP institutions." (cleaned up)); *see also* 18 U.S.C. § 3621(h)(6) (requiring the BOP to provide "all prisoners with the opportunity to actively participate in evidence-based recidivism reduction programs or productive activities . . . throughout their entire term of incarceration").

301, 307 (4th Cir. 2005) (citation omitted); *see also Black & Decker Corp. v. C.I.R.*, 986 F.2d 60, 64 (4th Cir. 1993) ("Regulations, like statutes, are interpreted according to canons of construction."); *Lexington Cnty. Hosp. v. Schweiker*, 740 F.2d 287, 290 (4th Cir. 1984) (applying this ejusdem generis principle to interpret a regulation). Here, the general term "[d]esignation status outside the institution" is followed by specific examples, including "extended medical placement in a hospital or outside institution," "an escorted trip," and "a furlough."   28 C.F.R. § 523.41(c)(4)(ii). Those specific terms share an essential feature: they all refer to situations where a prisoner is physically located somewhere other than a BOP facility.  That does not describe White while in the Federal Transfer Institution.

\* \* \*

Once in BOP custody, the FSA mandates that eligible inmates accrue FSA time credits.  The FSA contains no carveouts for when an individual is in transfer status.  Thus, the BOP regulation purportedly excluding inmates from FSA time credits while in transfer status violates the FSA and cannot stand.  This Court should reverse the denial of White's § 2241 petition.

## II.    Federal Prisoners Possess a Due Process Interest in Earning First Step Act Time Credits.

Not only did the BOP violate White's rights by invoking an inapplicable regulation that (as read by the BOP) violates the plain text of the FSA, but it also deprived White of FSA time credits without any due process.

- 27 -

Below, the district court concluded that the Due Process Clause did not apply because White did not have a protected liberty interest in earning FSA time credits. This was erroneous. The Government waived any objection to White's due process claim. And federal inmates *do* have a protected liberty interest in FSA time credits.

## A.    The Government waived any due process argument.

Waiver and forfeiture rules apply to the Government. *United States v. Davis*, 99 F.4th 647, 653 n.2 (4th Cir. 2024); *United States v. Lee*, 827 F. App'x 274, 276 n.* (4th Cir. 2020) (issue forfeited where "the Government offer[ed] no argument in support" of its argument); *United States v. Diaz*, 865 F.3d 168, 179 (4th Cir. 2017) (Government's "meager submission" did not preserve argument); *United States v. Metzger*, 3 F.3d 756, 757 (4th Cir. 1993); *United States v. Griffiths*, 47 F.3d 74, 77 (2d Cir. 1995).

White clearly raised a due process argument below. He argued that "Due Process protections . . . must be extended to a federal prisoner before he may be deprived of good time credits under any name, including [FSA time credits]." J.A.8. He cited seminal due process cases, like *Wolff*, 418 U.S. 539, and *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1 (1979). J.A.6-8. He articulated the procedural process protections that should attach to FSA time credit decisions, like a notice and hearing. J.A.8. That this argument was obviously raised is reflected

- 28 -

in the district court's order, which specifically addressed White's due process argument. J.A.193-95.

Yet, the Government did not even *attempt* to respond to White's due process argument. Its motion to dismiss/for summary judgment does not even use the term "due process," let alone specifically argue that White lacked a protected liberty interest in FSA time credits. J.A.14-27. White even flagged the failure to address the due process argument (J.A.155), yet the Government still neglected to mention due process (J.A.140-48, 165-66). The Court should conclude that the Government waived or forfeited any argument that White does not have a due process right to FSA time credits.

### B.    Federal inmates have a protected liberty interest in earning FSA time credits.

Even if the Government had not waived objection to White's due process claim, the Court should still reverse. The Due Process Clause protects individuals' ability to earn FSA time credits. That is because the FSA, especially in conjunction with the BOP's implementation of that statute, creates a reasonable expectation in earning FSA time credits, and the earning of those credits results in an individual's release from behind prison walls.

#### 1.    *The Due Process Clause can protect rights created by statute.*

Under the Fifth and Fourteenth Amendment Due Process Clauses, individuals may not be deprived of life, liberty, or property without due process of law. *Wolff*,

- 29 -

418 U.S. at 556. To state a due process claim, a plaintiff must first "identify a protected liberty or property interest." *Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015); *see also Henderson*, 102 F.4th at 247. Where an individual has sufficiently identified a protected liberty interest, he cannot be deprived of that interest without the minimum protections of procedural due process. *See Slezak v. Evatt*, 21 F.3d 590, 593 (4th Cir. 1994).[13] Given the district court's ruling, this case only presents the first question—whether White sufficiently alleged a protected liberty interest.

A liberty interest can derive from two places. It can arise under the Due Process Clause directly. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). Or it can be created by law. *Id.* For example, although the Supreme Court has held there is no inherent right to parole under the Due Process Clause, if the state or federal government grants that right, then "due process protections attach to the decision to revoke parole." *Vitek*, 445 U.S. at 488 (citing *Morrissey*, 408 U.S. 471). Similarly, the Supreme Court has held that while "the Constitution itself does not guarantee good-time credit for satisfactory behavior while in prison," where the government "has not only provided a statutory right to good time but also specifies that it is to

---

[13] Those minimum requirements include advanced written notice, an opportunity to respond, including the ability to call witnesses and present evidence, a written statement of explanation from the decisionmaker, and evidence supporting the decision. *Henderson*, 102 F.4th at 248; *Wilson v. Jones*, 430 F.3d 1113, 1117 (10th Cir. 2005). White received no process whatsoever when being deprived of FSA time credits.

be forfeited only" under specified circumstances (like "serious misbehavior"), the Constitution prohibits the denial or removal of good-time credits without affording procedural due process. *Wolff*, 418 U.S. at 557; *see also Jackson v. Carlson*, 707 F.2d 943, 947 (7th Cir. 1983) (recognizing that due process applies to federal good-time credits).

> ### 2.    A two-step inquiry applies to analyzing whether a prisoner has a protected liberty interest.

This case is about whether the FSA, as implemented by the BOP, has created a due-process-protected liberty interest in earning FSA credits. A two-prong test applies to answer that question. *Anderson*, 317 F.3d at 195, 199-200; *Adepoju*, 2025 WL 1392287, at *10; *Mills v. Holmes*, 95 F. Supp. 3d 924, 932 (E.D. Va. 2015).

First, a court should address the "threshold question" of whether the state (or, in this case, the federal government) created a right or interest. *Prieto*, 780 F.3d at 249 (quoting *Wilkinson*, 545 U.S. at 221). To answer this, courts look at the pertinent statutes, regulations, and official practice to ascertain whether the government created an "right or expectation" in some outcome. *Anderson*, 317 F.3d at 195. Where a statute uses mandatory language and limits the government's discretion to withhold some right or benefit, this prong is satisfied. *Mills*, 95 F. Supp. 3d at 932; *see also Kentucky Dep't of Corrs. v. Thompson*, 490 U.S. 454, 463 (1989).

Second, even if there is a statutorily created right, that right must be of a sufficient "nature" to trigger due process protection. This prong can be satisfied by

- 31 -

showing *either* (a) that the government's actions affected the duration of the sentence *or* (b) that the statute or regulation imposes an atypical or significant hardship on the inmate in relation to the ordinary incidents of prison life. *Sandin v. Conner*, 515 U.S. 472, 486-87 (1995); *Adepoju*, 2025 WL 1392287, at *10; *Mills*, 95 F. Supp. 3d at 932-33; *Deas v. Kohl*, No. 8:15CV35, 2015 WL 4601523, at *3 (D. Neb. July 29, 2015).

This two-pronged test follows directly from Supreme Court precedent. For decades, the Supreme Court's test for state- or federally- created liberty interests focused solely on whether the law used discretionary or mandatory language (*i.e.*, the first prong of this test). *See Sandin*, 515 U.S. at 479-80. For example, the Court held that the Due Process Clause did not apply to decisions to transfer an individual from a medium- to maximum-security facility because the prison had complete discretion to effectuate transfers—they could transfer a prisoner "for whatever reason or for no reason at all." *Meachum v. Fano*, 427 U.S. 215, 228-29 (1976). Contrarily, the Court held that the Due Process Clause did apply to Nebraska's parole scheme because state law mandated an individual's release on to parole unless certain conditions applied, thus "creat[ing] a protectible expectation of parole." *Greenholtz*, 442 U.S. at 11-12.

The Supreme Court's decision in *Sandin* added the second prong to the liberty interest test. In particular, *Sandin* held that a protected liberty interest did not arise

- 32 -

simply because the law used mandatory language. 515 U.S. at 482-84. Rather, the Court held that a court should also look at "the nature of the deprivation" to make sure that the law at issue implicated the Due Process Clause's core interests of life, liberty, and property. *Id.* at 481-84. The Court explained that this requirement would be satisfied "where the State's action will inevitably affect the duration of his sentence," in other words, where the State action would cause a prisoner's sentence to "exceed . . . in . . . duration" what it otherwise would. *Id.* at 486-87. Or, for prison restrictions that did not affect the length of sentence (*i.e.*, conditions of confinement claims), the Due Process Clause might still attach, but only where the restriction "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484.

But "*Sandin* did not dispense with [the requirement of] statutory or regulatory language creating an entitlement." *Anderson*, 317 F.3d at 199; *see also Adepoju*, 2025 WL 1392287, at *10; *Mills*, 95 F. Supp. 3d at 932. That analysis is still necessary to analyze whether the state or federal law has actually created a right. *Sandin* added only the additional "nature of the deprivation" gloss, hence creating, in effect, a two-pronged test for ascertaining liberty interests.

        3.     *Applying the two-step inquiry, federal prisoners have a liberty interest in earning FSA time credits.*

Turning to the application of this two-prong standard, FSA time credits obviously satisfy the legal test for protected liberty interests. The FSA uses

- 33 -

mandatory, discretion-limiting language that creates a clear expectation in earning FSA credits. And FSA credits implicate "the real concerns undergirding the liberty protected by the Due Process Clause," *Sandin*, 515 U.S. at 483, namely, freedom from incarceration behind prison walls. When FSA credits apply, a prisoner gets out of prison early, either to supervised release, home confinement, or an RRC. As a district court in this Circuit recently concluded, *see Adepoju*, 2025 WL 1392287, at \*10-\*11, this Court should hold that federal prisoners have a constitutionally protected liberty interest in FSA time credits.

1.    The first prong is satisfied because the FSA, plus the implementing regulations, program statement, and BOP practice, have created a real right or expectation in earning (and applying) FSA time credits.

The pertinent question under this prong is whether the law at issue creates a reasonable or justifiable expectation of some right or benefit. *Wilkinson*, 545 U.S. at 221; *Vitek*, 445 U.S. at 489. "Unilateral expectations and hopes for early release do not" satisfy this prong. *Montgomery*, 262 F.3d at 644. But, where the government "gives prisoners more than a subjective hope of receiving . . . credit," then the Due Process Clause is triggered. *Id.* at 645; *see also Thompson*, 490 U.S. at 463; *Vitek*, 445 U.S. at 490-91.

This requirement is satisfied where a statute or regulation speaks in mandatory language such as "shall" and limits official discretion. *Thompson*, 490 U.S. at 463;

- 34 -

*Adepoju*, 2025 WL 1392287, at \*10; *Mills*, 95 F. Supp. 3d at 932. For example, the Seventh Circuit concluded that a federal statute created a liberty interest in good-time credits where the statute stated that "if the prisoner complies with the requirement of good behavior he 'shall be entitled' to time off at a stated rate." *Jackson*, 707 F.2d at 947. "This is the language of rights rather than of privileges, and if the government violates this right it deprives the prisoner of his liberty within the meaning of the Constitution." *Id.* Similarly, that court held that a prisoner could challenge a prison's decision affecting his credit-earning class under the Due Process Clause because the laws at issue had created an "entitlement" and "curtail[ed] administrators' discretion," thus "giv[ing] prisoners more than a subjective hope of receiving . . . credit." *Montgomery*, 262 F.3d at 645; *see also Wilson v. Jones*, 430 F.3d 1113, 1120-21 (10th Cir. 2005). And, in *Wolff*, the United States Supreme Court held the Due Process Clause applied to good-time credits because the State had "created the right to good time" and had "itself recogniz[ed] that its deprivation" was "authorized" only under specified circumstances (*i.e.*, "major misconduct"). 418 U.S. at 557.

The FSA uses mandatory, discretion-limiting, and expectation-creating language. Under the statute, the BOP *must* award FSA time credits and then apply them to early release. As this Court explained in *Valladares*, the FSA "established a system of mandatory time credits" and "[t]he award and computation of time

- 35 -

credits is mandatory." 130 F.4th at 77, 79. The FSA says eligible prisoners "*shall* earn time credits," that they "*shall* earn" them at a specified rate, and that these credits "*shall* be applied[.]" 18 U.S.C. § 3632(4)(A), (C) (emphases added). In short, the FSA uses "mandatory language *requiring* release from prison." *Rivera-Perez v. Stover*, 757 F. Supp. 3d 204, 213 (D. Conn. 2024); *see also Kuzmenko v. Phillips*, No. 2:25-cv-00663-DJC-AC, 2025 WL 779743, at *5 (E.D. Cal. Mar. 10, 2025) ("[T]he BOP does not have the discretion to exclude an eligible prisoner from having his earned time credits applied under the FSA, because the FSA language in 18 U.S.C. § 3632(d)(4)(C) is mandatory.").

The BOP itself has recognized the mandatory and expectation-creating nature of FSA time credits. The pertinent Program Statement recognizes that "[t]he First Step Act *requires* that, if an individual meets the criteria outlined in (c)(1), the credits *must* be applied[.]" J.A.210 (emphases added). There is no discretion, as the calculation of FSA time credits "is fully automated," with credits "auto-calculated" and "automatically uploaded." J.A.223-25.

The BOP has further limited discretion and created an expectation in how the credits will be applied. The first 365 days of credits are applied to early release to supervision. J.A.212, 230. Any additional FSA time credits should be credited to prerelease custody (*i.e.*, home confinement or halfway house). 18 U.S.C. §§ 3632(d)(4)(A), (d)(4)(C), 3624(g).

- 36 -

A district court recently found this prong satisfied in the FSA context. *Adepoju*, 2025 WL 1392287, at \*10-\*11. There, a federal inmate had been released to a halfway house due to his FSA time credits but, in violation of the statute, was rearrested. *Id.* at \*2, \*8-\*10. The district court concluded that the first prong of the two-part protected liberty interest test was satisfied (and ultimately found a due process violation), explaining that "[a]s an FSA-eligible prisoner," the petitioner "had an objective expectation in his placement in a residential reentry center following his accrual of time credits under the FSA." *Id.* at \*11.

Contrary to the district court's implication otherwise,[14] the fact that the FSA gives the BOP *some* discretion not does not mean Mr. White does not have a real expectation in earning FSA credits. In particular, the fact that the BOP has discretion to apply FSA credits to either early release to supervision or prerelease custody does not eliminate due process protection. For one, although the FSA does give BOP the ability to choose where among three choices to apply FSA time credits, 18 U.S.C. § 3632(d)(4)(C), the BOP itself has created a clear expectation that the first year of credit will be credited toward early release. J.A.212, 230.[15]

---

[14] J.A.194 (quoting *Fiorito*, 2022 WL 16699472, at \*5).

[15] A government-created liberty interest can be derived not only from the statute itself, but also implementing regulations or "official penal complex practice." *Vitek*, 445 U.S. at 489; *see also Prieto*, 780 F.3d at 249 (noting a liberty interest can "arise from state policies or regulations" (quoting *Wilkinson*, 545 U.S. at 222)).

- 37 -

In any event, "the presence of official discretion in this sense is not incompatible with the existence of a liberty interest[.]" *Bd. of Pardons v. Allen*, 482 U.S. 369, 376 (1987). The government has consistently been found "to create liberty interests in the expectation of early release even where the statute at issue 'afforded plenty of discretion' to prison administrators." *Wilson*, 430 F.3d at 1121 (quoting *Montgomery*, 262 F.3d at 645); *e.g.*, *Vitek*, 445 U.S. at 489-91; *Greenholtz*, 442 U.S. at 11-12; *Allen*, 482 U.S. at 375-76; *Morrissey*, 408 U.S. at 479-80, 483-84; *Montgomery*, 262 F.3d at 645. For example, in *Greenholtz*, the Supreme Court applied the Due Process Clause to Nebraska's parole statute, even though that statute gave the Board of Parole substantial discretion to deny parole. 442 U.S. 1. The statute at issue required the release of eligible prisoners (stating that the Board of Parole "shall order his release"), but then provided four exceptions that permitted substantial discretion. *Id.* at 11. The Board could deny parole, for example, if it determined that there was "a substantial risk that [the prisoner] will not conform to the conditions of parole" or "release would depreciate the seriousness of his crime or promote disrespect for law." *Id.* at 11. But the existence of this discretion over parole decisions did not negate the application of the Due Process Clause. *Id.* at 12. The Court reached the same conclusion in *Morrissey*, holding the Due Process Clause applied to parole revocation decisions even though parole officers typically have "broad discretion" to determine whether there was a violation of "quite vague

- 38 -

conditions." 408 U.S. at 479, 483-84. Here, although the FSA gives the BOP discretion over whether to apply FSA time credits to supervised release or prerelease custody, it still creates an expectation that those credits will be earned and applied to *some* form of early release.

* * *

"[I]f the government creates . . . a firm expectation that if the prisoner complies with specified conditions he will automatically earn the credits and be released earlier[,] a deprivation of that right is a deprivation of liberty." *Jackson*, 707 F.2d at 946. That is precisely what the FSA does. *Adepoju*, 2025 WL 1392287, at *11. By using mandatory language and substantially limiting the BOP's discretion, the FSA "convey[s] more than a subjective hope" in credits. *Montgomery*, 262 F.3d at 645. It creates a firm right and expectation that, if an eligible prisoner successfully participates in the FSA time credit program, they will earn credits that will be automatically applied to early release, whether to supervised release or prerelease custody. Thus, this prong of the legal test for statutorily created liberty interests is satisfied.

2.      The second prong of the due-process test is also satisfied because "the nature of the deprivation" is of the type that triggers due process protection. *Sandin*, 515 U.S. at 481; *see also Adepoju*, 2025 WL 1392287, at *10-*11. FSA time credits qualify because: (1) they affect the duration of the sentence; (2) the FSA requires, at

minimum, release to home confinement or to an RRC, and due process applies to any law that affects whether a prisoner will "live outside the walls of a prison facility," *Cardoza*, 2022 WL 3212408, at *10; and (3) incarceration constitutes an "atypical and significant hardship" relative to prerelease custody, *Adepoju*, 2025 WL 1392287, at *11.

*First*, this second prong of the legal test is satisfied because FSA time credits shorten a federal prisoner's sentence.

A liberty interest is of a sufficient nature to implicate the Due Process Clause when it affects the duration of a sentence. *Sandin*, 515 U.S. at 486-87; *Wolff*, 418 U.S. at 557. This makes sense, since "[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause." *United States v. Vandivere*, 88 F.4th 481, 491 (4th Cir. 2023) (quoting *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)).[16]

FSA time credits fall within this category. Although the FSA gives the option of having FSA credits applied either to early release or prelease custody, BOP mandates that the first 365 days of credit get applied to early release to supervision. J.A.212, 230. In short, the FSA and BOP Program Statement clearly provide that

---

[16] Where this liberty interest is implicated, an incarcerated person need not also demonstrate the additional *Sandin* requirement of an "atypical and significant hardship." *See Montgomery*, 262 F.3d at 644; *Mills*, 95 F. Supp. 3d at 932-33 & n.6.

the time credits reduce the prisoner's prison term—precisely the type of liberty interest that the Due Process Clause protects.

*Second*, even if BOP decided tomorrow to stop applying FSA time credits to early release to supervision, the "prerelease" component of the FSA independently satisfies the second prong of the applicable due process test. Prerelease custody results in the release of individuals from the confines of the prison walls, and thus is of a nature to implicate due process.

Courts have adopted a bright-line rule that, once an individual is "liv[ing] outside the walls of a prison facility," that is of a sufficient nature to trigger due process protections, even if the release would be to another form of so-called "custody." *Cardoza*, 2022 WL 3212408, at *10. "[O]nce the State has given an inmate the freedom to live outside an institution, it cannot take that right away without according the inmate procedural due process." *Anderson*, 317 F.3d at 200. Regardless of what other restrictions may attach to prerelease custody, "[t]he freedoms inherent in [an] outside-of-prison arrangement" are substantial. *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 888 (1st Cir. 2010); *see also Morrissey*, 408 U.S. at 482. Applying this bright-line rule, courts have held that due process protections

- 41 -

apply to decisions affecting: (1) "preparole";[17] (2) work release;[18] (3) release to electronic monitoring;[19] and (4) home confinement.[20]

This bright-line rule follows from Supreme Court precedent. The Court has *always* found a protected liberty interest where the prison regulation impacts whether a person will be inside or outside of the prison walls, even where a government maintains some custody or control over the individual. *E.g.*, *Morrissey*, 408 U.S. 471 (parole revocation)*, Wolff*, 418 U.S. 539 (good-time credits)*, Greenholtz*, 442 U.S. 1 (parole eligibility); *Vitek*, 445 U.S. 480 (transfer to mental hospital); *Young v. Harper*, 520 U.S. 143 (1997) (preparole). Those cases that have declined to find a protected liberty interest have all involved *intra*-prison transfers, like a transfer from a medium to maximum security prison (*Meachum*, 427 U.S. 215), a prison in one state to another (*Olim v. Wakinekona*, 461 U.S. 238 (1983)) or general population to disciplinary segregation (*Sandin*, 515 U.S. 472).

Application of this bright-line rule here means due process attaches to FSA time credits. If the BOP does not outright release a federal prisoner to supervision, then it must apply the credits to a prisoner's release to "prerelease custody," either a

---

[17] *Young v. Harper*, 520 U.S. 143 (1997).

[18] *Anderson*, 317 F.3d 194; *Kim v. Hurston*, 182 F.3d 113 (2d Cir. 1999). *But see Asquith v. Dep't of Corr.*, 186 F.3d 407 (3d Cir. 1999).

[19] *Gonzalez-Fuentes*, 607 F.3d 864.

[20] *Paige v. Hudson*, 341 F.3d 642 (7th Cir. 2003).

halfway house or home confinement. 18 U.S.C. § 3632(d)(4)(C); 18 U.S.C. § 3624(g). Both options "give[] an inmate the freedom to live outside an institution," *Anderson*, 317 F.3d at 200, and ultimately "reduce incarceration time," *Guerriero v. Miami RRM*, 2024 WL 2017730, at \*2 (11th Cir. May 7, 2024). Thus, the Due Process Clause applies. Indeed, the BOP has implicitly conceded as much, as its home confinement Program Statement requires conformance with "the 'due process' criteria of *Wolff v. McDonnell*."[21]

*Third*, assuming arguendo that *Sandin*'s "atypical and significant hardship" standard even applies, it is satisfied here. As the district court in *Adepoju* explained in the FSA context, "[]incarceration impose[s] 'an atypical and significant hardship' relative to . . . serving [a] sentence in a residential reentry center." 2025 WL 1392287, at \*11.

Petitioner maintains that *Sandin*'s "atypical and significant hardship" test does not apply here. That standard only applies to "sanctions such as segregation that do not affect the length of incarceration," *Montgomery*, 262 F.3d at 644, *i.e.*, "conditions of confinement" claims, *Mills*, 95 F. Supp. 3d at 933 ("*Sandin*'s 'atypical and significant hardship' inquiry applies only to cases challenging conditions of

---

[21] Fed. Bureau of Prisons, *Home Confinement*, Program Statement 7320.01, at 6 (Sept. 6, 1995), *available at* https://www.bop.gov/policy/progstat/7320_001_CN-1.pdf.

confinement because claimants must show that the condition complained of is sufficiently onerous in order for that condition to rise to the nature of a liberty interest."). It does *not* apply where, as is true here, the prison regulation affects the duration of a sentence because "freedom from confinement is necessarily in the nature of a liberty interest." *Mills*, 95 F. Supp. 3d at 933; *see also McQuillion v. Duncan*, 306 F.3d 895, 903 (9th Cir. 2002) ("*Sandin*'s holding was limited to internal prison disciplinary regulations."); *Anderson*, 317 F.3d at 200 ("negat[ing] any suggestion that *Sandin*'s particularized test should be applied outside the intra-prison disciplinary context").

But if *Sandin*'s hardship test applies, FSA time credits obviously satisfy it. The differences between prison and prerelease custody are atypical and significant. *See United States v. Burke*, 694 F.3d 1062, 1064 (9th Cir. 2012) (noting "the general understanding that restrictions at a halfway house are *significantly* less than those at a custodial facility" (emphasis added))); *Gonzalez-Fuentes*, 607 F.3d at 882, 888 (recognizing "the freedoms inherent in the outside-of-prison arrangement" compared to the "substantial" "impact of []incarceration"); *Adepoju*, 2025 WL 1392287, at *11. A person living in a halfway house or in home confinement has substantially more freedom than an incarcerated person. On home confinement, they can (among other things) (a) look for and maintain employment; (b) perform community service; (c) attend religious activities; and (d) participate in "family-

- 44 -

related activities," such as attending a funeral or wedding or visiting a sick family member.[22]  In a halfway house, they can look for and maintain employment, attend doctors' visits (both for physical and mental health), and leave for "counseling, visiting, or recreation purposes."[23]  These are the types of substantial additional liberties that trigger due process protection.  *See Young*, 520 U.S. at 147 (noting that the ability to be "gainfully employed," "to be with family and friends," and "and to form the other enduring attachments of normal life" gave an individual protected liberty interest in preparole (quoting *Morrissey*, 408 U.S. at 482)).  Indeed, a district court in this Circuit already concluded as much in the FSA context.  *Adepoju*, 2025 WL 1392287, at *11.

To the extent there is a question about how restrictive life in prerelease custody would be compared to prison, that warrants remand.  *Smith v. Collins*, 964 F.3d 266, 269 (4th Cir. 2020) (holding summary judgment was inappropriate where there was "a genuine dispute of material fact as to whether Smith's conditions of confinement imposed a significant and atypical hardship in relation to the ordinary incidents of prison life"); *Portley-El v. Brill*, 288 F.3d 1063, 1065 (8th Cir. 2002)

---

[22] 18 U.S.C. § 3624(g)(2)(A)(i)(II).

[23]      Fed.      Bureau      of      Prisons,      *About      Our      Facilities*, https://www.bop.gov/about/facilities/residential_reentry_management_centers.jsp.

("[A]typical and significant hardship is a question of fact that may require a fuller record than the initial complaint.").

### 4. The district court's opinion is riddled with errors.

Contrary to the analysis above, the district court concluded that federal prisoners do not have a liberty interest in earning FSA time credits. None of its reasoning holds water.

#### a. The district court did not apply the proper legal test.

As a threshold matter, the district court did not actually apply the proper legal framework. *See* J.A.193-95. It did not apply the two-prong test outlined above. The court did not even cite any relevant seminal cases, like *Wolff* or *Sandin*. Accordingly, this Court could reverse and remand for the district court to apply the appropriate framework in the first instance. *See LaMar v. Ebert*, 756 F. App'x 245, 251-52 (4th Cir. 2018) (reversing and remanding where "[t]he district court failed to apply the proper legal standard to Appellant's procedural due process claim").

#### b. The district court failed to recognize that FSA time credits shorten sentences.

Next, relying exclusively on the out-of-district opinion in *Fiorito*, the district court reasoned that White did not have a liberty interest in earning FSA credits because the FSA gives the BOP discretion to apply the credits "toward time in prerelease custody *or* supervised release" and, per the district court, prerelease

- 46 -

custody does not implicate the Due Process Clause. J.A.194 (quoting *Fiorito*, 2022 WL 16699472, at *5). Both parts of that reasoning are wrong.

The district court misapprehended how FSA credits work. In implementing the FSA, the BOP has decided to automatically apply the first year of FSA time credit to early release to supervision. J.A.212, 230.[24] That means FSA time credits do result in federal prisoners being released from BOP custody. As noted, any decision that affects the duration of sentence (*i.e.*, whether an individual will be released from BOP custody altogether) implicates the Due Process Clause, and neither the district court nor *Fiorito* said otherwise.

Putting aside the district court's factual error about how FSA time credits are applied, the district court's reasoning was legally flawed. In the district court's view, prerelease custody decisions do not trigger due process protections. The court reasoned that prerelease custody "is just another form of BOP custody" and prisoners cannot challenge "transfer[s] from one form of BOP custody to another." J.A.194 (quoting *Fiorito*, 2022 WL 16699472, at *5). This conclusion suffers from numerous flaws.

---

[24] The district court in *Fiorito* can be excused for this error, since the BOP Program Statement mandating application of FSA time credits to early release to supervision came out after that decision. But the district court here does not have that excuse. The pertinent Program Statement was issued November 18, 2022 and updated in February and March 2023. J.A.210, 211, 214. The district court issued its opinion on July 31, 2023. J.A.196.

*First*, the fact that the BOP considers release to prerelease custody as "just another form of BOP custody" does not control the due process question.  The Due Process Clause protects prisoners against decisions that affect whether they can live outside the walls of a prison facility, even where the government still maintains some level of custody or control over the individual.  For example, the Supreme Court held that due process applied to parole, even "[t]hough the State properly subjects [a parolee] to many restrictions not applicable to other citizens."  *Morrissey*, 408 U.S. at 482.  Similarly, the Supreme Court held that due process protected an individual on "preparole" and, in doing so, rejected the prison's argument that the difference between prison and pre-parole was merely a "degree of confinement" or a difference in "prison environment" or "classification."  *Young*, 520 U.S. at 148-50.  The First Circuit applied procedural due process protections to individuals released on electronic monitoring, even though that release was still considered a part of "the remainder of their sentences" and even though they had a host of restrictions upon them.  *Gonzalez-Fuentes*, 607 F.3d at 870, 887-88.  And, in *Cardoza*, the district court specifically rejected the argument that "the label attached to Petitioner's status—'prerelease custody'"—governed the due process question.  2022 WL 3212408, at *10.  As the court explained, "that the BOP considers Petitioner's placement in home confinement simply as a difference in her *place* of confinement is . . . not determinative."  *Id.*  What mattered was that "Petitioner's home

confinement allowed her to live outside the walls of a prison facility." *Id.* Accordingly, the district court's observation here that the BOP considers prerelease custody an alternative form of custody was irrelevant. Regardless of BOP labels, the fact remains that release to prerelease custody means an individual lives outside the prison walls, and that is all that is necessary to implicate the Due Process Clause.

The second part of the district court's reasoning—that prisoners cannot challenge a "transfer from one form of BOP custody to another" (J.A.194)—was also legally incorrect. Prisoners *can* challenge transfers from one form of custody to another; it is just that, under *Sandin*, they must show that they must also satisfy the "atypical and significant hardship" standard. 515 U.S. at 484, 486-87. As explained above, Petitioner believes *Sandin*'s "atypical and significant hardship" test does not apply here but, if it does, then the FSA satisfies it. *Supra* at 43-45.

> c. *The district court erred in concluding that the so-called "conditional" nature of FSA time credits defeats a due process claim.*

Finally, the district court appeared to believe that the FSA did not create a liberty interest because certain conditions attach to the earning and application of those credits. For example, the district court noted that prisoners still had to take advantage of "opportunit[ies]" to actually *earn* the credits, *i.e.*, prisoners had to successfully participate in EBBRs or PAs to get credits. J.A.194 (quoting *Fiorito*, 2022 WL 16699472, at *6). The district court also considered FSA time credits

- 49 -

"conditional" or "contingent" because not everyone who earns FSA time credits ultimately qualifies to have them applied. *Id.* at *5; *see also Clinkenbeard v. King*, No. 23-cv-3151, 2024 WL 4355157, at *6 (D. Minn. June 20, 2024) (citing *Fiorito* for the proposition that "a liberty interest cannot be created by a statute which, like the FSA, only conditionally grants prisoners the opportunity to accrue credits possibly affecting the duration of said prisoners' confinement"). Indeed, below, the Government kept insisting the Due Process Clause did not apply because White was only challenging his ability "to *earn* Time Credits," and that he had not yet reached the position to have them "*applied.*" J.A.15.

Although FSA time credits may be "conditional" in some sense, they are not "conditional" in the way that matters for the Due Process Clause. The "conditional" nature of a prison regulations matters under the liberty-interest-test insofar as, if the prison has complete discretion to make a decision, then a prisoner does not have a legitimate expectation in some outcome and thus cannot meet the first prong of the test. *Supra* at 34-35.[25] But, if a prison regulation *mandates* an outcome and, in doing so, creates a real expectation in that outcome, the Due Process Clause attaches, even

---

[25] Compare the FSA to the Residential Drug Abuse Program (RDAP). In the RDAP context, the BOP has complete discretion to decide whether a person who successfully completed RDAP will get early release at all. 28 C.F.R. § 550.55(c)(1). Thus, RDAP is truly "conditional" and thus falls outside the ambit of due process because a prisoner has no legitimate expectation or right to RDAP release.

where conditions attach to that mandate. For example, good-time credits are "conditional" in some sense—they require a "determination by the Bureau of Prisons that, during that year, the prisoner has displayed exemplary compliance with institutional disciplinary regulations"[26] and generally do not "vest" until "the date the prisoner is released from custody," *see* 18 U.S.C. § 3624(b)—yet the Due Process Clause protects those credits, *see Wolff*, 418 U.S. 539; *Jackson*, 707 F.2d at 946-47.[27] Similarly, the Due Process Clause applied to Oklahoma's "preparole" program, even though that program was conditional, as individuals were only "conditionally released." *Young*, 520 U.S. at 146. In *Greenholtz*, the Court held the Due Process Clause applied to parole, even though parole was "conditional" insofar as the Board of Parole could deny the otherwise mandated release if certain conditions were met. 442 U.S. at 11-12. Thus, the mere existence of a "condition" or "contingency" does not matter. What matters is whether the individual has a real expectation in early release from prison. Mr. White, through his mandatory entitlement to FSA time credits, has that.[28]

---

[26] 18 U.S.C. § 3624(b)(1).

[27] And the state good-time credit at issue specifically in *Wolff* was also conditional, as it could be withheld or forfeited. *Id.* at 546-47.

[28] Although White is not currently eligible for application of his FSA time credits, he almost certainly will be by the time his date for early release comes about. The FSA states that, to have time credits apply, a prisoner must satisfactorily maintain a "low" or "minimum" PATTERN score. 18 U.S.C. § 3624(g); *see also* J.A.227, 229-30. Although White currently has a "medium" PATTERN score, he will very likely

The district court's reasoning also ignored that the Due Process Clause applies not only to the *application* of time credits, but also decisions affecting the ability to *earn* them. "[A] month in prison is a month in prison, whether caused by failure to award [credits] or by awarding and then revoking [credits]." *Montgomery*, 262 F.3d at 645. Courts have consistently recognized that a protected liberty interest in decisions affecting an inmate's "opportunity" to earn credit toward their sentence. For example, the Seventh Circuit held that due process attached to decisions affecting a prisoner's "credit-earning class," which affected how fast he earned credit. *Id.* The Tenth Circuit held that the Due Process Clause applied to a prison decision that "demoted" the inmate "from a credit-earning prisoner to a non-credit-earning prisoner." *Wilson*, 430 F.3d at 1115. It has also held that the Due Process Clause applied to classification of inmate as a sex offender because that classification implicated his ability to earn time credits. *Chambers v. Colorado*, 205 F.3d 1237, 1242-43 (10th Cir. 2000); *see also Neal v. Shimoda*, 131 F.3d 818, 829 (9th Cir. 1997) (due process applied to "sex offender" classification, in part because it affected a prisoner's eligibility for parole); *Mills*, 95 F. Supp. 3d at 933 (concluding

---

have the requisite "low" or "minimum" when the time for application comes up. Given his current projected release date, White will not be eligible to have his FSA time credits applied until some time in the 2030s. J.A.30, 36. By that time, White's PATTERN score will have decreased due to his chronological age and the passage of time since his last incident reports. *See* J.A.96; *see also* Fed. Bureau of Prisons, *PATTERN Risk Assessment*, https://www.bop.gov/inmates/fsa/pattern.jsp.

that decisions regarding "the rate at which GCA [Good Conduct Allowance] is accrued" could implicate the Due Process Clause because it affected "the amount of time the inmate expects to remain confined," but concluding that the language of the Virginia regulations did not create a sufficient expectation). These cases make the district court (and Government's) purported distinction between "earning" and "applying" FSA credits fall apart.

The Government and district court's purported distinction between earning and applying FSA time credits is also an administrative nightmare. The BOP does not "apply" FSA time credits until the moment a prisoner is entitled to release. 18 U.S.C. § 3624(g)(1)(A); J.A.227. If this Court holds that federal prisoners only have a protected liberty interest in the *application* of FSA time credits, and not the *earning* of those credits, it will mean that prisoners with legitimate due process claims will inevitably spend additional time in prison beyond that lawfully allowed. They would not be allowed to raise a due process claim until the date that the BOP has decided they are entitled to release. But if the BOP made an error with respect to the prisoner's earning rate, and the prisoner should have been released earlier because they had more earned FSA time credits than the BOP accounted for, then this proposed rule would mean that a prisoner cannot challenge their release until *after* their release date had already come and gone. Given that it will obviously take time to process a habeas petition in court, the prisoner will be kept in custody for days,

- 53 -

months, or maybe even years longer than lawfully permitted, all because of an arbitrary distinction between "earning" and "applying" FSA time credits. Such a rule would burden the courts, which would be faced with emergency habeas petitions or temporary restraining orders seeking the immediate release of prisoners. The easier, and more administrable, rule is to hold that earning (and not just applying) FSA time credits implicates the Due Process Clause, so that questions about how much time an inmate rightfully earned and when they are entitled to release can be resolved *before* the actual release date. That holding would impose no additional burden on the BOP, which already automatically calculates earned FSA time credits, even for individuals who do not presently qualify for application of those credits.

* * *

For these reasons, this Court should hold that White had a liberty interest protected by the Fifth Amendment Due Process Clause in his earned FSA time credits. Because the BOP did not give White any process before depriving him of credits, this Court should reverse and remand for the district court to issue an order requiring the BOP to instate any earned credits for White.

## CONCLUSION

This Court should reverse and remand with instructions to grant the § 2241 petition. Alternatively, this Court should reverse and remand with instructions to

- 54 -

apply the proper legal framework to both the statutory and constitutional questions in this case.

<div style="margin-left: 50%;">

Respectfully submitted,

JAMES WYDA
Federal Public Defender

/s/ Claire Madill
CLAIRE MADILL
PATRICIA L. RICHMAN
Assistant Federal Public Defenders
Office of the Federal Public Defender
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 344-0600
Claire_Madill@fd.org
Patricia_Richman@fd.org

</div>

May 21, 2025

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

The First Step Act is a relatively new statute that has benefited from limited interpretation from Federal Courts of Appeal generally. Additionally, to counsel's present knowledge, neither this Court nor any other Federal Court of Appeals has addressed the question of whether federal prisoners have a liberty interested protected by the Due Process Clause in either earning or applying FSA time credits. Counsel for appellant accordingly asserts that the issues raised in this brief may be more fully developed through oral argument, and respectfully requests the same.

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) in that, according to the word-count feature of the word-processing system used to prepare this document (Microsoft Word for Microsoft 365), the brief contains 12,972 words, excluding the portions exempted by Rule 32(f).

/s/ Claire Madill
CLAIRE MADILL

57

**CERTIFICATE OF SERVICE**

I certify that on May 21, 2025, I electronically filed the foregoing brief with the Clerk of Court using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

/s/ Claire Madill
CLAIRE MADILL

58