No. 23-7116

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

### WILLIAM WHITE

**Petitioner-Appellant,**

**v.**

### WARDEN, FEDERAL CORRECTIONAL INSTITUTION – CUMBERLAND,

**Respondent-Appellee.**

_____

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (No. 22-cv-02371-DKC (Chasanow, J.))

---

## BRIEF FOR THE APPELLEE

---

**Kelly O. Hayes**
United States Attorney
District of Maryland

**Beatrice C. Thomas**
Assistant United States Attorney
U. S. Attorney's Office
District of Maryland
36 South Charles Street, 4th Fl.
Baltimore, Maryland 21201
(410) 209-4848

**Dated July 23, 2025**

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................1

STATEMENT OF JURISDICITION ....................................................................2

ISSUES PRESENTED...........................................................................................2

STATEMENT OF THE CASE...............................................................................3

      A.     Background of the First Act of 2018 ........................................................3

      B.     Factual Background ..............................................................................15

SUMMARY OF ARGUMENT ............................................................................17

STANDARD OF REVIEW ..................................................................................22

ARGUMENT .......................................................................................................22

I.    The District Court properly determined that an inmate does not have a protected liberty interest in the earning and application of Earned Time Credits under the Fifth Amendment of the United States Constitution ..........................................22

      A.   White cannot establish a liberty interest because unlike Good Conduct Time, there is no clearly delineated and specifically enumerated statutory entitlement in the earning and application of Earned Time Credits......25

      B.   The earning and application of ETCs requires satisfaction of too many statutory conditions to give rise to a liberty interest............................27

II.   The District Court properly concluded that White was precluded from receiving ETCs while at FTC Oklahoma City ..................................................................33

      A.   While Congress does not define "successful participation," the canons of statutory construction support that Congress did not intend to reward inmates for being in prison; rather, it intended inmates to show that they successfully participated in individualized recommended programming .....33

      B.   The BOP properly promulgated 28 C.F.R. § 523.41(c)(4)(i)-(v) to assist the BOP in determining whether an inmate is "successfully participating." 38

C.    *Chevron* deference was approppriate under *stare decisis, Loper Bright* does not alter this outcome, and *Skidmore* deference would alternatively apply……………………………………………………………………………..43

CONCLUSION ........................................................................................................51

CERTIFICATE OF SERVICE .............................................................................52

CERTIFICATE OF COMPLIANCE...................................................................53

ii

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Adepoju v. Scales,* No. 3:25-cv-245,
 2025 WL 1392287 (E.D. Va. May 14, 2025) ............................................ 30, 31

*Alvarez v. Cox,* No. 2:23-CV-00018,
 2023 WL 9110918 (S.D. Tex. Nov. 3, 2023) ..................................................... 42

*Alvarez v. Cox,* No. 2:23-CV-00018,
 2024 WL 69079 (S.D. Tex. Jan. 5, 2024) ........................................................ 42

*Barber v. Thomas*,
 560 U.S. 474 (2010) ................................................................................. 20, 36

*Bloom v. Fed. Bureau of Prisons*, No 19-21589 (KMW)(SAK),
 2022 WL 341200 (D. N.J. Feb. 4, 2022) .................................................... 29-30

*Brown & Williamson Tobacco Corp. v. Food & Drug Admin.*,
 153 F.3d 155 (4th Cir. 1998) ....................................................................... 34

*Burnette v. Fahey*,
 687 F.3d 171 (4th Cir. 2012) ....................................................................... 24

*Cabebe v. Derr,* No. 22-CV-496 SOM-KJM,
 2023 WL 2713652 (D. Haw. Mar. 30, 2023) ............................................. 41-42

*Cabell Huntington Hosp., Inc. v. Shalala*,
 101 F.3d 984 (4th Cir. 1996) ....................................................................... 34

*Cardoza v. Pullen,* No. 3:22-cv-00591,
 2022 WL 3212408 (D. Conn. Aug. 9, 2022) ............................................. 30, 31

*Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*,
 982 F. 3d 258 (4th Cir. 2020) .................................................................. 21, 49

*Caudillo v. Carter,* No. 22-CV-01265-CNS,
 2022 WL 17454446 (D. Colo. Dec. 6, 2022) ................................................. 41

*Cheng v. United States*,
 132 F.4th 655 (2d Cir. 2025) ....................................................................... 28

*Chevron, U.S.A., Inc. v. NRDC., Inc.*,
467 U.S. 837 (1984) ................................................................ passim

*Clinkenbeard v. King*, No. 23-3151,
2024 WL 4355157 (D. Minn. June 20, 2024) .................................... 29

*Clinkenbeard v. King*, No. 23-3151 (JRT/LIB),
2024 WL 4355063 (D. Minn. Sept. 30, 2024) ............................. 46-47

*Cunningham v. Scibana*,
259 F.3d 303–07 (4th Cir. 2001) ....................................................... 49

*Dunlap v. Warden FMC Devens*,
2024 WL 5285006 (D. Mass. Dec. 13, 2024) ............................ 42, 47

*Falcetta v. Rosalez,* No. 23-50159,
2024 WL 890124 (5th Cir. Mar. 1, 2024) ........................................ 37

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ......................................................................... 37

*Fiorito v. Fikes,* No. 22-CV-0749 (PJS/TNL),
2022 WL 16699472 (D. Minn. Nov. 3, 2022) .......................... passim

*Fiorito v. Fikes,* No. 23-1006, No. 23-1007,
2023 WL 4841966 (8th Cir. 2023) ................................................... 29

*Fontanez v. Rardin,* No. 2:23-cv-12415,
2024 WL 1776338 (E.D. Mich. Apr. 24, 2024) ............................... 29

*Gant v. King,* No. 23-cv-1766, (NEB/ECW),
2023 WL 6910771 (D. Minn. Oct. 19, 2023) ................................... 29

*Geurriero v. Miami RRM,* No, 24-10337,
2024 WL 2017730 (11th Cir. 2024) ........................................... 20, 35

*Graham County Soil & Water Conservation Dist. V. United States ex. rel. Wilson*,
545 U.S. 409 (2005) ......................................................................... 36

*Green v. Hudson*, No. 23-3141,
2024 WL 960497 (10th Cir. 2024) .................................................. 10

*Greenholtz v. Inmates of Neb. Penal & Cor. Complex*,
442 U.S. 1 (1979) ............................................................................. 23

iv

*Henderson v. Harmon*,
102 F.4th 242 (4th Cir. 2024) ............................................................. 22

*Inst. S'holder Serv, Inc. v. Sec. and Exch. Comm'n*, No. 24-5105,
2025 WL 1802786, n. 5 (D.C. Cir. July 1, 2025)................................... 38

*Jackson v. Doerer,* No. 5:24-01353-ADS,
2024 WL 4719489 (C.D. Cal. Nov. 7, 2024) ............................. 42, 43

*Jobin v. Mendota*, No. 23-cv-01700-WBS-SKO (HC),
2024 WL 1367902 (E.D. Cal. Apr. 1, 2024) ............................... passim

*Kentucky Dep't of Corrections v. Thompson*,
490 U.S. 454 (1989) ........................................................... 24

*Knox Creek Coal Co.*,
811 F.3d 148 (4th Cir. 2016) ............................................... 49

*Loper Bright v. Raimondo*,
603 U.S. 369 (2024) ........................................................ passim

*Lovelace v. Lee*,
472 F.3d 174 (4th Cir. 2006) ................................................ 24

*Mars v. Heisner*, No. CV-22-01933-PHX-SPL (JZB),
2023 WL 4960411 (D. Ariz. Aug. 3, 2023) ............................... 29-30

*Mars v. Heisner,* No. CV-22-01933-PHX-SPL (JZB),
2023 WL 4977335 (D. Ariz. June 26, 2023) .............................. 29

*Martin v. LeMaster*, No. 21-6247,
2022 WL 18145207 (6th Cir. Oct. 19, 2022) ............................. 37

*Meachum v. Fano*,
427 US. 215 (1976) ........................................................ 32

*Mills v. Holmes*,
95 F. Supp. 3d 924 (E.D. Va. 2015) ...................................... 24

*Mills v. Starr,* No. 21-1335,
2022 WL 4084178 (D. Minn. Aug. 17, 2022)(C) ........................ 26-27

*Mohammed v. Warden Stover, FCI Danbury*, No. 3:23-CV-757 (SVN),
2023 WL 7300592 (D. Conn. Nov. 6, 2023) .............................. 41

*Nicoletti v. Bayless*, No. 24-6012,
  2025 WL 80294 (4th Cir. 2025) ................................................................ passim

*Nicoletti v. Bayless,* No. 5:23-cv-120,
  2023 WL 11920620 (N.D.W. Va. Dec. 18, 2023) ............................................. 44

*Payne v. Taslimi*,
  988 F.3d 648 (4th Cir. 2021) ........................................................................ 43

*Perez v. Cuccinelli*,
  949 F.3d 865 (4th Cir. 2020) ........................................................................ 49

*Pierce v. LeMaster,* No. 24-7-DLB,
  2024 WL 439447 (E.D. Ky. Jan. 29, 2024)(4) .................................................. 41

*Prieto v. Clarke*,
  780 F.3d 245 (4th Cir. 2015) ........................................................................ 24

*Pulsifer v. United States*,
  601 U.S. 124 (2024) ...................................................................................... 37

*Ramos v. Louisiana*,
  590 U.S. 83 (2020) ........................................................................................ 43

*Reno v. Koray*,
  515 U.S. 50 (1995) ................................................................................... 20, 36

*Sandin v. Conner*,
  515 U.S. 472 (1995) ...................................................................................... 24

*Sedlacek v. Rardin*, No. 24-1254,
  2025 WL 948485 (6th Cir. 2025) ................................................................... 29

*Sharma v. Peters*,
  756 F. Supp. 3d 1271 (M.D. Ala. 2024) ......................................................... 42

*Shemtov v. Birkholz*, No. 24-cv-10630-SRM-JC
  2025 WL 1490543 (C.D. Cal. March 13, 2025) .............................................. 40

*Singleton v. Wulff*,
  428 U.S. 106 (1976) ...................................................................................... 22

*Skidmore v. Swift & Co.,*
  323 U.S. 134 (1944) ................................................................................. passim

*Smith v. Eischen,* No. 22-CV-1704 (NEB/DJF),
2023 WL 4203165 (D. Minn. June 27, 2023) ................................................... 41

*Smith v. Warden, FCI Beckley,* No. 5:23-cv-00360,
2024 WL 832879 (S.D.W. Va. Feb. 1, 2024)(C) ............................................. 30

*Stevens v. Jacquez,* No. 3:23-cv-01482-AA,
2024 WL 3200546 (D. Ore. June 25, 2024)(a) ............................................... 42

*U.S. v. Wilson*,
503 U.S. 329 (1992) ....................................................................................... 31

*United States Nat'l Bank of Oregon v. Independent Ins. Agents of America, Inc.*,
508 U.S. 439 (1993) ...................................................................................... 34

*United States v. Mead Corp.*,
533 U.S. 218 (2001) ...................................................................................... 49

*United States v. Olano*,
507 U.S. 725 (1993) ...................................................................................... 22

*United States v. Parker*, No. 1:01-cr-248,
2019 WL 2005652 (M.D. Pa. May 7, 2019) ................................................... 25

*United States v. Smith*, No. 06-20659,
2020 WL 705144 ...................................................................................... 25-26

*United States v. Turner*,
389 F.3d 111 (4th Cir. 2004) ......................................................................... 22

*United States v. Venable*,
943 F.3d 187 (4th Cir. 2019) ................................................................... 3, 33

*Valladares v. Ray*,
130 F.4th 74 (4th Cir. 2025) ................................................................ passim

*Wilkinson v. Austin*,
545 U.S. 209 (2005) ...................................................................................... 23

*Wolff v. McDonnell*,
418 U.S. 539 (1974) ................................................................................. 23, 26

*Wright v. Warden FCI Bennettsville*, No. 5:23-cv-00221-DCC,
2023 WL 3853461 (D.S.C. June 6, 2023) ....................................................... 30

vii

*Yanagihara v. Derr,* No. 22-CV-145-JAO-RT,
  2023 WL 2163685 (D. Haw. Feb. 22, 2023) ...................................................... 41

**Statutes**

5 U.S.C. § 551 ................................................................................. 38, 45

16 U.S.C. § 1801 ..................................................................................... 45

18 U.S.C § 3621 ...................................................................................... 19

18 U.S.C. § 3232 ................................................................................... 4, 27

18 U.S.C. § 3559 ....................................................................................... 9

18 U.S.C. § 3621 ..................................................................................... 31

18 U.S.C. § 3624 ................................................................................. passim

18 U.S.C. § 3631 ................................................................ 4, 6, 7, 8, 26, 27

18 U.S.C. § 3632 ................................................................................. passim

18 U.S.C. § 3635 ..................................................................................... 35

21 U.S.C. § 924 ........................................................................................ 9

28 U.S.C. § 1291 ....................................................................................... 2

28 U.S.C. § 2241 ................................................................................. passim

**Regulations**

28 C.F.R. § 522.20 .................................................................................... 7

28 C.F.R. § 523.41 .............................................................................. passim

28 C.F.R. § 523.42 ................................................................................ 19, 40

87 Fed. Reg. 12, 2712 (January 19, 2022) ................................................. 38-39, 40

**Other Authorities**

U.S. CONST. AMEND. V ........................................................................ 22, 23, 50

*BOP First Step Act Approved Programs Guide*, May 2025 Version, *available* at
  https://www.bop.gov/inmates/fsa/docs/fsa-approved-program-
  guide.pdf?v=1.0......... ......................................................................... 10

BOP Program Statement 5290.15, *Intake Screening*, (Mar. 30, 3009), available at
  https://www.bop.gov/policy/progstat/5290_015.pdf ......................................... 7

BOP Program Statement 5410.01, *First Step Act of 2018 – Time Credits: Procedures for Implementation of 18 U.S.C. § 3632(d)(4)* (Mar. 10, 2023), *available at* https://www.bop.gov/policy/progstat/5410.01_cn2.pdf ................. 13

BOP Program Statement 5800.15, *Correctional Systems Manual* (Sept. 23, 2016), *available at* https://www.bop.gov/policy/progstat/5800_015_CN-01.pdf ............................................................................................................................... 8

CONGRESS.GOV., *The First Step Act of 2018; An Overview* (Nov. 4, 2019), *available at* https://www.congress.gov/crs-product/R45558 ............................... 4

Federal Bureau of Prisons, *About Our Agency*, *available at https://www.bop.gov/about/agency/* ................................................................. 32

Federal Bureau of Prisons, *An Overview of the First Step Act* (Nov. 4, 2019), *available at* https://www.bop.gov/inmates/fsa/overview.jsp ............................... 4

MERRIAM-WEBSTER'S DICTIONARY (2022 ed.)....................................................... 35

OXFORD ENGLISH DICTIONARY ONLINE (July 9, 2025), *available at* http://doi.org/10.1093/OED/4351349770......................................................... 36

U.S. Dep't of Justice, *2020 Review and Revalidation of the First Step Act Risk Assessment Tool*, (Jan. 2021), *available at* https://www.ojp.gov/pdffiles1/nij/256084.pdf ................................................... 6

U.S. Dep't of Justice, *First Step Act Annual Report April 2022 13–16* (2022), *available at* https://www.bop.gov/inmates/fsa/docs/First-Step-Act-Annual-Report-April-2022.pdf. ............................................................................................................... 8

## **INTRODUCTION**

This case presents a non-controversial question with a clear-cut answer: do federal inmates have a due process-protected liberty interest in *a discretionary incentive*? The answer is a resounding no. And the district court correctly held as such.

Appellant William White ("White"), currently incarcerated in federal prison, petitions this Court to overturn the Bureau of Prisons' ("BOP") determination that he was ineligible to earn First Step Act ("FSA") time credits ("earned time credits" or "ETCs")[1] during the four days he spent in transit during which he participated in no programming. The BOP's decision was consistent with federal regulation, specifically 28 C.F.R. § 523.41, which states that inmates are ineligible to earn ETCs while in a "[d]esignation status outside the institution (*e.g.,* for extended medical placement in a hospital or outside institution, an escorted trip, a furlough, etc.)." 28 C.F.R. § 523.41(c)(4)(ii). White filed a petition under 28 U.S.C. § 2241 asserting that the regulation conflicted with the statutory scheme, 18 U.S.C. § 3632, and that he was entitled to due process protections before the denial of such credits.

---

[1] 18 U.S.C. § 3632 provides for the application of Time Credits. Courts have used various terms for these time credits, such as "Federal Time Credits," or "FTCs"; "Earned Time Credits" or "ETCs"; or Time Credits. Hereinafter, these Time Credits will be referred to as "ETCs."

1

The district court rejected White's claims, ruling that the BOP's interpretation of the FSA was reasonable and entitled to deference. This Court should conclude likewise. White's argument ignores that there is no protected due process interest in ETCs which are discretionary incentives. Furthermore, White's argument is counter to the plain text of the FSA, which ties the award of ETCs to the successful participation in evidence-based recidivism reduction programs ("EBRR") or productive activities ("PAs") and not to an inmate's mere presence in a BOP facility during transfer status.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over the case pursuant to 28 U.S.C. § 2241. On July 31, 2023, the district court entered a final judgment in favor of the Warden. JA 196. On November 1, 2023, White, after receiving an extension, filed a timely notice of appeal. JA 202. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED

1. Do federal inmates possess a constitutionally protected liberty interest in ETCs earned under 18 U.S.C. § 3632(d)(4)(A) where the statutory scheme clearly conditions both the earning and application of ETCs on satisfactory program participation and other discretionary factors enumerated in the FSA?

2. Did the district court properly deny White's habeas petition because he was ineligible to earn ETCs during his approximately four-day detention at the Federal Transfer Center Oklahoma City when he provided no evidence he successfully participated in EBRR programming?

**STATEMENT OF THE CASE**

**A. Background of the First Step Act of 2018[2]**

On December 21, 2018, the First Step Act ("FSA") was enacted "with the purpose of modifying prior sentencing law and expanding vocational training, early release programs, and other initiatives designed to reduce recidivism." *United States v. Venable*, 943 F.3d 187, 188 (4th Cir. 2019). It "established a system of mandatory time credits for incarcerated individuals *who participate in recidivism reduction programming*, with limited exceptions." *Valladares v. Ray,* 130 F.4th 74, 77 (4th Cir. 2025) (emphasis added). Inmates are eligible to earn up to 15 days of time credits for every 30 days they have successfully participated in EBRR Programs or PAs. *See* 18 U.S.C. § 3632(d)(4)(A); *see also Nicoletti v. Bayless,* No. 24-6012, 2025 WL 80294, at *1 (4th Cir. 2025). At the discretion of the BOP, inmates can earn incentives and rewards for successful participation and completion of EBRR programs and PAs. Most importantly here, time credits, as an incentive under the

---

[2] The FSA is available at: https://uscode.house.gov/statutes/pl/115/391.pdf (last visited July 22, 2025).

3

FSA, can be applied toward prerelease custody or earlier transfer to supervised release. *See* 18 U.S.C. §§ 3632 (d)(1)–(4)(C).

Unlike other major reform bills, the FSA is an amalgamation of various statutes all working in tandem.[3] *See* 18 U.S.C. § 3631(a)(1)-(b)(1)–(4); 18 U.S.C. § 3232 (d)(4)(D); 18 U.S.C. § 3232(d)(4)(A)(ii); 18 U.S.C. § 3624(g). Through these different statutes, Congress created a multi-step directive to the Attorney General, in consultation with the Director of the BOP, to: (1) create and develop a risk and needs assessment that can accurately review and predict an individual's progression and regression while in prison and reflect their recidivism risk level; *see* 18 U.S.C. § 3631(a)(1)-(b)(1)–(4); (2) determine an individual inmate's recidivism risk level and specific needs under said risk and needs assessment; (3) determine whether the inmate is eligible, based on their count of conviction(s), pursuant to 18 U.S.C. § 3232 (d)(4)(D), to receive ETCs; (4) create and implement EBRR programs and PAs for inmates to "successfully participate" in; *see* 18 U.S.C. § 3631(b)(2); (5) determine whether the individual inmate is "successfully participating" in said EBRR programs or PAs; *see* 18 U.S.C. § 3232(a)(5); (6) determine whether the

---

[3] *See also* Federal Bureau of Prisons, <u>An Overview of the First Step Act</u>, *available at* https://www.bop.gov/inmates/fsa/overview.jsp (last accessed July 23, 2025); Congress.Gov., <u>The First Step Act of 2018; An Overview</u>, *available at* https://www.congress.gov/crs-product/R45558 (last accessed July 23, 2025). The statutory amendments included a change in how GCT was calculated as discussed *infra*.

4

inmate is a low or minimum recidivism risk[4] level utilizing PATTERN; *see* 18 U.S.C. § 3624(g); and (7) if the individual inmate is a low or minimum recidivism risk level utilizing PATTERN, determine whether the inmate has earned ETCs "in an amount that is equal to the remainder of the prisoner's imposed term of imprisonment." *See* 18 U.S.C. § 3624(g)(1)(A); *see also Nicoletti,* 2025 WL 80294, at *1. The BOP has complied with these directives and, for individual inmates who are both eligible to earn and apply ETCs, will apply those ETCs towards supervised release or towards prerelease custody once their credits "equal to the remainder of their imposed term of imprisonment." *Id.* Each step will be discussed in turn.

*First*, in conjunction with the Department of Justice, the Director of the National Institute of Justice ("NIJ"), the Director of the National Institute of Corrections, and the Independent Review Committee (formulated to assist the Attorney General with carrying out his or her responsibilities under 18 U.S.C. §§ 3631(b), 3632, and 3633), established the newest risk and needs assessment tool–

---

[4] 18 U.S.C. § 3624(g) provides an alternative process for individuals who have a high or medium recidivism risk level to have their ETCs applied. Specifically, the inmate can petition the Warden to be transferred to prerelease custody or supervised release after the Warden's determination that—
(aa) the prisoner would not be a danger to society if transferred to prerelease custody or supervised release;
(bb) the prisoner has made a good faith effort to lower their recidivism risk through participation in recidivism reduction programs or productive activities; and
(cc) the prisoner is unlikely to recidivate."

 *See* 18 U.S.C. § 3624(g) (1)(D)(i)(II)(aa)-(cc).

Prisoner Assessment Targeting Estimated Risk and Needs ("PATTERN").

PATTERN:

> is designed to predict the likelihood of general and violent recidivism for all [BOP] inmates three years post release. PATTERN contains both static (*e.g.*, criminal history) and dynamic (*e.g.*, participation in education or drug treatment) factors that are associated with one's risk of recidivism. The PATTERN assessment tool provides predictive scores, developed and validated for males and females separately.

U.S. Dep't of Justice, 2020 Review and Revalidation of the First Step Act Risk Assessment Tool, at 2 (2021), *available at* https://www.ojp.gov/pdffiles1/nij/256084.pdf (last accessed July 23, 2025). The tool is reviewed and validated annually in accordance with 18 U.S.C. § 3631(b)(4). *Id.* It considers fifteen (15) variables: "age at assessment"; "infraction convictions (any) current incarceration"; "infraction convictions (serious and violent) current incarceration"; "infraction-free (any)"; "infraction-free (serious and violent)"; "program completions"; "work programming"; "drug treatment while incarcerated"; "noncompliance with financial responsibility"; "instant offense violent"; "sex offender"; "criminal history score"; "history of violence"; "history of escapes"; and "education score." *Id.* at 12–13. Each variable item receives a score of "yes/no" where applicable. *Id.* at 14–15. Additionally, PATTERN calculates two risk scores: one for general recidivism risk and one for violent recidivism risk. NIJ describes the difference as follows:

6

General recidivism is defined as a return to BOP custody or a re-arrest within three years of release from BOP custody, excluding traffic offenses except driving under the influence (DUI) and driving while intoxicated (DWI). Violent recidivism is defined as a re-arrest for a suspected act of violence within three years of release from BOP custody. Examples of the violent offenses captured in this definition include, but are not limited to, firearms violations, homicide, child abuse, robbery, sex trafficking, and sexual assault.

U.S. Dep't of Justice, The First Step Act of 2018: Risk and Needs Assessment System – UPDATE, at 12–13 (2020), *available at* https://www.bop.gov/inmates/fsa/docs/the-first-step-act-of-2018-risk-and-needs-assessment-system-updated.pdf (last accessed July 2, 2025).

The initial recidivism risk assessment occurs as part of the intake process and the BOP is instructed to classify each inmate as having a minimum, low, medium, or high risk of recidivism. *Id.* Pursuant to BOP policy and practice, the official intake process occurs for all newly arrived inmates at their designated institutions. *See* BOP Program Statement 5290.15[5], Intake Screening, (Mar. 30, 2009), *available at* https://www.bop.gov/policy/progstat/5290_015.pdf (last visited July 23, 2025); *see also* 28 C.F.R. § 522.20. United States Marshal Services ("USMS") facilities are (1) not equipped with the resources and knowledge to perform the risk and needs assessment for BOP inmates; and (2) they are not authorized to do so pursuant to 18

---

[5] When an inmate arrives and is reviewed for FSA risk and needs, four departments are involved: Psychology Services, Unit Management, Education, and Health Services. *See id.*

7

U.S.C. § 3631(a)(1)-(b)(1)–(4). Accordingly, there is no established mechanism for BOP staff to perform the risk and needs assessment for BOP inmates housed at USMS holding facilities.  Furthermore, a transfer center, like the Federal Transfer Center Oklahoma City ("FTC Oklahoma City"), by definition, is a transitory institution.  It is not intended to be a holdover or a transfer inmate's final designation, and an inmate's assigned unit team does not have the necessary documentation[6] and resources to perform the initial risk and needs or aids in programming.

*Second*, NIJ determined risk level categories based on "cut points," or "risk score thresholds that place individuals into four categories: high, medium, low, or minimum."  U.S. Dep't of Justice, The First Step Act of 2018: Risk and Needs Assessment System – UPDATE, at p. 37.  "Each item response results in a score, and an individual's response scores are summed to compute a total.  The total scores for individuals are analyzed" and their risk level is ascertained based on "the score's reference to all other released inmates in the sample."  *Id.*  A "General Male" score between 40 and 54 and a "Violent Male" score between 25 and 31 correspond to a medium recidivism risk level inmate.  U.S. Dep't of Justice, First

---

[6] An inmate's Central File which includes the inmate's Pre-Sentence Report and other necessary documents to perform the risk and needs assessments are sent to the inmate's intended designated institution and does not accompany them to the Federal Transfer Center Oklahoma City.  BOP Program Statement 5800.15, PDF p. 16, Correctional Systems Manual, available at https://www.bop.gov/policy/progstat/5800_015_CN-01.pdf (last accessed July 23, 2025).

8

Step Act Annual Report April 2022 13–16 (2022), https://www.bop.gov/inmates/fsa/docs/First-Step-Act-Annual-Report-April-2022.pdf. Additionally, it created a list of thirteen needs that are to be periodically assessed: anger/hostility, antisocial peers, cognitions, dyslexia, education, family/parenting, work, finance/poverty, medical, mental health, recreation/leisure/fitness, substance abuse, and trauma. U.S. Dep't of Justice, The First Step Act of 2018: Risk and Needs Assessment System – UPDATE, at p. 23, n. 18.

*Third*, in 18 U.S.C. § 3632(d)(4)(D), Congress provided that a "prisoner is ineligible to receive time credits under this paragraph if the prisoner is serving a sentence for a crime of conviction" specifically enumerated in that section. Such offenses include, for example, convictions pursuant 21 U.S.C. § 924(c). *See* 18 U.S.C. § 3632(d)(4)(D)(xxii). Additionally, those inmates with final orders of removal for immigration offenses pursuant to 18 U.S.C. § 3632(d)(4)(E)(1) and those inmates who were convicted of a serious violent felony, as defined in 18 U.S.C. § 3559(c)(2), are also precluded. *See* 18 U.S.C. § 3632(d)(4)(E)(1); 18 U.S.C. § 3559(c)(2).[7]

---

[7] An inmate convicted of an offense specifically included in 18 U.S.C. § 3632(d)(4)(D) is considered ineligible to *earn* ETCs, regardless of his or her recidivism risk.

9

*Fourth*, the BOP was responsible for establishing EBRR and PA programming so that inmates can have a "meaningful opportunity to reduce their classification during the period of incarceration." *See* 18 U.S.C. § 3632(a)(5)*; see also Green v. Hudson,* No. 23-3141, 2024 WL 960497 (10th Cir. 2024). EBRR is defined as:

> a group or individual activity that— (A) has been shown by empirical evidence to reduce recidivism or is based on research indicating that it is likely to be effective in reducing recidivism; (B) is designed to help prisoners succeed in their communities upon release from prison; and (C) may include— (i) social learning and communication, interpersonal, anti-bullying, rejection response, and other life skills; (ii) family relationship building, structured parent-child interaction, and parenting skills; (iii) classes on morals or ethics; (iv) academic classes; (v) cognitive behavioral treatment; (vi) mentoring; (vii) substance abuse treatment; (viii) vocational training; (ix) faith-based classes or services; (x) civic engagement and reintegrative community services; (xi) a prison job, including through a prison work program; (xii) victim impact classes or other restorative justice programs; and (xiii) trauma counseling and trauma-informed support programs.

*See* 18 U.S.C. § 3632(a)(5). A productive activity is defined as:

> either a group or individual activity that is designed to allow prisoners determined as having a minimum or low risk of recidivating to remain productive and thereby maintain a minimum or low risk of recidivating, and may include the delivery of the programs described in paragraph (1) to other prisoners.

*Id.* The BOP has and continues to fulfill its duty. It developed a series of EBRRs and PAs that correspond to the thirteen established needs under PATTERN and routinely updates the list with available EBRRs and PAs to provide a range of opportunities to inmates to help them "successfully participate." *See* BOP First Step Act Approved Programs Guide, May 2025 Version, *available* at

10

https://www.bop.gov/inmates/fsa/docs/fsa-approved-program-guide.pdf?v=1.0.4

(last accessed July 23, 2025).

*Fifth*, the BOP is responsible for determining when an eligible inmate under 18 U.S.C. § 3632(d)(4)(D), is "successfully participating[8]" in approved EBRR programming or PAs. As "successful participation" is not defined by statute, the BOP, through notice and comment pursuant to the Administrative Procedures Act ("APA"), promulgated 28 C.F.R. § 523.41(c) which defines "successful participation" as follows:

> (1) An eligible inmate must be "successfully participating" in EBRR Programs or PAs to earn FSA Time Credits for those EBRR Programs or PAs.
> (2) "Successful participation" requires a determination by Bureau staff that an eligible inmate has participated in the EBRR programs or PAs

---

[8] If the inmate is determined to be "successfully participating," then he will earn ETCs at the following rates:

**(A)** In general.—A prisoner, except for an ineligible prisoner under subparagraph (D), who successfully completes evidence-based recidivism reduction programming or productive activities, shall earn time credits as follows:

    **(i)**     A prisoner shall earn 10 days of time credits for every 30 days of *successful participation* in evidence-based recidivism reduction programming or productive activities.

    **(ii)**    A prisoner determined by the Bureau of Prisons to be at a minimum or low risk for recidivating, who, over 2 consecutive assessments, has not increased their risk of recidivism, shall earn an additional 5 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities.

18 U.S.C. § 3632(d)(4)(A)-(B) (emphasis added).

11

that the Bureau has recommended based on the inmate's individualized risk and needs assessment, and has complied with the requirements of each particular EBRR Program or PA.

(3) Temporary operational or programmatic interruptions authorized by the Bureau that would prevent an inmate from participation in EBRR programs or PAs will not ordinarily affect an eligible inmate's "successful participation" for the purposes of FSA Time Credit eligibility.

(4) An eligible inmate, as described in paragraph (d) of this section, will generally not be considered to be "successfully participating" in EBRR Programs or PAs in situations including, but not limited to:

> (i) Placement in a Special Housing Unit;
> (ii) Designation status outside the institution (*e.g.,* for extended medical placement in a hospital or outside institution, an escorted trip, a furlough, etc.);
> (iii) Temporary transfer to the custody of another Federal or non-Federal government agency (*e.g.,* on state or Federal writ, transfer to state custody for service of sentence, etc.);
> (iv) Placement in mental health/psychiatric holds; or
> (v) "Opting out" (choosing not to participate in the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment).

(5)

> (i) If an eligible inmate "opts out," or chooses not to participate in any of the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment, the inmate's choice must be documented by staff.
> (ii) Opting out will not, by itself, be considered a disciplinary violation. However, violation of specific requirements or rules of a particular recommended EBRR Program or PA, including refusal to participate or withdrawal, may be considered a disciplinary violation (*see* this part).
> (iii) Opting out will result in exclusion from further benefits or privileges allowable under the FSA, until the date the inmate "opts in" (chooses to participate in the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment, as documented by staff).

12

*See* 28 C.F.R. § 523.41(c). "Successful participation" is further discussed in BOP

Program Statement 5410.01, <u>First Step Act of 2018 – Time Credits: Procedures for</u>

<u>Implementation of 18 U.S.C. § 3632(d)(4)</u>, PDF pp. 7–9, *available at*

https://www.bop.gov/policy/progstat/5410.01_cn2.pdf (last accessed July 23, 2025).

 *Sixth*, once an inmate is found to be "successfully participating," then the BOP

must determine if the inmate can apply earned ETCs towards prerelease custody

and/or towards supervised release.  *See* 18 U.S.C. § 3632(d)(4)(C) ("Time credits

earned under this paragraph by prisoners who successfully participate in recidivism

reduction programs or productive activities shall be applied toward time in

prerelease custody or supervised release. The Director of the Bureau of Prisons shall

transfer eligible prisoners, as determined under section 3624(g), into prerelease

custody or supervised release.")  Accordingly, ETCs *earned* upon program

completion *may not* be *applied* to prerelease custody or towards supervised release

*until* the inmate:

> **A)** has earned time credits under the risk and needs assessment system developed under subchapter D (referred to in this subsection as the "System") in an amount that is equal to the remainder of the prisoner's imposed term of imprisonment;
> **(B)** has shown through the periodic[9] risk reassessments a demonstrated recidivism risk reduction or has maintained a minimum or low recidivism risk, during the prisoner's term of imprisonment;

---

[9] The periodic risk assessments occur approximately twice per year at or around when an inmate attends his/her regularly scheduled program review (approximately

**(C)** has had the remainder of the prisoner's imposed term of imprisonment computed under applicable law; and

**(D)**

**(i)** in the case of a prisoner being placed in prerelease custody, the prisoner—

**(I)** has been determined under the System to be a minimum or low risk to recidivate pursuant to the last 2 reassessments of the prisoner; or

**(II)** has had a petition to be transferred to prerelease custody or supervised release approved by the warden of the prison, after the warden's determination that—

**(aa)** the prisoner would not be a danger to society if transferred to prerelease custody or supervised release;

**(bb)** the prisoner has made a good faith effort to lower their recidivism risk through participation in recidivism reduction programs or productive activities; and

**(cc)** the prisoner is unlikely to recidivate; or

**(ii)** in the case of a prisoner being placed in supervised release, the prisoner has been determined under the System to be a minimum or low risk to recidivate pursuant to the last reassessment of the prisoner and

. . .

(3) the Director of the Bureau of Prisons may transfer the prisoner to begin any such term of supervised release at an earlier date, not to exceed 12 months, based on the application of time credits under section 3632.

*See* 18 U.S.C. § 3624(g)(1), (3).

Finally, even if the inmate is eligible to earn and apply ETCs, the BOP cannot release or transfer him/her until he/she has earned ETCs "in an amount that is equal to the remainder of the prisoner's imposed term of imprisonment." *See* 18 U.S.C. § 3624(g)(1)(A). To ensure that inmates are released on time in accordance with their earned ETCs, the BOP has fully automated its calculation system to account for

---

every 180 days). This is designed to increase efficiency. *See* BOP Program Statement 5410.01 at PDF p. 13.

successful participation on a thirty-day basis.  *See* BOP Program Statement 5410.01, PDF p. 14.  The first 365 ETCs earned are applied towards early transfer to supervised release with any remaining ETCs applied towards prerelease custody. *Id.,* at p. 21.

## B. Factual Background

Federal inmate William White, Federal Register Number 13888-084, is currently serving an aggregate 349-month term of imprisonment at the Federal Correctional Institution Cumberland ("FCI Cumberland") in Cumberland, Maryland. JA 30.  Assuming he receives all good conduct time currently projected, White has a release date of September 1, 2037.  On November 22, 2019, White's current convictions were reviewed, and he was determined to be eligible to receive ETCs pursuant to 18 U.S.C. § 3632(d)(4)(D).  JA 76.  On August 30, 2022, White attended his routine 180-day program review where he was evaluated pursuant to the Prisoner Assessment Tool Targeting Estimated Risk and Needs ("PATTERN"). JA 16.  White was evaluated as a medium recidivism risk level inmate. JA 16.

On July 21, 2022, White was transferred from the Federal Correctional Institution Terre Haute ("FCI Terre Haute") in Terre Haute, Indiana and arrived at FTC Oklahoma City.  JA16.  Between July 21, 2022 (the day he arrived at FTC Oklahoma City) and July 25, 2022 (the day he left FTC Oklahoma City), White was held in the Special Housing Unit ("SHU") because he had several security threat

15

group assignments. JA 104–105. On January 19, 2023, White's ETCs were recalculated in accordance with BOP's monthly auto calculator. BOP Program Statement 5410.01, First Step Act of 2018 – Time Credits: Procedures for Implementation, 18 U.S.C. § 3632(d)(4), wherein he had earned 365 days toward supervised release and 155 days towards prerelease custody that could be applied once he reaches a low or minimum recidivism risk level. JA 165, 168. However, White's FSA worksheet did not reflect credit for the time he was in transfer status. JA 165.

On September 16, 2022, White filed his Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241. JA 4–10. White maintained that BOP incorrectly denied him ETCs for his time spent at FTC Oklahoma City. JA 8–9. White averred that the BOP's interpretation of what "successful participa[tion]" means was in error, and that BOP violated his due process rights by depriving him of credit. JA 7–9. White requested that the district court restore his ETCs. JA 9. The Warden filed a Motion to Dismiss, arguing first a failure to exhaust. JA 22–23. The Warden also asserted that even though White was eligible to receive ETCs, his "medium" PATTERN score excluded him from the application of ETCs. JA 23–24. White opposed the Motion to Dismiss, JA 131–37, and in the Reply, the Warden explained that the BOP is afforded deference in relation to the statutes it is congressional mandated to administer, and its interpretation of 28 C.F.R. § 523.41(c) is

16

constitutional. JA 140–42. Further, the Warden reiterated that BOP was in full compliance with the FSA's statutory mandate to determine eligibility and application of ETCs. JA 143.

The district court dismissed the Petition, first acknowledging that White's sentence had been correctly calculated, and he was not entitled to additional ETCs. JA 190. Further, the district court held that White's procedural due process claim failed because he lacked a protected liberty interest in merely the opportunity to earn ETCs, citing *Swarthout v. Cooke,* 562 U.S 216, 219 (2011) and *Fiorito v. Fikes*, No. 22-CV-0749 (PJS/TNL), 2022 WL 16699472 (D. Minn. Nov. 3, 2022 (distinguishing ETCs from good-time credits because ETCs are contingent on participation in assigned programming and maintaining a low recidivism risk.). JA 194–95. Accordingly, the district court denied White's petition and granted the Warden's Motion to Dismiss. JA 195. On November 1, 2023, White appealed. JA 202.

## SUMMARY OF ARGUMENT

The district court properly rejected White's claims. Regarding White's constitutional claim that he has a liberty interest in the earning and application of ETCs, the district court correctly determined that he did not possess a liberty interest protected by the Due Process Clause in the earning or application of ETCs. JA 193-94. The district court appropriately relied on precedent which held that conditional

17

or discretionary incentives such as ETCs are not afforded due process protections. JA 194-95 (quoting *Fiorito,*2022 WL 16699472, at \*5–6).

The district court applied the test set forth in *Chevron, U.S.A., Inc. v. NRDC., Inc.,* 467 U.S. 837 (1984), which was the governing law at time JA 192–93. Judge Chasanow noted that Congress had not defined the term "successful participation" in 18 U.S.C. § 3632(d)(4)(A), but held that BOP's determination that White was ineligible to receive ETCs while in transfer status was reasonable, and supported by its thorough agency expertise. JA 192–93. White's argument ignored the plain structure of the FSA, which ties the award of ETCs to successful participation in EBRR programs or PAs, rather than to an inmate's presence at a BOP facility during transfer status.

The district court's ruling should be affirmed for two reasons.

First, White cannot establish any protected liberty interest in ETCs because, unlike GCT, ETCs are not statutory entitlements automatically awarded upon sentencing. GCT is earned by every compliant inmate automatically and is only forfeited through disciplinary proceedings that comport with due process. In contrast, ETCs are purely conditional incentives designed to encourage participation in EBRR, subject to strict statutory prerequisites, including conviction eligibility, successfully program participation, and maintaining a low or minimum recidivism

18

risk.[10] It is simply untenable to determine an inmate has a liberty interest in *earning* ETCs if he may not ultimately be able to *apply* them. Courts nationwide, including the Second, Sixth, and Eighth Circuits, have repeatedly held that these numerous statutory conditions preclude any liberty interest in ETCs. Congress intentionally structured ETCs as discretionary motivational tools, not guaranteed sentencing reductions, thereby defeating White's attempt to equate them with GCT or manufacture a liberty interest where none exists.

Furthermore, White's argument disregards the practical and legal realities of the FSA. The BOP retains broad discretion in inmate designation and transfer decisions under 18 U.S.C § 3621(b), and temporary stays in transfer centers—where successful participation in programming is not necessarily offered—do not entitle inmates to ETCs. Accepting White's theory would impose due process hearings for every inmate transfer, writ, or hospital visit, creating administrative chaos and undermining prison safety and operations nationwide. Congress never intended such an absurd result. The district court properly rejected this flawed argument, and this Court should affirm, recognizing that ETCs are conditional, incentive-based credits that do not create constitutionally protected liberty interests.

---

[10] While White is *eligible* to receive Time Credits, because he is a medium risk inmate, he is not entitled to the *application* of Time Credits until he receives a Low or Minimum risk level and maintains the Low or Minimum risk level for two consecutive assessment periods pursuant to 28 C.F.R. § 523.42(c). JA 23.

19

Second, while "successful participation" is not expressly defined in the statute, 18 U.S.C. § 3632, traditional rules of statutory construction and common sense confirm that it requires more than mere presence in BOP custody. As the Supreme Court emphasized, "[t]he meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used." *Reno v. Koray,* 515 U.S. 50, 56 (1995). The FSA's statutory scheme, read as a whole, reveals that Congress intended to incentivize inmates to reduce recidivism by granting time credits *in exchange for* active, successful participation in EBRR programs or PAs. *See Geurriero v. Miami RRM,* No, 24-10337, 2024 WL 2017730, at \*3 (11th Cir. 2024). ETCs are not rewards for existing in prison, but for achieving the purpose of assigned programming. *See Barber v. Thomas*, 560 U.S. 474, 483 (2010) (requiring reading a statute in context to maintain its efficacy and intended operation.).

In implementing this clear congressional intent, the BOP promulgated 28 C.F.R. § 523.41(c)(4)(i)-(v), excluding periods where inmates are unable to participate in programming, such as during transfer, mental health holds, or placement in disciplinary segregation status in special housing. 18 U.S.C. § 3632(d)(4). Courts across the country have upheld this reasonable interpretation. *See, e.g., Jobin v. Mendota,* No. 23-cv-01700-WBS-SKO (HC), 2024 WL 1367902, at \*5 (E.D. Cal. Apr. 1, 2024) (holding BOP properly denied FSA credits for transit periods where participation was impossible). Even post-*Loper Bright v. Raimondo,*

20

603 U.S. 369 (2024), agency regulations remain entitled to respect under both *Loper Bright* and *Skidmore v. Swift & Co.,* 323 U.S. 134 (1944)*,* where, as here, they reflect expertise, thorough consideration, and valid reasoning. *See Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC,* 982 F. 3d 258, 264 (4th Cir. 2020). Thus, because White was not actively participating in assigned programming at FTC Oklahoma City, the lower court correctly affirmed BOP's determination that White was not in earning status. This interpretation preserves Congress's intent to link ETCs directly to recidivism-reduction program participation rather than passive confinement, *i.e.* congressional intent to promote rehabilitation through participation in programs, not just keeping people confined.

In essence, White's failure to participate in any assigned programming at FTC Oklahoma City means he earned no ETCs during those four days – credits for which he has no legally cognizable protected liberty interest. This Court should therefore affirm the district court's judgment and disregard White's meritless attempt to rewrite the FSA and gut Congress's recidivism-reduction mandate. Moreover, the recent Supreme Court decision in *Loper Bright* does not undo the otherwise well-founded regulatory framework or the district court's ruling. Primarily, *Loper Bright* does not disturb cases that relied on the *Chevron* framework. *See Loper Bright*, 603 U.S. at 412 ("We do not call into question prior cases that relied on the *Chevron* framework."). However, even without *Chevron* deference, BOP's regulations meet

21

the *Loper Bright* standard and deserves substantial respect under *Skidmore,* based on the BOP's expertise and careful reasoning.

## STANDARD OF REVIEW

This Court reviews the district court's denial of habeas corpus relief de novo. *Valladares v. Ray*, 130 F.4th 74, 80 (4th Cir. 2025). This Court also reviews questions of statutory interpretation de novo. *Id., see also Henderson v. Harmon,* 102 F.4th 242, 247 (4th Cir. 2024); *United States v. Turner*, 389 F.3d 111, 119 (4th Cir. 2004).

## ARGUMENT

**I. The District Court properly determined that an inmate does not have a protected liberty interest in the earning and application of ETCs under the Fifth Amendment of the United States Constitution.[11]**

---

[11] White's argument that the Government has waived or forfeited any argument regarding due process is baseless and absurd. The Government did not intentionally abandon the issue of due process; it merely did not address it below, as the argument regarding due process was unnecessary given that the plain reading of the statute indicates that White's was not entitled to ETCs when he had not "successfully participat[ed]" in any programming while in transfer status. JA. 165. Additionally, the district court's detailed ruling shows that the due process issue was live below, and the Government never waived it's right to argue it. *See United States v. Olano,* 507 U.S. 725, 733 (1993). Even if the Court accepted White's argument, this Court explicitly requested that the Government brief the issue on appeal. ECF No. 9. Indeed, as the Supreme Court has long held, "the matter of what questions may be taken up … on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." *Singleton v. Wulff*, 428 U.S. 106, 121 (1976). Clearly, the Court has deemed the issue significant so as to order the Government to brief the argument on appeal. *Id.*

Thus, the issue of due process was not waived because it was never intentionally relinquished. Even if forfeited, plain error review permits consideration. *Olano,*

Ultimately, "[t]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." *Greenholtz v. Inmates of Neb. Penal & Cor. Complex,* 442 U.S. 1, 7 (1979). It is settled that although "lawful imprisonment necessarily makes unavailable many rights and privileges of the ordinary citizen," prisoners are entitled, in certain limited and specified instances, such as disciplinary proceedings, to the protections of the Due Process Clause. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974). Specifically, they "may not be deprived of life, *liberty*, or property without due process of law." *Id.; see also* U.S. CONST. AMEND. V (emphasis added). And while "there is no iron curtain drawn between the Constitution and the prisons of this country," "the fact that prisoners retain rights under the Due Process Clause in no way implicates that these rights are not subject to restrictions imposed by the nature of the regime to which they have been lawfully committed." *Id.,* at 555–56 (internal citations omitted). "A liberty interest may only derive "from the Constitution itself, or . . . from an expectation or interest created by state laws or policies." *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005); *see also Wolff,* 418 U.S. at 556–58.

---

507 U.S. at 733. Further, the Fourth Circuit's explicit request for briefing confirms its authority and intent to resolve the issue of due process to ensure correct application of law without prejudice to any party. *Singleton,* 428 U.S. at 121.

23

To succeed on a procedural or substantive due process claim, an inmate "must have a legitimate claim of entitlement" to the alleged "liberty or property interest which has been interfered with." *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460 (1989).   This Court routinely uses the two-prong test set forth in *Sandin v. Conner,* 515 U.S. 472, 484 (1995) and applied in *Wilkinson*: to establish a liberty interest, a "prisoner must show (1) denial of 'an interest that can arise either from the Constitution itself or from state laws or policies,' and that (2) "this denial imposed on him an 'atypical and significant[12] hardship . . . in relation to the ordinary incidents of prison life'" which may also impact the inmate's sentence duration. *Prieto v. Clarke,* 780 F.3d 245, 251 *(*4th Cir. 2015) (quoting *Sandin,* 515 U.S. at 484); *see also Lovelace v. Lee,* 472 F.3d 174, 202 (4th Cir. 2006); *Burnette v. Fahey,* 687 F.3d 171, 181 (4th Cir. 2012).  Essentially, an inmate "can only be *deprived* of that to which he is entitled." *Prieto,* 780 F.3d at 254 (emphasis in the original).

Here, White asserts that both prongs of the *Sandin* analysis are met because: (1) "the FSA, plus the implementing regulations, program statement, and BOP practice, have created a real right or expectation in earning and applying FSA time

---

[12] The "atypical and significant hardship" inquiry only applies to challenges about the conditions of confinement "because claimants must show that the condition complained of is sufficiently onerous in order for that condition to rise to the level of a liberty interest.  No such test is necessary where the claim involves the *duration* of confinement because freedom from confinement is necessarily in the nature of a liberty interest." *Mills v. Holmes,* 95 F. Supp. 3d 924, 933 (E.D. Va. 2015).

24

credits"; and (2) because "FSA time credits shorten a federal prisoner's sentence" and thus satisfy the duration element. Op. Br. 19, 40—41. White both complicates and oversimplifies the issue he raises, and, is in fact, incorrect.

A. <u>White cannot establish a liberty interest because unlike GCT, there is no clearly delineated and specifically enumerated statutory entitlement in the earning and application of ETCs.</u>

With the congressional creation of an incentive structure—including the earning and application of ETCs—the FSA also changed how GCT is calculated. The inclusion of this change in the amalgamation of statutory amendments included in the FSA can lend itself to confusion and oversimplification which was clearly done here. However, ETCs and GCT are distinct and must be evaluated differently.

Prior to the FSA, 47 days of GCT was awarded for every year the inmate *served* of his or her sentence. The FSA simplified the structure, now providing that up to 54 days of GCT are awarded for every year of the sentence *imposed. See* 18 U.S.C. § 3624(b)(1) (emphasis added);[13] *see also United States v. Parker*, No. 1:01-

---

[13] "[A] prisoner who is serving a term of imprisonment of more than 1 year other than a term of imprisonment for the duration of the prisoner's life, may receive credit toward the service of the prisoner's sentence, of up to 54 days for each year of the prisoner's sentence imposed by the court, *subject to determination by the Bureau of Prisons* that, during that year, the prisoner has displayed exemplary compliance with institutional disciplinary regulations. Subject to paragraph (2), if the Bureau determines that, during that year, the prisoner has not satisfactorily complied with such institutional regulations, the prisoner shall receive no such credit toward service of the prisoner's sentence or shall receive such lesser credit as the Bureau determines to be appropriate."

cr-248, 2019 WL 2005652, at *1 (M.D. Pa. May 7, 2019); *United States v. Smith,* No. 06-20659, 2020 WL 705144 (E.D. Mi. Feb. 12, 2020). Unlike ETCs, GCT is an automatic entitlement awarded to every inmate upon commencement of their sentence, regardless of conviction, so long as he or she complies with institutional rules. *Compare* 18 U.S.C. § 3624(b)(1) *with* 18 U.S.C. § 3631(b)(2). It can only be taken away in disciplinary proceedings after the inmate is afforded a hearing with certain limited procedural due process protections. *See Wolff,* 418 U.S. at 556. Congress conditioned both the earning and application of ETCs, on the other hand, on the fulfillment of several different prerequisites. Namely, as a preliminary matter and as explained *supra*, an inmate must: (1) show that he is not precluded from receiving ETCs based on his crime of conviction pursuant to 18 U.S.C. § 3632(d)(4)(D); and (2) that he has "successfully participated" in EBRR programs or PAs, 18 U.S.C. § 3632(a). Congress's intentional imposition of conditions on both the earning and application of ETCs while simultaneously updating and streamlining how GCT should be calculated makes clear that it intended GCT and ETCs to be treated differently. Specifically, it created a liberty interest in GCT that does not extend to ETCs. *See* 18 U.S.C. §§ 3631(b)(2), 3632(d)(4)(D)*; see also Mills v. Starr,* Civ. No. 21-1335, 2022 WL 4084178, at *4 n.4 (D. Minn. Aug. 17, 2022) ("To clarify, good conduct time is different than time credits under the First Step Act. Good conduct time credit reduces a prisoner's actual time in BOP custody by

26

awarding credit toward the service of the prisoner's sentence. 18 U.S.C. § 3624(b). Time credits, on the other hand, provide an extra incentive for inmates to participate in EBRR programs or PAs by providing time credits that can be applied toward prerelease custody or supervised release. 18 U.S.C. § 3632(d)(4)(A), (C).")). Instead, ETCs, may be earned and applied only after several conditions are met.

B. <u>The earning and application of ETCs requires satisfaction of too many statutory conditions to give rise to a liberty interest.</u>

As stated *infra*, Congress intentionally placed statutory conditions, or prerequisites, that must be satisfied before an inmate can earn and apply ETCs. Specifically, this multi-step directive to the Attorney General, in consultation with the Director of the BOP, to (1) create and develop a risk and needs assessment that can accurately review and predict an individual's progression and regression while in prison and reflect their recidivism risk level; *see* 18 U.S.C. § 3631(a)(1)-(b)(1)–(4); (2) determine an individual inmate's recidivism risk level and specific needs under said risk and needs assessment; (3) determine whether the inmate is eligible, based on their count of conviction(s), pursuant to 18 U.S.C. § 3232 (d)(4)(D), to receive ETCs; (4) create and implement EBRR programs and PAs for inmates to "successfully participate" in; *see* 18 U.S.C. § 3631(b)(2); (5) determine whether the individual inmate is "successfully participating" in said EBRR programs or PAs; *see* 18 U.S.C. § 3232(a)(5); (6) determine whether the inmate is a low or minimum recidivism risk[1] level utilizing PATTERN; *see* 18 U.S.C. § 3624(g); and (7) if the

individual inmate is a low or minimum recidivism risk level utilizing PATTERN, determine whether the inmate has earned ETCs "in an amount that is equal to the remainder of the prisoner's imposed term of imprisonment," 18 U.S.C. § 3624(g)(1)(A), is extensive. ETCs are not, and were never intended to be, a handout. Rather, Congress specifically created the above conditions to ensure that inmates are properly incentivized to reduce their recidivism by "successfully participating" in approved EBRR programs and PAs.

Indeed, many courts, including two sister Circuit Courts of Appeals, have found that an inmate has no protected liberty interest in the earning or application of ETCs due to the conditional nature of the credits. *See Cheng v. United States,* 132 F.4th 655, 659 (2d Cir. 2025) ("Because Cheng had no protected interest in the award of good time credits under the FSA, we reject his due process claim."), *cert denied*, No. 24-6319, 145 S. Ct. 1221 (Feb. 24, 2025); *Fiorito,* 2022 WL 16699472, at *6. ("Unlike good-time credit accumulated under § 3624(b), FTCs are not a general entitlement. Instead, prisoners are merely afforded the *opportunity* to earn FTCs by participating in recidivism-reduction programming. Although FTCs themselves are a recent creation, many courts examining similar time-credit schemes have held that the loss of a mere *opportunity* to accumulate credit towards a sentence is not sufficient to create a protected liberty interest. The general rule that the loss of an opportunity to earn a reduction in sentence does not amount to infringement of a

28

protected liberty interest makes particular sense in the context of FTCs, as the opportunity to participate in recidivism-reduction programming can be lost for several reasons, including reasons having nothing to do with the conduct or blameworthiness of the prisoner.")); *aff'd Fiorito v. Fikes,* No. 23-1006, No. 23-1007, 2023 WL 4841966 (8th Cir. 2023); *Sedlacek v. Rardin,* No. 24-1254, 2025 WL 948485, at *1 (6th Cir. 2025) ("We agree that because the FSA earned-time credits are *conditional,* they do not create a liberty interest.") (emphasis added); *Fontanez v. Rardin,* No. 2:23-cv-12415, 2024 WL 1776338 (E.D. Mich. Apr. 24, 2024); *Clinkenbeard v. King,* No. 23-3151, 2024 WL 4355157, at *6 (D. Minn. June 20, 2024) ("A liberty interest cannot be created by statute which, like the FSA, only *conditionally* grants prisoners the opportunity to accrue credits possibly affecting the duration of said prisoner's confinement.") (emphasis in the original)); *Gant v. King,* No. 23-cv-1766 (NEB/ECW), 2023 WL 6910771, at *3 (D. Minn. Oct. 19, 2023) ("Given the contingent nature of the application of FSA time credits to prerelease custody, they cannot reasonably be regarded as an entitlement.")); *Mars v. Heisner,* No. CV-22-01933-PHX-SPL (JZB), 2023 WL 4977335, at *7 (D. Ariz. June 26, 2023) (a prisoner does not "have a constitutional right to 'apply' his FSA time credits in a specific manner, such as demanding that he be granted prerelease custody or home confinement"), *report and recommendation adopted, Mars v. Heisner,* No. CV-22-01933-PHX-SPL (JZB), 2023 WL 4960411 (D. Ariz. Aug. 3, 2023); *Bloom v.*

29

*Fed. Bureau of Prisons,* No 19-21589 (KMW)(SAK), 2022 WL 341200, at *2 (D. N.J. Feb. 4, 2022) ("prisoners have no constitutionally protected liberty interest in an opportunity to earn additional good time or similar credits."); *Wright v. Warden FCI Bennettsville,* No. 5:23-cv-00221-DCC, 2023 WL 3853461, at *2 (D.S.C. June 6, 2023).

Contrary to White's argument, the FSA does not simply "shortens [sic] sentences." Op. Br. at 46. While an inmate may apply 365 days of ETCs towards supervised release, that is not directly shortening his sentence – an inmate is transferred from the legal custody of the BOP to the oversight of the appropriate United States Probation Office; only the sentencing Court, not the BOP, may shorten an inmate's sentence. *See Smith v. Warden, FCI Beckley,* No. 5:23-cv-00360, 2024 WL 832879, at *6 (S.D.W. Va. Feb. 1, 2024) ("This provision, [18 U.S.C. § 3632(d)(4)(C)], does not suggest that the term of supervised release might be reduced (or eliminated) because of time credits. Rather it [FSA] contemplated that the prisoner will be released to begin any such term of supervised release that was include[d] in a prisoner's sentence.").

Throughout his brief, White relies heavily on two non-binding cases, *Adepoju v. Scales,* No. 3:25-cv-245, 2025 WL 1392287 (E.D. Va. May 14, 2025) and *Cardoza v. Pullen*, No. 3:22-cv-00591, 2022 WL 3212408 (D. Conn. Aug. 9, 2022) to support the patently illogical and impractical notion that *any* time an inmate spends time

30

"outside" prison walls, they should be afforded due process. Op. Br. at 34, 37, 41. In *Adepoju*, the district court found that Adepoju, a non-citizen, retained a liberty interest in his *return* from prerelease custody to a BOP institution because he "was not given any notice, explanation, or an opportunity to contest this decision." *Adepoju,* 2025 WL 1392287, at *12. And in *Cardoza*, notably a case premised on the CARES Act, not the FSA, the district court found that in fact, Cardoza **did not** have a liberty interest in her return to a BOP institution from home confinement. *See Cardoza,* 2022 WL 3212408, at *14 ("[T]he Court is constrained by *Morrissey, Young*, and their progeny to find that Petitioner has not plausibly alleged that she had a liberty interest in remaining on home confinement and, therefore, that no process was due to Petitioner when the BOP revoked her home confinement. Her procedural due process claim is dismissed.") (emphasis added). More to the point, White's individualized circumstances are different from both *Adepoju* and *Cardoza*: namely he was not already in prerelease custody or home confinement. Instead, he spent approximately four days at FTC Oklahoma City, a BOP institution, where he remained before transferring to another BOP institution, FCI Cumberland. JA 76. The BOP retains sole discretion regarding where to designate an inmate. 18 U.S.C. § 3621(b); *see also U.S. v. Wilson,* 503 U.S. 329, 335 (1992) (only the Attorney General, through the BOP, may administer a federal inmate's sentence, including where the inmate serves his sentence).

31

White's suggestion that he be afforded procedural due process protections before transfer, is not only legally incorrect, but logistically impractical. Pursuing White's legal theory to its logical conclusion, every time that an inmate goes to a hospital, is transferred on writ, and/or transferred in between facilities, a liberty interest is automatically triggered. *See* 28 C.F.R. § 523.41(c); *see also Meachum v. Fano,* 427 US. 215, 223—24 (1976) ("Transfer . . . from medium to maximum security prisons did not infringe or implicate a 'liberty' interest of prisoners within meaning of due process clause."). This burden on BOP's administration and orderly operation of its mission could not be what Congress intended. Congress, when developing the FSA, was aware that the BOP houses the largest prison population in the country. Currently, the BOP has 155,933 inmates in its care and custody. *See* Federal Bureau of Prisons, <u>About Our Agency</u>, *available at* *https://www.bop.gov/about/agency/* (last visited July 9, 2025). These inmates are frequently sent out on writ, transferred between institutions, and transported to community hospital providers for care and treatment. Requiring a due process hearing for every single inmate every time one of these events occurs would create an undue burden on staff and could jeopardize the safety of the inmate, *e.g.,* a delay in transfer to a hospital because a due process hearing would need to occur. And in White's case, notwithstanding that he does not have a liberty interest in the earning

or application of ETCs, even if this Court found otherwise, White cannot have any ETCs applied because he is a medium recidivism[14] risk level.  JA 23.

White's attempt at parsing out the conditional nature that Congress, *not the BOP,* placed on the earning and application of ETCs, must fail.  Accordingly, this Court should uphold the lower court's finding that White does not have a liberty interest in the earning and/or application of ETCs.

## II.   The District Court properly concluded that White was precluded from receiving ETCs while at FTC Oklahoma City.

A. While Congress does not define "successful participation," the canons of statutory construction support that Congress did not intend to reward inmates for being in prison; rather, it intended that inmates show that they successfully participated in individualized recommended programming.

The FSA, as discussed at length *supra*, was not intended to grant rewards merely for being incarcerated; an inmate does not earn ETCs simply by passively residing in prison.  Rather, the FSA was enacted "with the purpose of modifying prior sentencing law and expanding vocational training, early release programs, and other initiatives designed to reduce recidivism."  *Venable*, 943 F.3d at 188. Specifically, the statute provides:

---

[14] White, in fact, concedes that none of the ETCs he has earned can be applied because he is a medium recidivism risk level inmate.  *See* JA 132 ("Here, I challenge the constitutionality of 28 CFR § 523.41(c)'s bar on me earning ETCs while in the Special Housing Unit ("SHU"). Decl para 10-16. Nowhere do I ask for the credits to be applied and I will not be eligible for their application until at least 2029.") (emphasis added).

**(A)** In general.—A prisoner, except for an ineligible prisoner under subparagraph (D), who successfully completes evidence-based recidivism reduction programming or productive activities, shall earn time credits as follows:

**(i)** A prisoner shall earn 10 days of time credits for every 30 days of *successful participation* in evidence-based recidivism reduction programming or productive activities.

**(ii)** A prisoner determined by the Bureau of Prisons to be at a minimum or low risk for recidivating, who, over 2 consecutive assessments, has not increased their risk of recidivism, shall earn an additional 5 days of time credits for every 30 days of *successful participation* in evidence-based recidivism reduction programming or productive activities.

*See* 18 U.S.C. § 3632(d)(4)(A)(i)-(ii). To be sure, Congress did not define "successful participation." However, "if the court can ascertain Congress' intent on a particular question by applying the traditional rules of statutory construction, then it must give effect to that intent." *Brown & Williamson Tobacco Corp. v. Food & Drug Admin.,* 153 F.3d 155, 162 (4th Cir. 1998) (internal citations omitted). "The goal of statutory interpretation is to implement congressional intent." *Cabell Huntington Hosp., Inc. v. Shalala,* 101 F.3d 984, 986 (4th Cir. 1996). "Although the task of statutory construction generally begins with the actual language of the provision in question, the inquiry does not end there." *Brown*, 153 F.3d at 162. Context is crucial. Courts "must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *United States Nat'l Bank of Oregon v. Independent Ins. Agents of America, Inc.,* 508 U.S. 439, 455 (1993) (internal quotations omitted). "Thus, the traditional rules of statutory construction to be used in ascertaining congressional intent include: the

34

overall statutory scheme, the history of evolving congressional regulation in the area, and a consideration of other relevant statutes." *Brown,* 153 F.3d at 162 (internal citations and quotations omitted).

Here, as noted above, Congress did not explicitly define "successful participation" or "completion of" EBRR programs or PAs; however, the canons of statutory construction lend themselves to determining Congress' intent. *See* 18 U.S.C. § 3635. The word "for" in this context serves "to indicate equivalence in exchange." *For*, MERRIAM-WEBSTER'S DICTIONARY (2022 ed.). The law provides time credits in exchange for successful participation in EBRR programming or PAs. It does not provide time credits in exchange "for the time" that an inmate spends in prison, contrary to what White avows. Op. Br. at 22, 25. One "essential element of context that gives meaning to words" is the "evident purpose of what a text seeks to achieve." A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 20 (2012). "As is apparent from the overall statutory language, the obvious purpose of Congress – in providing for these time credits – was to provide an incentive for prisoners to attend the recidivism reduction programs Congress was devising." *Geurriero v. Miami RRM,* No. 24-10337, 2024 WL 2017730, at *3 (11th Cir. 2024). Time credits are not rewards for *being* in prison; they are incentives to *participate* in programs that reduce recidivism. White's claim would reduce the efficacy of this incentive by enabling prisoners to earn credits merely by serving time, rather than

35

attempting to or actively working toward reducing their risk of recidivism. His position would destroy "the statute's connection between" participating in recidivism reduction programming and the award of time credits in return. *See Barber v. Thomas,* 560 U.S. 474, 483 (2010).

To be clear, "[t]he meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used." *Reno v. Koray*, 515 U.S. 50, 56 (1995); *Graham County Soil & Water Conservation Dist. V. United States ex. rel. Wilson,* 545 U.S. 409, 415 (2005) ("Statutory language has meaning only in context."). White's interpretation of 18 U.S.C. § 3632(d)(4) and 18 U.S.C. § 3632(a) fails not only to account for the plain meaning of "successfully participating", but also neglects critical context – including the FSA's structure and purpose. These considerations make clear that an inmate must successfully participate in programming to earn and apply ETCs. Relevant here, the word "success" means "[t]he achievement of a desired result or outcome; the accomplishment of an aim or purpose." *Success,* OXFORD ENGLISH DICTIONARY ONLINE (July 9, 2025), *available at:* http://doi.org/10.1093/OED/4351349770. One cannot measure success without reference to a pre-existing desire, aim, or purpose – the goal of the endeavor in the first place. For instance, a student cannot successfully complete coursework without first having it assigned. And, in this context, the BOP establishes the relevant goal by "determine[ing] the type and amount of [EBRR] programming that is appropriate

36

for each prisoner and assign[ing] each prisoner to such programming accordingly, and based on the prisoner's specific criminogenic needs." 18 U.S.C. § 3632(a)(3).

An inmate's successful participation in recidivism reduction programming thus depends on whether he has fulfilled the *assignment.* "The PATTERN tool helps the [BOP] to determine the type of recidivism reduction programming most appropriate for each inmate" and "[a] system of time credits and other incentives encourages inmates to participate in *this* recidivism reduction programming." *Falcetta v. Rosalez,* No. 23-50159, 2024 WL 890124, at *2 (5th Cir. Mar. 1, 2024) (emphasis added); *see Martin v. LeMaster,* No. 21-6247, 2022 WL 18145207, at *1 (6th Cir. Oct. 19, 2022) ("A prisoner who successfully completes assigned EBRR or PA programs shall earn certain time credits."). The BOP naturally cannot measure an inmate's success without reference to the goals and benchmarks that it assigns.

In any event, the provision of the FSA authorizing time credits—Section 3632(d)(4)— "cannot be construed in the abstract." *Pulsifer v. United States,* 601 U.S. 124, 140 (2024). It must be read "in [its] context and with a view to [its] place in the overall statutory scheme." *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 133 (2000). Section 3632(d)(4) does not create a standalone mechanism for reducing prison time. Rather, it exists and operates within a broader system – namely, the BOP's risk and needs assessment system. A prisoner therefore can only earn time credits *via* the risk and needs assessment system, which by its plain terms

37

requires a threshold assessment of the prisoner's risk and needs. And a prisoner can only apply ETCs once he "successfully participates" in programming. 18 U.S.C. § 3632(d)(4); *see also* 18 U.S.C. § 3632(a)(5). Accordingly, the assertion that White should receive ETCs while in transfer status without any showing of participation is a fallacy.

B. The BOP properly promulgated 28 C.F.R. § 523.41(c)(4)(i)-(v) to assist the BOP in determining whether an inmate is "successfully participating."

The APA, *see* 5 U.S.C. § 551, *et. seq.,* was created to assist agencies, including executive agencies, in creating and administering rules "designed to implement, interpret, or prescribe law or policy . . . ." 5 U.S.C. § 551(1), (4). Because 18 U.S.C. § 3632(d)(4) and 18 U.S.C. § 3632(a)(5) do not define "successful participation," the BOP, using that authority and its extensive expertise, promulgated 28 C.F.R. § 523.41(c)(4)(i)-(v) to aid the BOP in fulfilling Congress' intent. *Inst. S'holder Serv, Inc. v. Sec. and Exch. Comm'n,* No. 24-5105,2025 WL 1802786, n. 5 (D.C. Cir. July 1, 2025) (Additionally, "if an agency is authorized to exercise a degree of discretion in defining statutory terms, our role under the APA is to independently interpret the statute and effectuate the will of Congress subject to constitutional limits by recognizing constitutional delegations, fixing the boundaries of the delegated authority, and ensuring the agency has engaged in reasoned decision-making within those boundaries") (quoting *Loper Bright,* 603 U.S. at 394–95 (internal quotation marks omitted)).

38

On January 19, 2022, the BOP published its procedures regarding the earning and application of time credits as authorized by the FSA. 87 Fed. Reg. 12, 2712 (January 19, 2022) (codified at 28 C.F.R. pt. 523), *available at* https://www.govinfo.gov/content/pkg/FR-2022-01-19/pdf/2022-00918.pdf (last visited July 2, 2025). In that publication, the BOP specifically stated: "[t]he proposed rule on this subject was published on November 25, 2020 (85 FR 75268). The public comment period ended on January 25, 2021. The Bureau received over two hundred and fifty responses to the publication of the proposed rule." *See id.* at 2706. Specifically, in response to the public comment: "*FSA Time Credits should be earned for successful participation, not only for successful completion,*" BOP delineated several situations in which earning ETCs may be suspended when the inmate is unable to participate in recommended programming. Specifically, it stated:

> The regulation indicates that accrual of Time Credits may be suspended in certain situations when the inmate is unable to participate in recommended programming, including, but not limited to situations such as:
>
> - Placement in a Special Housing Unit;
> - Designation status outside the institution (*e.g.,* for extended medical placement in a hospital or outside institution, court appearances, an escorted trip, a furlough, etc.);
> - Temporary transfer to the custody of another federal or non-federal government agency (*e.g.,* on state or federal writ, transfer to state custody for service of sentence, etc.);
> - Placement in mental health/psychiatric holds; or

39

- "Opting out" (choosing not to participate in the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment).

*See id.,* at 2711. No comments responsive to this update were observed, either in support of or against this regulation. *Id.* Subsequently, 28 C.F.R. § 523.41 and 28 C.F.R. § 523.42 were codified. An inmate, therefore, is not considered to be "successfully participating" in programming in situations "*including, but not limited to*:"

(i) Placement in a Special Housing Unit;

(ii) Designation status outside the institution (*e.g.,* for extended medical placement in a hospital or outside institution, court appearances, an escorted trip, a furlough, etc.);

(iii) Temporary transfer to the custody of another federal or non-federal government agency (*e.g.,* on state or federal writ, transfer to state custody for service of sentence, *etc.*);

(iv) Placement in mental health/psychiatric holds; or

(v) "Opting out" (choosing not to participate in the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment).

*See* 28 C.F.R. § 523.41(c)(4)(i)-(v).

Indeed, several district courts have upheld BOP's reasonable interpretation of "successful participation." *See, e.g., Shemtov v. Birkholz,* No. 24-cv-10630-SRM-JC, 2025 WL 1490543 (C.D. Cal. March 13, 2025) ("The critical question here is whether [Petitioner] in fact completed or 'successfully participated' in any qualified programs or productive activities in the relevant time period ...."); *Jobin,* 2024 WL 1367902, at *5 ("Congress thus made clear that a prisoner earns FSA credits based

40

on the days in which he actively participates in eligible programs. The BOP reasonably interpreted § 3632 in determining that eligible inmates are not 'successfully participating' in programming when they are in transit to 'the custody of another Federal or non-Federal government agency.' *Id.;* 28 C.F.R. § 523.41(c)(4)(iii). The BOP therefore correctly excluded the 333 days spent in transit when it calculated Petitioner's total FSA credits."); *Pierce v. LeMaster,* No. 24-7-DLB, 2024 WL 439447, at *2 (E.D. Ky. Jan. 29, 2024) ("Relying upon subsection (c)(4)(ii), the BOP denied 137 days of eligibility status for FSA credits to Pierce, and properly so. By its terms, Section 3632(d)(4)(A) requires a prisoner to successfully complete EBBR programming or PAs to earn FSA credit. There are limited exceptions, but by regulation certain locational transfers remove the prisoner from earning status, often in situations where the EBBR programming or PAs are simply unavailable. 28 C.F.R. § 523.41(c)(4)(i)-(iv)."); *Smith v. Eischen*, No. 22-CV-1704 (NEB/DJF), 2023 WL 4203165, at *1 (D. Minn. June 27, 2023) ("Eligible inmates are not 'successfully participating' in programming when they are in transit to 'the custody of another Federal or non-Federal government agency.'"); *Yanagihara v. Derr*, No. 22-CV-145-JAO-RT, 2023 WL 2163685, at *5 (D. Haw. Feb. 22, 2023); *Caudillo v. Carter*, No. 22-CV-01265-CNS, 2022 WL 17454446, at *4 (D. Colo. Dec. 6, 2022); *Mohammed v. Warden Stover, FCI Danbury*, No. 3:23-CV-757

41

(SVN), 2023 WL 7300592, at *3 (D. Conn. Nov. 6, 2023); *Alvarez v. Cox*, No. 2:23-CV-00018, 2023 WL 9110918, at *4 (S.D. Tex. Nov. 3, 2023), *report and recommendation adopted*, 2024 WL 69079 (S.D. Tex. Jan. 5, 2024); *Cabebe v. Derr*, No. 22-CV-496 SOM-KJM, 2023 WL 2713652, at *2 (D. Haw. Mar. 30, 2023); *Stevens v. Jacquez,* No. 3:23-cv-01482-AA, 2024 WL 3200546, at *2 (D. Ore. June 25, 2024) ("Pursuant to BOP implementing regulations, '[a]n eligible inmate begins earning FSA Time Credits after the inmate's term of imprisonment commences (the date the inmate arrives or voluntarily surrenders at the designated Bureau facility where the sentence will be served).' 28 C.F.R. § 523.42(a). AICs may earn credit by 'successfully participating in EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment.'")); *Dunlap v. Warden FMC Devens,* 2024 WL 5285006 (D. Mass. Dec. 13, 2024) ("Unlike the court in *Sharma*, however, I am not persuaded that the FSA requires the BOP to give ETCs for periods during which a prisoner has not successfully participated in BOP-assigned EBRR programming. It is difficult to discern much consistency in the BOP's practices, which sometimes grant ETCs to prisoners without regard to any actual participation, but that does not mean that the FSA creates an entitlement to receive ETCs under such circumstances."); *but see Sharma v. Peters*, 756 F. Supp. 3d 1271 (M.D. Ala. 2024); *Jackson v. Doerer,* No. 5:24-01353-ADS, 2024 WL 4719489, at *8 (C.D. Cal. Nov. 7, 2024).

42

Here, the regulation applies to White. White was not at a designated institution where he was successfully participating in approved EBRR programs or PAs nor does he claim to be. Op. Br. at 26. Instead, White routinely asserts that because he was physically on BOP property, he should receive ETCs. *See id.* However, this oversimplification ignores the important prerequisite that he must be "successfully participating" in programming which he did not do at a transfer center because, as previously discussed *supra*, FTC Oklahoma City, by definition, is a transitory institution. It is not intended to be a holdover or transfer inmate's final designation, and as such, an inmate's assigned unit team does not have the necessary documentation and resources to perform the initial risk and needs or aid in programming. This is in alignment with the plain reading of the statute in conjunction with the purpose of ETCs. Accordingly, the regulation is a reasonable interpretation of 18 U.S.C. § 3632(d)(4) and 18 U.S.C. § 3632(a)(5) and this Court should uphold the district court's finding.

C. *Chevron* deference was appropriate under *stare decisis*, *Loper Bright* does not alter this outcome, and *Skidmore* deference would alternatively apply.

A reversal of the district court's decision premised on *Chevron* is neither warranted nor required here because The Supreme Court's decision in *Loper Bright* does not vitiate cases that premised its holdings on the deference afforded by *Chevron*. *See Loper Bright*, 603 U.S. at 412 ("We do not call into question prior cases that relied on the *Chevron* framework. The holdings of those cases that specific

43

agency actions are lawful . . . are still subject to statutory *stare decisis*[15] despite our change in interpretive methodology."). But, even if this Court determines that 28 C.F.R. § 523.41(c) is not afforded the level of deference that the district court gave it *two years* before *Loper Bright* was decided, BOP's interpretation still meets the *Loper Bright* standard, and the case can be evaluated under *Skidmore v. Swift & Co.,* 323 U.S. 134, 140 (1944). *See Nicoletti,* 2025 WL 80294, at *2, *vacated, reversed, and remanded to Nicoletti v. Bayless,* No. 5:23-cv-120, 2023 WL 11920620 (N.D.W. Va. Dec. 18, 2023) (The Supreme Court's decision in *Loper Bright* does not appear to impact the framework established in *Skidmore.* 144 S. Ct. at 2262–63; *see id.* at 2309 (Kagan, J., dissenting) ("[T]he majority makes clear that what is usually called *Skidmore* deference continues to apply. Under that decision, agency

---

[15] Stare decisis, the doctrine "to stand by the thing decided and not disturb the calm," *Ramos v. Louisiana,* 590 U.S. 83, 116 (2020) (Kavanaugh, J., concurring), "'is a principle of policy' and neither "a mechanical formula of adherence" nor an 'inexorable command.'" *Payne v. Taslimi*, 988 F.3d 648, 653 (4th Cir. 2021). This Court has routinely held that the doctrine of stare decisis stands. *See Payne*, 988 F.3d at 654 ("[A]s an inferior court, the Supreme Court's precedents do constrain us. *See Agostini v. Felton*, 521 U.S. 203, 237, 117 S. Ct. 1997, 138 L.Ed.2d 391 (1997). In looking up to the Supreme Court, we may not weigh the same factors used by the Supreme Court to evaluate its own precedents in deciding whether to follow their guidance. We must simply apply their commands. So even were we to correctly conclude that a Supreme Court precedent contains many "infirmities" and rests on "wobbly, moth-eaten foundations," it remains the Supreme Court's "prerogative alone to overrule one of its precedents." *State Oil Co. v. Khan*, 522 U.S. 3, 20, 118 S. Ct. 275, 139 L.Ed.2d 199 (1997) (quoting *Khan v. State Oil Co.*, 93 F.3d 1358, 1363 (7th Cir. 1996) (Posner, J.)). It is beyond our power to disregard a Supreme Court decision, even if we are sure the Supreme Court is soon to overrule it.").

44

interpretations constitute a body of experience and informed judgment that may be entitled to respect." (cleaned up))).

At issue in *Loper Bright* was a rule promulgated by the National Marine Fisheries Service ("NMFS") pursuant to the Magnuson-Stevens Act, 16 U.S.C. § 1801 *et seq.*, which incorporates the APA, 5 U.S.C. § 551 *et seq.*; *Loper Bright,* 144 S. Ct. at 2254–56. In separate actions, the two *Loper Bright* petitioners challenged the NMFS rule, alleging that it was unauthorized under the Magnuson-Stevens Act. *Id.* at 2255–57. In evaluating the NMFS rule, the reviewing courts applied the two-step framework set forth in *Chevron* that was broadly applicable to review of agency action and resolved the cases in favor of the Government. *Id.* When "review[ing] an agency's construction of the statute which it administers" under *Chevron*, a court's first inquiry was "whether Congress ha[d] directly spoken to the precise question at issue," and "[i]f the intent of Congress [wa]s clear, that [wa]s the end of the matter." *Id.* at 842. But, "if the statute [wa]s silent or ambiguous with respect to the specific issue, the question for the court [wa]s whether the agency's answer [wa]s based on a permissible construction of the statute." *Id.* at 843. If an agency offered a "reasonable interpretation," a court afforded the agency's interpretation deference, even if the court would have reached a different construction. *Id.* at 843–44.

45

However, in *Loper Bright*, the Supreme Court overturned *Chevron,* and held that courts need not, and under the APA may not, defer to an agency's interpretation of the law simply because a statute is ambiguous. *See id.* at 2263–73. The Court observed that "*Chevron* cannot be reconciled with the APA . . . by presuming that statutory ambiguities are implicit delegations to agencies." *Id.* at 2265. Rather, "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Id.* at 2273. For purposes of such an inquiry, the "question that matters" is: "Does the statute authorize the challenged agency action?" *Id.* at 2269. As the Supreme Court has articulated, "[c]areful attention to the judgment of the Executive Branch may help inform that inquiry" and, "when a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it." *Id.* at 2273. And as stated above, *Loper Bright* did not "call into question prior cases that relied on the *Chevron* framework" like the district court's holding in this case. *See Loper Bright*, 603 U.S. at 412.

However, "even post-*Loper Bright*, courts should still defer to an agency's interpretation when a statute expressly delegates interpretive authority to an agency or when the statute allows the agency to 'fill up the details of a statutory scheme.'" *Clinkenbeard v. King*, No. 23-3151 (JRT/LIB), 2024 WL 4355063 (D. Minn. Sept. 30, 2024) (quoting Loper Bright, 603 U.S. at 395). Such is the case here.

46

As noted by the court in *Clinkenbeard*, "the Attorney General and the [BOP] are entrusted with sole authority to compute federal sentences ... The [FSA] also expressly delegates at least some authority to the Attorney General and [BOP] to fill up the details of the time credit system [by directing them to develop a 'risk and needs assessment system but giving the agency the discretion to determine the parameters thereof]." *Clinkenbeard,* 2024 WL 4355063, at *4. In accordance with that discretion, and pursuant to the "single, best meaning," without any particular deference to the BOP's interpretation of the statute, *Loper Bright,* 144 S. Ct. at 2266, BOP is responsible for determining when an eligible inmate under 18 U.S.C. § 3632(d)(4)(D), is "successfully participating" in approved EBRR programming or PAs assigned by the BOP. As stated *supra,* the statute is designed to permit prisoners to receive ETCs for participating in assigned EBRR programs, *see* § 3632(d)(4)(A), and it requires the BOP to make such assignments, through the implementation of a required "System." Notably, the statute provides:

> The System shall provide guidance on the type, amount, and intensity of evidence-based recidivism reduction programming and productive activities that shall be assigned for each prisoner, including—
> (1) programs in which the Bureau of Prisons shall assign the prisoner to participate, according to the prisoner's specific criminogenic needs; and
> (2) information on the best ways that the Bureau of Prisons can tailor the programs to the specific criminogenic needs of each prisoner so as to most effectively lower each prisoner's risk of recidivism.

18 U.S.C. § 3632(b).

As held in *Dunlap,* 2024 WL 5285006, at \*7, where the court evaluated 28 C.F.R. § 523.41(c) under the now-governing *Loper Bright* standard, "there is nothing in the text of the FSA that can be read as suggesting that the EBRR programming to be "successfully complete[d]" could refer to anything other than the assigned EBRR programming described in the immediately adjacent sections of the statute. Reading the statute otherwise would strain the statutory language." The court further held:

> The FSA is plainly designed to, and does, create a system whereby programming is matched to prisoners' needs, and credits are meted out for successful participation in such tailored programming. It would make no sense to mandate a system for identifying and assigning appropriate EBRR programming (and to link ETCs to the successful completion of such programming) if participation in other programming (of whatever description) could earn a prisoner ETCs without regard to whether that programming is appropriate to that prisoner's needs.

*Id.* at \*7. Thus, even under *Loper Bright,* where courts independently interpret clear statutory text but may give weight to agency expertise when persuasive, the BOP's interpretation here is reasonable and consistent with the statute's design and thus warrants deference.

Lastly, even if this Court believes reconsideration of this matter is appropriate under the principles enumerated in *Skidmore*, *see Nicoletti*, 2025 WL 80294, at \*2, the lower court's decision should still be affirmed.

In *Skidmore,* the Supreme Court explained what gives an agency interpretation, such as a program statement, the "power to persuade":

48

> We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

*Cunningham v. Scibana,* 259 F.3d 303, 306–07 (4th Cir. 2001).  Thus, "if a statute is ambiguous, courts exercise their independent judgment to determine the single, best meaning, but do so with the agency's body of experience and informed judgment' ... at [their] disposal." *Valladares,* 130 F.4th at 83–84, (citing *Loper Bright,* 603 U.S. at 400, 402, 412) (internal quotations omitted). "The weight that courts afford an agency's interpretation depends upon the thoroughness evident in the agency's consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*, 982 F.3d 258, 264 (4th Cir. 2020) (cleaned up); *see also Perez v. Cuccinelli*, 949 F.3d 865, 877 (4th Cir. 2020) (Absent eligibility for *Chevron* deference, agency interpretations are only given a level of respect commensurate with their persuasiveness." (internal quotation marks omitted)); *Knox Creek Coal Co.*, 811 F.3d 148, 160 (4th Cir. 2016) (listing factors). Other factors used to assess a rule's persuasiveness include "the degree of the agency's care, its consistency, formality, and relative expertness." *Carlton*, 982 F.3d

49

at 264–65 (internal quotation marks omitted). The application of this "approach has produced a spectrum of judicial responses from great respect at one end, to near indifference at the other." *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001) (citations omitted).

Here, the lower court properly determined that 28 C.F.R. § 523.41(c) and accompanying program statement, 5410.01, were entitled to deference, both under *Chevron* and *Skidmore.* J.A. 193. The BOP properly denied White approximately four days of ETCs, between July 21, 2022, and July 25, 2022, when he was at FTC Oklahoma City. Thus, under BOP's regulation and the plain statutory language, he was not successfully participating in programming and is not entitled to earn ETCs for that period of time. Even though FTC Oklahoma City is a BOP institution, while at FTC Oklahoma City, White engaged in no EBRR or PA programming whatsoever, nor does he show that he did, or even that he could have during his brief stay there. Accordingly, this Court should affirm the lower court's decision in its entirety.

***

For these reasons, this Court should (1) affirm the lower court's holding that White is not entitled to a liberty interest in the earning and/or application of ETCs that is protected by the Fifth Amendment to the United States Constitution; and (2) uphold the validity of 28 C.F.R. § 523.41(c) in determining that the BOP properly

50

denied White approximately four days of ETCs while he was in transfer status at

FTC Oklahoma City.

## CONCLUSION

For the foregoing reasons, the Appellee respectfully requests that this Court

affirm the judgment of the United States District Court for the District of Maryland.

Respectfully submitted,

Kelly O. Hayes
United States Attorney

/s/ Beatrice C. Thomas
Beatrice C. Thomas
Assistant United States Attorney
36 South Charles Street, 4th Floor
Baltimore, Maryland 21201
410-209-4848
beatrice.thomas@usdoj.gov

*Counsel for Appellee, Warden, FCI - Cumberland*

51

## CERTIFICATE OF SERVICE

I certify that on July 23, 2025, the foregoing documents was served on

Appellant's counsel of record through the CM/ECF system.


Respectfully submitted,


Kelly O. Hayes
United States Attorney

        /s/ Beatrice C. Thomas
Beatrice C. Thomas
Assistant United States Attorney
36 South Charles Street, 4th Floor
Baltimore, Maryland 21201
410-209-4848
beatrice.thomas@usdoj.gov

*Counsel for Appellee, Warden, FCI - Cumberland*

52

**No. 23-7116**

Caption: <u>William White v. Warden, Federal Correctional Institution - Cumberland</u>

**CERTIFICATE OF COMPLIANCE
WITH RULE 28.1(e) and 32(a), (f)**

Certificate of Compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitation of Fed. R. App. P.28.1(e)(2) or 32(a)(7)(B) because:

   - **This brief contains 11,472 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).**
   - **This brief uses monospaced type and contains 1,034 lines.**

2. This brief complies with the typeface requirements of Fed. R. App. P.32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   - **This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman, 14 pt.**

Date: July 23, 2025            <u>/s/ Beatrice C. Thomas</u>
                                      Beatrice C. Thomas
                                      Assistant United States Attorney
                                      Counsel for Appellee-Respondent

53