**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 23-7116**

---

WILLIAM A. WHITE,

         Petitioner - Appellant,

     v.

WARDEN OF FEDERAL CORRECTIONAL INSTITUTION - CUMBERLAND,

         Respondent - Appellee.

---

Appeal from the United States District Court for the District of Maryland, at Baltimore. Deborah K. Chasanow, Senior District Judge. (1:22-cv-02371-DKC)

---

Argued: September 9, 2025             Decided: January 13, 2026

---

Before WILKINSON, NIEMEYER, and KING, Circuit Judges.

---

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Wilkinson joined. Judge King wrote a dissenting opinion.

---

**ARGUED:** Claire Victoria Madill, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Greenbelt, Maryland, for Appellant. Beatrice Campbell Thomas, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** James Wyda, Federal Public Defender, Patricia L. Richman, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Greenbelt, Maryland, for Appellant. Kelly O. Hayes, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

NIEMEYER, Circuit Judge:

As a federal prisoner, William White is entitled to jail-time credits under the First Step Act of 2018 (FSA) for participating in specified programming administered by the Bureau of Prisons (BOP) and designed to reduce his risk of recidivism. *See* 18 U.S.C. § 3632(d)(4). Contending that the BOP failed to provide him with programming that would have allowed him to earn FSA time credits during a three-day period while he was housed in a federal transfer center — during transfer from one federal prison to another — he filed this petition for a writ of habeas corpus under 28 U.S.C. § 2241 to obtain an award of such credits. He also contends that the BOP's denial of these jail-time credits violated his rights under the Due Process Clause of the Fifth Amendment by unlawfully extending his incarceration without due process.

The district court denied White's petition, ruling that the BOP's denial of FSA time credits for the three-day transit period was consistent with the BOP's regulations and policy statement. The court noted that an eligible prisoner, such as White, generally will not be considered to be successfully participating in FSA programs when in transit for a few days, explaining that prisoners in transit "are not 'successfully participating' in [recidivism reduction programs] and accordingly they are not able to accrue [FSA time credits]." Because the district court's ruling follows the text of the FSA itself, we need not assess further whether the BOP's regulations and policy statement were correctly applied or, indeed, were even valid. The FSA provides that "[a] prisoner . . . who successfully completes evidence-based recidivism reduction programming or productive activities, shall earn time credits" based on time participating in such programming. 18 U.S.C.

§ 3632(d)(4) (emphasis added).  Because White does not claim that he participated in such programming or activities during the three days he was in transit, he cannot claim that he "earned" FSA time credits.  Accordingly, we affirm.  Moreover, White's argument that the BOP should have offered him such programming during his transfer so that he could have earned the FSA time credits cannot, even if successful, lead to a ruling awarding him such credits because he still would not have shown that he had earned them by actually participating in the programming, as required by the FSA.

I

White is serving a 349-month term of imprisonment with a projected release date in 2037.  While he was housed in Federal Correctional Institution (FCI) Terre Haute in Indiana, the BOP decided to transfer him to FCI Cumberland in Maryland.  Thus, on July 21, 2022, he was transferred first to a transfer center — Federal Transfer Center Oklahoma City — for three full days and then, on July 25, 2022, to FCI Cumberland, where he is currently housed.  Moreover, while in the Federal Transfer Center, he was held in a "Special Housing Unit" for security concerns.

White does not allege that he participated in any FSA programming while in the Transfer Center, and apparently the BOP did not offer him any.  As the BOP explains, a transfer center is "a transitory institution" where the BOP often lacks the tools and prisoner documentation necessary to perform the FSA's recidivism risk assessments and provide programming more generally.  Apparently, White understood this because there is no

3

evidence that he expected to be given programming while in transfer or that he requested it.

Thus, in calculating White's FSA time credits, the BOP denied White any credits for the three days he spent in the Transfer Center, citing 28 C.F.R. § 523.41(c)(4), which provides that a prisoner "will generally not be considered to be 'successfully participating'" in an FSA program when he is, among other situations, housed in a "Special Housing Unit" or designated "outside the institution."

Acting pro se, White filed this petition for a writ of habeas corpus under 28 U.S.C. § 2241, seeking an order awarding FSA time credits based on the three days he spent in the Transfer Center. He alleged that under BOP's regulations and practices, he was entitled to FSA time credits regardless of his participation in programming because, as he claims, "a prisoner needs to do little more than be in the BOP and not refuse [FSA] programming." And he asserts that the only reason he could not earn FSA time credits under that standard was that he was placed in a Special Housing Unit and in transfer status and that the BOP placed him there without due process, thus denying him programming. But, he added, "This is not about [a Special Housing Unit] confinement per se. The BOP may or may not have been permitted to place me in [Special Housing Unit]. But, the BOP was not permitted to impose loss of [FSA time credits] as a collateral consequence of [Special Housing Unit] confinement without Due Process." Thus, White maintains that he was effectively denied FSA time credits because he was placed in these designations without due process, which presumes that if he had not been placed in the Special Housing Unit or in transfer status, he would have then received FSA time credits even without participating

4

in programming. White requested an order directing the BOP to award FSA time credits for the three days he was detained at the Transfer Center, which would have amounted to one day less in prison. *See* 18 U.S.C. § 3632(d)(4)(A)(i).

The district court denied White's petition, ruling that the BOP's decision based on its regulations and policy statement was at least entitled to respect. It observed that the BOP's regulations were a permissible interpretation of the FSA under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), and that its policy statement was entitled to respect under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). It found that denying FSA time credits for "time spent in transfer status in [Oklahoma] City makes sense and thus is entitled to respect." Thus, the court held that White "is not entitled to the credit that he seeks." The district court also rejected White's due process argument under the Fifth Amendment, reasoning that the FSA did not provide White with a protected liberty interest in earning credits during each day of incarceration. And it concluded that White was not entitled to process before the BOP transferred him from FCI Terre Haute, via the Transfer Center, to FCI Cumberland.

From the district court's judgment dated July 31, 2023, White filed this appeal. And to represent White on appeal, we appointed the Federal Public Defender for the District of Maryland.[*]

---

[*] We are especially grateful to Ms. Claire Madill, who ably represented White in this appeal.

5

II

White contends first that the district court erred in applying *Chevron*, which has since been overruled by the Supreme Court, to uphold the BOP regulation that, he argues, "contravenes the plain text of the FSA." He notes that this regulation, 28 C.F.R. § 523.41(c)(4), creates exceptions to when FSA programming must be provided, whereas the FSA itself "mandates that all eligible people earn FSA time credits any time after the date their sentence commences." (Citing 18 U.S.C. § 3632(d)(4)(B)); *see also* 18 U.S.C. § 3585(a).

White is, of course, correct that the Supreme Court overruled *Chevron* in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), explaining that proper judicial function requires courts to exercise independent judgment to determine a statute's "single, best meaning" rather than deferring to an agency's interpretation when a statute is ambiguous. *Id.* at 400. That said, however, *Loper* also noted that courts remain free to seek aid from "the interpretations of those responsible for implementing particular statutes." *Id.* at 394. But at bottom, the Court held that a court construing a statute has the responsibility itself of finding the best reading of the statute — "the reading the court would have reached if no agency were involved." *Id.* at 400 (cleaned up).

We thus must determine whether, *under the best reading* of the FSA, the district court correctly ruled that White is not entitled to FSA time credits for his three-day transitory stay in the Federal Transfer Center Oklahoma City, where no FSA programming was offered and where there is no evidence that White even requested such programming while there.

6

Title I of the First Step Act of 2018 was enacted to promote the release of prisoners who possess a reduced risk of recidivism and thus to reduce the federal prison population. In general, the Act requires that the Attorney General develop a "risk and needs assessment system" to be used by the BOP (1) to determine each federal prisoner's "recidivism risk" and "risk of violent or serious misconduct"; (2) to assign the prisoner to "appropriate evidence-based recidivism reduction programs or productive activities"; and (3) to assess when a prisoner is "ready to transfer into prerelease custody or supervised release." 18 U.S.C. § 3632(a). The Act also charges the BOP with the task of providing "all prisoners with the opportunity to actively participate in evidence-based recidivism reduction programs or productive activities . . . throughout their entire term of incarceration." *Id.* § 3621(h)(6).

Prisoners are given incentives and rewards "to participate in and complete evidence-based recidivism reduction programs" with various privileges, benefits, and, as applicable here, jail-time credits that may reduce a prisoner's time of incarceration. *Id.* § 3632(d). Thus, the FSA provides that "[a] prisoner . . . who successfully completes evidence-based recidivism reduction programming or productive activities, shall earn time credits" "for every 30 days of successful participation" in such programming or productive activities. *Id.* § 3632(d)(4)(A). In particular, a prisoner can "earn 10 days of time credits for every 30 days of successful participation," and, if that prisoner has been assessed to have a "minimum or low risk of recidivating," he can "earn an additional 5 days of time credits for every 30 days of successful participation." *Id.* In short, a prisoner who "successfully *completes*" qualified programming "shall *earn* time credits" "for every 30 days of

7

successful *participation*" in the programming.  The requirements of completing, earning, and participating are defined with active verbs requiring conforming action by the prisoner.

In this case, the record does not demonstrate, nor does it at all suggest, that White participated in or completed any programming to earn credits during his three days in the Federal Transfer Center Oklahoma City while transferring from FCI Terre Haute to FCI Cumberland.  Nor does White contend that he participated in any programming there. Indeed, the BOP provides practical reasons for why it did not offer programming during the transfer.  Because White did not participate in programming, he could not earn credits, and therefore the BOP was correct in denying them for that three-day period.  The statute is plain; it requires *participation* for *credits*.

Nonetheless, White seeks an order awarding credits, not based on his participation in programming but based on his claim that the BOP wrongfully failed to provide him with programming, as required by the FSA.  He points to the statutory requirement that the BOP is required to provide prisoners with the opportunity to participate in programming "throughout their entire term of incarceration," 18 U.S.C. § 3621(h)(6), and therefore argues that it should have given him that opportunity while he was in the Transfer Center. Moreover, he argues that the statute mandates the blanket awarding of credits to every eligible inmate *for each day* that he has not affirmatively opted out of qualifying programming, and that anything less thwarts Congress's goal of reducing the inmate's risks of recidivism.  Thus, he asserts, the BOP must either provide him programming or award him credits, even without his actual participation in programming.

First, we observe that the record evidence indicates that White has thus far been provided the opportunity to participate in programming throughout his incarceration, at least since FSA time credits became available, as evidenced by the large number of credits — at least 520 credit days — that he had already received as of the time of proceedings before the district court, more than two years ago. Those credits remain applicable, as provided by statute and regulation. *See* 18 U.S.C. § 3624(g); 28 C.F.R. § 523.44. Moreover, the record contains no evidence that the BOP ever denied a request by White to participate in programming.

In addition, White's claim that the BOP is required to provide programming *every day* throughout his incarceration is belied by the broader requirements of the FSA and by common sense. For instance, the BOP is directed to determine "the type and amount" of programming that is appropriate *for each prisoner*, 18 U.S.C. §§ 3632(a)(3), 3621(h)(2), indicating that programming is not a matter that flows continuously every day, but is customized for and provided to each prisoner. It would defy common sense and be inconsistent with the FSA to conclude that under such a scheme, a prisoner must be provided programming every single day. A prisoner often cannot receive programming while being taken to a hospital or even sick bay for medical care; or while being transported by bus to another prison or similar institution; or while being delivered to court, as required. Yet, the FSA also requires the BOP to fulfill these functions. *See id*. § 3621(i) (requiring the BOP to provide access to medical care); *id.* § 3621(b) (authorizing the BOP to transfer prisoners from one facility to another); *id.* § 3621(d) (requiring the BOP to deliver prisoners to court, as required). And the BOP's regulations attempt to implement these obligations.

9

*See, e.g.*, 28 C.F.R. § 523.41(c)(4) (noting that programming will generally not be available to prisoners in certain situations, such as when a prisoner is in a Special Housing Unit or is "outside the institution").

Moreover, if White believed that the BOP had wrongfully denied him programming on any given day during his incarceration, he could have requested, as the remedy, an administrative correction of the omission or even a court order directing the BOP to provide the claimed programming. But the fact that White was not provided with programming and therefore was unable to earn FSA time credits does not provide a basis for an order awarding time credits as a remedy. Congress made clear that time credits have to be *earned* by successful *participation* in programming, and we are not free to award such credits for periods during which a prisoner does not satisfy Congress's requirement.

At bottom, because White did not participate in programming while at Federal Transfer Center Oklahoma City, he cannot claim that, under the FSA, he earned time credits for a period during which he did not participate in programming. That conclusion flows straight from the FSA, which is not ambiguous in this regard. The Act provides that "a prisoner . . . who successfully completes evidence-based recidivism reduction programming or productive activities, shall earn time credits" "for every 30 days of successful participating" in such programming or productive activities. 18 U.S.C. § 3632(d)(4)(A). White has not satisfied those statutory requirements and therefore is not entitled to the credits for the three days he spent at the Federal Transfer Center.

White argues nonetheless that the BOP often awards FSA time credits to inmates in situations in which the prisoner has opted into FSA programming but has not actually

10

participated in a program, basing the awards of such credits on the prisoner's "earning status" and not on participation in and completion of programming. Although the BOP's program statements and practice about this approach are neither clear nor consistent, we conclude that if they reflect that the BOP awards credits for non-participation, that practice goes beyond the text of the FSA and its regulations. But more importantly, the BOP's decision to award credits absent actual participation does not expand its statutory obligations under the FSA. The law remains clear that a prisoner's statutory right to FSA time credits is tied to his actual participation in qualified programming. And in the absence of evidence that White participated in programming during his three-day stay at the Transfer Center, the BOP did not have a statutory obligation to award him FSA time credits for those days. *See, e.g.*, *Dunlap v. Warden FMC Devens*, Civ. A. No. 24-11462, 2024 WL 5285006, at *8 (D. Mass. Dec. 13, 2024) ("It is difficult to discern much consistency in the BOP's practices, which sometimes grant [FSA time credits] to prisoners without regard to any actual participation, but that does not mean that the FSA creates an entitlement to receive [FSA time credits] under such circumstances").

Finally, White contends that, in any event, the BOP intentionally waived the actual-participation argument before the district court by relying exclusively on a definition of "successful participation" in the regulations that provides exceptions to actual participation. He argues that because the BOP made the intentional choice to steer the district court toward its regulatory argument, the BOP waived its ability to advance the more fundamental statutory argument that "successful participation" requires some actual participation.

This argument, however, focuses far too myopically on the BOP's arguments before the district court and, indeed, its arguments before this court. To be sure, before the district court, the BOP did argue that White was not entitled to FSA time credits because he was in a transitory status, as well as being housed in a Special Housing Unit, relying on those exceptions provided in 28 C.F.R. § 523.41(c)(4). Although those arguments are grounded in specific regulatory exceptions to the requirement of successful participation contained in the statute, they still address the statutory requirement of "participation." Indeed, 28 C.F.R. § 523.41(c) begins, "An eligible inmate *must be 'successfully participating'* [in programming] to earn FSA Time Credits," parroting the statutory language in § 3632(d)(4)(A). (Emphasis added). The district court understood the BOP's argument to be that "Mr. White was statutorily ineligible to earn [FSA time credits]" based on regulatory exceptions, and it agreed with that argument, concluding that it made sense. But throughout the proceedings, the BOP did not waive or forfeit the underlying requirement that White had to show he successfully participated in FSA programming to earn credits, as required by the terms of the FSA and the regulation. The parties' arguments before the district court were various and wide-ranging, but both parties were, in essence, addressing whether White, directly or indirectly, satisfied the statutory requirement for earning FSA time credits by participating in programming during his stay in the Federal Transfer Center.

Moreover, the BOP continues the same argument on appeal, arguing more specifically, "White's argument is counter *to the plain text of the FSA*, which ties the award of [FSA time credits] to the successful participation in [programming] and not to an inmate's mere presence in a BOP facility during transfer status." (Emphasis added). The

12

BOP argues further that "Congress's intent to link [FSA time credits] directly to recidivism-reduction program *participation* rather than passive confinement . . . means he earned no" FSA time credits during his time at the Transfer Center.

Finally, we understand that both parties have been focusing throughout on the question whether White earned FSA credits by participating in FSA programming at the Transfer Center. To be sure, the parties' arguments may have wandered into regulations, program statements, practices, and even waiver and forfeiture, but all were essentially aimed at the same question — FSA compliance. In these circumstances, we cannot conclude that statutory arguments were waived or forfeited by either party.

In short, relying on the FSA, we affirm the district court's conclusion that White has not shown that he earned FSA time credits with respect to his stay at the Federal Transfer Center Oklahoma City, where he did not participate in any qualified programming. For White, it is not a question of whether he *successfully* participated; it is a question of whether he participated *at all*, and the record shows that he did not.

## III

White also contends that the "FSA has created a legitimate expectation that qualifying individuals will earn FSA time credits . . . affect[ing] whether a person is getting out of prison" and thus has created a liberty interest in those credits protected by the Due Process Clause of the Fifth Amendment. He argues that the FSA created that expectation by using "mandatory language and limit[ing] the government's discretion to withhold [FSA time credits]." *See Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S.

13

1, 11–12 (1979). And, in advancing this argument, he recognizes that for the Due Process Clause to apply, the statutory or regulatory language must create "an entitlement" in order to receive constitutional protection.

The Fifth Amendment provides, in relevant part, that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend V. And to show a violation as to liberty, "a plaintiff must (1) identify a protected liberty . . . interest and (2) demonstrate deprivation of that interest without due process of law." *Cartagena v. Lovell,* 103 F.4th 171, 182 (4th Cir. 2024) (quoting *Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015) (addressing the Due Process Clause of the Fourteenth Amendment)).

Addressing the first requirement, we conclude that a prisoner claiming rights to FSA time credits cannot show that he has a statutory entitlement to those credits. Although awarding FSA time credits is mandatory *if* the prisoner qualifies for and earns them, those conditions, which are solely determinative of the right to credits, indicate that the prisoner cannot legitimately expect that he has *a right* to them. Under the FSA, a prisoner must first qualify for the opportunity to earn credits by an initial assessment of his recidivism risk and regular reassessments thereafter under a comprehensive and complex "risks and needs assessment system." 18 U.S.C. § 3632. Moreover, even if a prisoner is eligible for the opportunity to earn FSA time credits, he may lose that opportunity during certain periods for reasons untethered to his conduct, such as due to practical limitations on the BOP's ability to provide qualifying programming in given situations. *See, e.g.,* 18 U.S.C. § 3621. Additionally, an eligible prisoner with the opportunity to earn credits can only do so

14

through "successful participation" in and "successful[] complet[ion]" of programming that is designed specifically for him, based on the BOP's assessments. *Id.* § 3632(d)(4). And in any event, the credits, even after they have been earned, are subject to withdrawal if the prisoner violates certain rules in prison. *See id.* § 3632(e). In addition, they may only be applied to reduce the prisoner's term of incarceration if he has a sufficiently low risk of recidivism or if the warden approves a waiver of that requirement. *See id.* § 3624(g).

Because the earning and application of FSA time credits are contingent upon numerous conditions both within and outside of a prisoner's control, the FSA does not create a statutory entitlement to those credits.

In so concluding, we join the other courts of appeals that have addressed the issue and concluded that the FSA does not create a protected liberty interest in earning FSA time credits. *See Vargas v. Rivers*, No. 24-10703, 2025 WL 1380067, at *1 (5th Cir. May 13, 2025) (per curiam) (concluding inmates have "no fundamental liberty interest in either participation in [qualifying programming] or the incentives associated with that voluntary participation, including the ability to earn FSA time credits"); *Sedlacek v. Rardin*, No. 24-1254, 2025 WL 948485, at *1 (6th Cir. Jan. 21, 2025) (concluding "because the FSA earned-time credits are conditional [on the inmate's participation in qualifying programs], they do not create a protected liberty interest"); *see also Cheng v. United States*, 132 F.4th 655, 659 (2d Cir. 2025) (per curiam).

At bottom, because the text of the FSA does not create a statutory entitlement for a prisoner to earn FSA time credits, we conclude that White did not have a constitutionally

15

protected liberty interest in earning them, and the BOP therefore did not violate his rights under the Due Process Clause in denying them to him.

\*    \*    \*

While FSA time credits are mandatorily granted to federal prisoners who earn them by participating in qualifying programming, White did not participate in any programming at all during the three-day period during which he was transferred from one federal institution to another. He therefore did not earn FSA time credits during that period, nor did he have a protected liberty interest in doing so. For the reasons we give herein, we affirm the district court's judgment denying White's § 2241 petition.

AFFIRMED

16

KING, Circuit Judge, dissenting:

Petitioner William A. White has asserted claims — one statutory and the other constitutional — that he was wrongly denied a single time credit under the First Step Act of 2018 (the "FSA").  The district court rejected both claims, and my distinguished friends in the panel majority now affirm the court's judgment.

In rejecting White's statutory claim, however, the district court improperly accepted the patently meritless theory that the respondent Warden (the "government") relied on below.  I would reverse the court's judgment on this simple basis.[1]

I also take issue with the panel majority's decision, which adopts a new theory with respect to White's statutory claim that the government raises for the first time on appeal and thus never presented to the district court.  There are three significant problems with the panel majority's decision.  First, the new theory adopted by the majority was waived by the government.  Second, the new theory lacks factual substantiation.  And third, the new theory runs headlong into the plain text of the FSA, along with Bureau of Prisons ("BOP") policies and practices.

Consequently, I dissent.

---

[1] To be clear, I would heed the constitutional avoidance doctrine and reverse the judgment without unnecessarily reviewing the district court's rejection of White's separate constitutional claim.  *See Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) (explaining that we do "not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of").

I.

I begin by addressing the theory that was advanced by the government below and accepted by the district court with respect to White's statutory claim. Again, I would reverse the court's judgment on the simple basis that this theory is patently meritless.

A.

1.

As brief background, under the FSA, an eligible prisoner "who successfully completes evidence-based recidivism reduction programming or productive activities, shall earn time credits." *See* 18 U.S.C. § 3632(d)(4). At a minimum, such "[a] prisoner shall earn 10 days of time credits for every 30 days of successful participation." *Id.* § 3632(d)(4)(A)(i). The FSA makes no exceptions for when the programs and activities are to be provided. Rather, Congress instructed the BOP to "provide all prisoners with the opportunity to actively participate in evidence-based recidivism reduction programs or productive activities, according to their specific criminogenic needs, *throughout their entire term of incarceration*." *Id.* § 3621(h)(6) (emphasis added).

By way of regulations that took effect on January 19, 2022, the BOP has sought to define "successful participation." *See* 28 C.F.R. § 523.41(c). Notably, the regulations contemplate that there may be "[t]emporary operational or programmatic interruptions authorized by the [BOP] that would prevent an inmate from participation." *Id.* § 523.41(c)(3). According to the regulations, such interruptions "will not ordinarily affect an eligible inmate's 'successful participation' for the purposes of FSA Time Credit eligibility." *Id.*

18

The regulations provide, however, that a prisoner "will generally not be considered to be 'successfully participating' . . . in situations including, but not limited to," the following:

(i)       Placement in a Special Housing Unit [hereinafter, the "SHU"];

(ii)     Designation status outside the institution (e.g., for extended medical placement in a hospital or outside institution, an escorted trip, a furlough, etc.);

(iii)    Temporary transfer to the custody of another Federal or non-Federal government agency (e.g., on state or Federal writ, transfer to state custody for service of sentence, etc.);

(iv)    Placement in mental health/psychiatric holds; or

(v)     "Opting out" (choosing not to participate in the [programs or activities] that the [BOP] has recommended based on the inmate's individualized risk and needs assessment).

*See* 28 C.F.R. § 523.41(c)(4).

As the government explained in its submissions to the district court in these proceedings, Congress enacted the FSA on December 21, 2018, and required the BOP to fully implement the FSA time credit system by January 2022. *See* J.A. 143-44.[2] In an exercise of discretion, the BOP resolved to retroactively award FSA time credits to eligible prisoners as of the FSA's enactment date of December 21, 2018. *Id.* at 144.

Under the government's own evidence, the BOP outlined the standards for awarding FSA time credits in an "Inmate Message" issued to all prisoners on August 30, 2022. *See*

---

[2] Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.

19

J.A. 76-77, 98-99.  The Inmate Message delineated December 21, 2018, through January 14, 2020, as a "presumed participation" period.  *Id.* at 98.  Relevant here, the Inmate Message further advised that from January 15, 2020, forward:

> The earning of [FSA time credits] is based on "earning status," and NOT participation and/or completion of individual programs.  Inmates who refuse or fail to complete any portion of the needs assessment and/or refuse or decline any program recommended to address a[] specific identified need area, is considered "opted out" and will not earn [FSA time credits].

*Id*.  Consistent with the Inmate Message, the government's evidence shows that prisoners who maintain "earning status" by not "opting out" or otherwise falling within an exception to "successful participation" set forth in 28 C.F.R. § 523.41(c)(4) have been automatically awarded FSA time credits.  Moreover, there is no evidence that the BOP has ever tracked, or even had the means to track, the actual day-to-day participation of any prisoner.

2.

Proceeding pro se, White filed his handwritten petition for a writ of habeas corpus under 28 U.S.C. § 2241 in the District of Maryland in September 2022, asserting his statutory and constitutional claims.  White challenges the denial of a single FSA time credit for the three full days he spent in the Federal Transfer Center ("FTC") at Oklahoma City, Oklahoma, in late July 2022 while being transferred from the Federal Correctional Institution at Terre Haute, Indiana, to that at Cumberland, Maryland.  The government responded to White's § 2241 petition in late October 2022 with a motion for dismissal or, in the alternative, an award of summary judgment.

Relevant to the statutory claim, White and the government agreed in the motion proceedings on how the FSA time credit system works.  That is, both parties portrayed the

20

FSA time credit system in a manner consistent with the government's evidence, including the Inmate Message of August 2022 advising that "[t]he earning of [FSA time credits] is based on 'earning status,' and NOT participation and/or completion of individual programs." *See* J.A. 98.

For his part, White described "successful participation" as a "default condition" for prisoners who do not "opt out" of programming or otherwise fall within one of the exceptions set forth in 28 C.F.R. § 523.41(c)(4). *See* J.A. 7. White emphasized that "[t]o earn [FSA time credits], a prisoner needs to do little more than be in the BOP and not refuse programming." *Id.* at 8. Rather than disputing White's description, the government similarly described an "opt-in" process under which prisoners automatically earn FSA time credits absent "opting out" or being subject to another § 523.41(c)(4) exception. *Id.* at 144-46. Moreover, the parties agreed that White is statutorily eligible to earn FSA time credits, that he has largely maintained "earning status," and that he has been automatically awarded FSA time credits while doing so.

Where the parties disagreed is on whether White fell within a § 523.41(c)(4) exception during his short stint in FTC-Oklahoma City. White's § 2241 petition suggested that the only exception that could apply was the § 523.41(c)(4)(i) exception for SHU placement. *See* J.A. 8-9. The petition explicitly asserted that the other § 523.41(c)(4) exceptions, "such as when on a medical trip or psychiatric hold, are also likely unlawful or un-Constitutional, but, are not at issue here." *Id.* at 8 (specifically identifying the § 523.41(c)(4)(ii) and (iv) exceptions as inapplicable to White).

In its responsive motion, the government initially contended that White lacked "earning status" because he was both placed in the SHU and in so-called "transfer status." *See* J.A. 17, 26. The government invoked § 523.41(c)(4)(i) as to its SHU contention, but it cited no particular § 523.41(c)(4) exception as to its "transfer status" contention.

By the time of its final submission to the district court — a supplemental submission of March 2023 — the government had abandoned its SHU contention and was relying entirely on its "transfer status" contention. *See* J.A. 165. In the supplemental submission, the government finally identified a basis for its "transfer status" contention: the § 523.41(c)(4)(ii) exception for "[d]esignation status outside the institution (e.g., for extended medical placement in a hospital or outside institution, an escorted trip, a furlough, etc.)." Specifically, the government asserted — without elaboration — that White "was in transfer status" and could not earn FSA time credits "while in a designation outside the institution." *Id.* at 166.

3.

For reasons explained in its Memorandum Opinion of July 2023, the district court denied White's 28 U.S.C. § 2241 petition. *See White v. Warden of Fed. Corr. Inst. – Cumberland*, No. 1:22-cv-02371 (D. Md. July 31, 2023), ECF No. 12 (the "Opinion"). In rejecting White's statutory claim, the court recognized that the issue before it was whether the BOP properly denied White an FSA time credit for the three full days he spent in FTC-Oklahoma City because he was in "transfer status." *See* Opinion 5. Referring to the government's supplemental submission of March 2023, the court described the government's theory as being that White was "not entitled to credit for the days that he was

22

in transfer status," in that he could not earn FSA time credits "'while in a designation outside the institution.'" *Id.* (quoting J.A. 166).

The district court was thus left to assess whether White was subject to the 28 C.F.R. § 523.41(c)(4)(ii) exception. Significantly, the court was thereby presented with at least two distinct questions: (1) whether § 523.41(c)(4)(ii) is a valid interpretation of the FSA; and (2) whether, as the government finally contended late in the motion proceedings, White's "transfer status" at FTC-Oklahoma City constituted "[d]esignation status outside the institution" within the meaning of § 523.41(c)(4)(ii), or whether, as White had asserted at the very start of the motion proceedings, the § 523.41(c)(4)(ii) exception was inapplicable to him.

The district court analyzed only the first question, concluding that § 523.41(c)(4)(ii) is indeed a valid interpretation of the FSA. *See* Opinion 17-18. In so doing, the court observed that because the FSA does not define "successful participation," Congress allowed the BOP to resolve that ambiguity in the statute. The court further recognized that the BOP's interpretation of the FSA was entitled to deference under the then-controlling precedent of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), which was later overruled by *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). Applying *Chevron* deference, the court upheld the BOP's § 523.41(c)(4)(ii) exception as "reasonable" and "a 'permissible construction of the statute.'" *See* Opinion 18 (quoting *Chevron*, 467 U.S. at 843).

Meanwhile, the district court never grappled with the second question, i.e., whether or not White's "transfer status" at FTC-Oklahoma City constituted "[d]esignation status

23

outside the institution" within the meaning of § 523.41(c)(4)(ii). Rather, the court just accepted that it did, summarily reciting that "successful participation" as defined by § 523.41(c)(4)(ii) excludes "'[d]esignation status outside the institution . . .' *such as Mr. White's few days in transfer status in Oklahoma City*." *See* Opinion 18 (second alteration in original) (emphasis added). Accordingly, the court specified that "Mr. White is not entitled to the credit that he seeks" and rejected his statutory claim. *Id.* at 19.

### B.

Of course, the theory advanced by the government below and accepted by the district court with respect to White's statutory claim — that his "transfer status" at FTC-Oklahoma City constituted "[d]esignation status outside the institution" within the meaning of 28 C.F.R. § 523.41(c)(4)(ii) — is patently meritless. In the words of White, who is now represented by appointed appellate counsel, "the text of [§ 523.41(c)(4)(ii)] does not apply to [him]" because he "was not 'outside the institution' when he was in [FTC-Oklahoma City]." *See* Br. of Appellant 25.

White emphasizes that whereas "a '[d]esignation status outside the institution' suggests someone who is physically exterior to a building or property owned and operated by the BOP," FTC-Oklahoma City "is owned and operated by the BOP" and he "was inside it." *See* Br. of Appellant 26. Additionally, White underscores that

> [t]he examples of "outside the institution" provided in [§ 523.41(c)(4)(ii)] confirm this reading. . . . Here, the general term "[d]esignation status outside the institution" is followed by specific examples, including "extended medical placement in a hospital or outside institution," "an escorted trip," and "a furlough." Those specific terms share an essential feature: they all refer to situations where a prisoner is physically located somewhere other

24

than a BOP facility.  That does not describe White while in [FTC-Oklahoma City].

*Id.* at 26-27 (fourth alteration in original) (citing, inter alia, *Lexington Cnty. Hosp. v. Schweiker*, 740 F.2d 287, 290 (4th Cir. 1984), for the proposition that, in interpreting a regulation, the principle of *ejusdem generis* requires "general language" to "be read as referring only to units similar to those specifically enumerated").

According to White, the inapplicability of § 523.41(c)(4)(ii) is a "fundamental problem" that alone requires reversal of the district court's judgment.  *See* Br. of Appellant 25; *see also* Reply Br. of Appellant 2 (reiterating that "this Court could reverse on the narrow ground that the regulation at issue did not apply to White, as he was not 'outside the institution' while at [FTC-Oklahoma City]").  As such, our Court need not reach and decide any other issue regarding the statutory claim, including whether the district court properly deemed § 523.41(c)(4)(ii) to be a valid interpretation of the FSA by according now-defunct *Chevron* deference.  Nor do we need to review the court's rejection of White's separate constitutional claim.

I readily agree with White and would reverse the district court's judgment on the simple basis that the court erred in accepting the government's theory with respect to White's statutory claim that his "transfer status" at FTC-Oklahoma City constituted "[d]esignation status outside the institution" within the meaning of § 523.41(c)(4)(ii).

II.

I turn to the panel majority's decision and its adoption of a new theory with respect to White's statutory claim that the government raises for the first time on appeal. In so doing, I address in turn the three significant problems therewith.

A.

First, the new theory was waived by the government. Pursuant to the new theory, the plain text of the FSA requires *actual participation* for "successful participation." And White did not actually participate in programming at FTC-Oklahoma City because no programs or activities were provided to him during his short stint there. As the panel majority explains in adopting the new theory: "Because White did not participate in programming, he could not earn credits, and therefore the BOP was correct in denying them for that three-day period. The statute is plain; it requires *participation* for credits." *See ante* 8.

Obviously, the new theory is wholly different from the theory that the government relied on — and thus preserved — below. Under the preserved theory, the meaning of "successful participation" cannot be discerned from the plain text of the FSA, and the BOP allowably resolved that ambiguity in the statute by devising an "opt-in" process under which prisoners automatically earn FSA time credits absent "opting out" or being subject to another exception to "successful participation" set forth in 28 C.F.R. § 523.41(c)(4). The government contended in the district court that White could not earn FSA time credits while at FTC-Oklahoma City simply and solely because his "transfer status" constituted "[d]esignation status outside the institution" within the meaning of § 523.41(c)(4)(ii).

26

In these circumstances, the government's waiver of the new theory is clear. The majority may say otherwise, *see ante* 11-13, but its reasoning is convoluted and unpersuasive.[3]

### B.

Second, the new theory lacks factual substantiation. The record is silent on whether programming was or was not provided to White at FTC-Oklahoma City, as the parties understandably did not present evidence to the district court on this then-irrelevant topic. Yet that does not stop the government from proclaiming on appeal — and the panel majority from accepting — that White was offered no programming at all.

Strikingly, the government and the majority sometimes state this in definitive terms, asserting, e.g., that "no FSA programming was offered" at FTC-Oklahoma City. *See ante* 6; *see also* Br. of Appellee 1, 43 (claiming that White "participated in no programming" at FTC-Oklahoma City because it "is a transitory institution" where the staff "does not have the necessary documentation and resources to perform the initial risk and needs or aid in programming"). At other times, however, their assertions are not so absolute. For example, the government states that "successful participation in programming is *not necessarily*

---

[3] In addition to waiving the new theory, the government now shamelessly blasts White for describing "successful participation" in his 28 U.S.C. § 2241 petition as a "default condition" for prisoners who do not "opt out" of programming or otherwise fall within a § 523.41(c)(4) exception, *see* J.A. 7 — a description that the government agreed with below. In its attack, the government misstates White's position as being that a prisoner is entitled to FSA time credits "merely for being incarcerated" and "passively residing in prison." *See* Br. of Appellee 33. And the government purports that White thereby seeks "to rewrite the FSA and gut Congress's recidivism-reduction mandate." *Id.* at 21.

offered" by the BOP at its transfer centers. *See* Br. of Appellee 19 (emphasis added). And the majority observes that the BOP "*apparently*" did not offer White programming at FTC-Oklahoma City, as "'a transitory institution' where the BOP *often* lacks the tools and prisoner documentation necessary to perform the FSA's recidivism risk assessments and provide programming more generally." *See ante* 3 (emphasis added).

Simply put, the use of "not necessarily," "apparently," and "often" underscores the lack of evidence — the absence of proof crucial to the new theory — that White was provided no programming at FTC-Oklahoma City.[4]

C.

Third and finally, the new theory runs headlong into the plain text of the FSA, along with BOP policies and practices. Contrary to the notion that the BOP need not provide programming at its own transfer centers, the FSA expressly requires the BOP to "provide all prisoners with the opportunity to actively participate . . . *throughout their entire term of incarceration*." *See* 18 U.S.C. § 3621(h)(6) (emphasis added). And contrary to the notion that prisoners cannot earn FSA time credits when the BOP has failed to provide programming, the BOP's regulations specify that although "[t]emporary operational or programmatic interruptions" may "prevent an inmate from participation," such

---

[4] In his reply brief, White emphasizes that "[t]here is no evidence in the record about [his] supposed failure to participate in [programming] while in [FTC-Oklahoma City], nor the availability of programming [there]." *See* Reply Br. of Appellant 8. White thus rightfully requests, "at minimum, reversal and remand" for factual development. *Id.* The majority, however, disregards White's remand request.

interruptions "will not ordinarily affect an eligible inmate's 'successful participation' for the purposes of FSA Time Credit eligibility." *See* 28 C.F.R. § 523.41(c)(3).

The new theory further conflicts with the BOP's Inmate Message of August 2022, which the government submitted to the district court as evidence in these proceedings. Whereas the government now insists that "successful participation" requires actual participation, the Inmate Message advised that "[t]he earning of [FSA time credits] is based on 'earning status," and NOT participation and/or completion of individual programs." *See* J.A. 98. Moreover, there is no evidence that the BOP has ever tracked, or even had the means to track, the actual day-to-day participation of any prisoner.

The panel majority fails to fully or satisfyingly deal with these contradictions, which are all raised by White in his reply brief. For example, the majority acknowledges the FSA's directive to the BOP to provide prisoners with programming "throughout their entire term of incarceration," *see ante* 7 (quoting 18 U.S.C. § 3621(h)(6)), but rejects the proposition that the BOP is thereby "required to provide programming *every day*," *id.* at 9. The majority reasons that — because "the broader requirements of the FSA" include, inter alia, the customization of programming for each prisoner — "[i]t would defy common sense and be inconsistent with the FSA to conclude that under such a scheme, a prisoner must be provided programming every single day." *Id.* Thus, the majority excuses the failure to provide programming in circumstances including — but in no way limited to — when a prisoner is outside a BOP facility (as covered by exceptions to "successful participation" set forth in 28 C.F.R. § 523.41(c)(4), such as being taken to a hospital) and

when, like White, a prisoner is in a BOP transfer center (a situation not covered by a specific § 523.41(c)(4) exception). *See id.* at 9-10.

Meanwhile, the majority fails to acknowledge either the BOP's regulation specifying that interruptions in programming "will not ordinarily affect an eligible inmate's 'successful participation' for the purposes of FSA Time Credit eligibility," *see* 28 C.F.R. § 523.41(c)(3), or the BOP's Inmate Message of April 2022 advising that "[t]he earning of [FSA time credits] is based on 'earning status,' and NOT participation and/or completion of individual programs," *see* J.A. 98. Rather, the majority only summarily declares:

> White argues nonetheless that the BOP often awards FSA time credits to inmates in situations in which the prisoner has opted into FSA programming but has not actually participated in a program, basing the awards of such credits on the prisoner's "earning status" and not on participation in and completion of programming. Although the BOP's program statements and practice about this approach are neither clear nor consistent, we conclude that if they reflect that the BOP awards credits for non-participation, that practice goes beyond the text of the FSA and its regulations. But more importantly, the BOP's decision to award credits absent actual participation does not expand its statutory obligations under the FSA.

*See ante* 10-11.

To make matters worse, the majority further rules that when a prisoner claims that the BOP wrongly failed to provide programming, the prisoner's only recourse is to "request[], as the remedy, an administrative correction of the omission or even a court order directing the BOP to provide the claimed programming." *See ante* 10. That is, the prisoner is not entitled to "an order awarding time credits as a remedy." *Id.* To be entitled to time credits, the prisoner must prove "his actual participation in qualified programming." *Id.* at 11.

So, under the majority's decision, the BOP is excused, without clear limitations, from providing programming to prisoners every day; the BOP can award FSA time credits to some prisoners based on their mere "earning status," but require actual participation of others; prisoners who claim a wrongful denial of programming can seek only future programming; and no back credits can be awarded unless a prisoner can come up with evidence of actual participation, something that, on this record, the BOP itself does not track. As such, the majority does not just flout the plain text of the FSA and the BOP's policies and practices. Its decision also threatens chaos, unequal treatment, and other unfairness in the FSA time credit system.

## III.

Pursuant to the foregoing, I dissent.